# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Savannah Division

|                          |     |                                          |
|--------------------------|-----|------------------------------------------|
|                          | )   |                                          |
|                          | )   |                                          |
|                          | )   |                                          |
|                          | )   |                                          |
|                          | )   |                                          |
|                          | )   |                                          |
| In re:                   | )   |                                          |
|                          | )   | Chapter 11                               |
| A & B Associates, L.P.,  | )   |                                          |
|                          | )   | Number <u>17-40185-EJC</u>               |
| *Debtor.*                | )   |                                          |
|                          | )   | **FILED**                                |
|                          | )   | **Lucinda B. Rauback, Clerk**            |
|                          | )   | **United States Bankruptcy Court**       |
|                          | )   | **Savannah, Georgia**                    |
|                          | )   | *By DReese at 4:43 pm, Sep 26, 2018*     |
|                          | )   |                                          |

## <u>OPINION ON MOTION TO CONVERT TO CHAPTER 7</u>

## I. INTRODUCTION

A & B Associates, L.P. (the "Debtor") filed this Chapter 11 single asset real estate case on February 3, 2017. (Dckt. 1). The Debtor, a limited partnership organized under the laws of the State of Georgia, owns and operates a 96-unit apartment complex in Beaufort County, South Carolina, known as August on Southside (the "Property"). The Debtor's principal creditor is FCRE REL, LLC ("FCRE"), which holds a first priority lien in the Property. FCRE has been an active creditor, both before and after the filing of this case.

Pending before the Court is FCRE's Motion Pursuant to 11 U.S.C. § 1112(b) to Convert this Case to a Case under Chapter 7 and for the Appointment of a Chapter 7

Trustee (the "Motion to Convert"), which was filed on June 13, 2017. (Dckt. 161). In the Motion to Convert, FCRE only requested conversion to Chapter 7, not dismissal of the case. However, in its second supplemental brief,[1] filed on February 2, 2018, FCRE appeared to request, in the alternative, dismissal of the case. (Dckt. 358). At a hearing on April 16, 2018, FCRE clarified through counsel that it only seeks conversion, not dismissal. (Transcript,[2] p. 13).[3]

In its Motion to Convert (dckt. 161) and supplemental briefs (dckt. 333, 358, 388, 418, 475), FCRE essentially makes two arguments concerning the Debtor's eligibility to proceed with reorganization under Chapter 11 based on its limited partnership status under Georgia law. First, FCRE contends that the entity that filed the petition, ABGP, Inc., ostensibly the Debtor's general partner as of 2010, lacked authority to do so because it was never properly admitted as a general partner. Second, FCRE contends that the Debtor cannot be a debtor under 11 U.S.C. § 109(d) because the limited partnership was dissolved, or at least rendered moribund, by the administrative dissolution in 2005 of its erstwhile general partner, also called ABGP, Inc.

---

[1] This document was entitled "Secured Creditor FCRE REL, LLC's Second Supplemental Brief to its Motion Pursuant to 11 U.S.C. § 1112(b) to Convert this Case to a Case under Chapter 7 and for the Appointment of a Chapter 7 Trustee [Dkt. #161]; or in the Alternative, Motion for the Dismissal of the Petition for Lack of Authority to File." (Dckt. 358).

[2] This designation shall be used in reference to the transcript of the April 16, 2008 hearing. (Dckt. 438.)

[3] Nevertheless, counsel for FCRE recognized that if the Debtor lacked authority to file bankruptcy, then the Court might be required to dismiss this case. (Transcript, p. 148).

Although this case has been proceeding toward confirmation,[4] the Court must not further delay a resolution of these fundamental questions. Accordingly, at a status conference held on February 21, 2018, the Court advised counsel that an evidentiary hearing would be scheduled as to the narrow issues surrounding the organization of the Debtor and whether certain alleged defects in its general partner's status would prevent this case from moving forward. The Court directed the parties to stipulate to as many facts (and there are dozens, if not hundreds, bearing on these issues) as possible, and to stipulate to the admissibility of as many documents (and there are dozens of these, as well) as possible, so that any evidence that may be needed to supplement an otherwise replete record could be received with a minimum of time. (Dckt. 370, p. 9).

This matter was scheduled for hearing on April 16, 2018. (Dckt. 375). The parties failed to accommodate the Court's request regarding factual stipulations and instead submitted separate "stipulations." (Dckt. 385, 390). Prior to the hearing, however, the parties did stipulate to the admissibility of numerous documents.[5] (Transcript, pp. 17, 28-30). At the hearing, the Court heard testimony from L. Christopher Kettles ("Mr. Kettles"), the authorized representative of ABGP, Inc., the Debtor's "managing" general partner. The Court also admitted certain additional exhibits into evidence. The parties were given an opportunity to brief the Court on the issues, and the matter is now ripe for ruling.

As set forth below, the Court finds that the limited partnership formed in 1976

---

[4] A confirmation hearing in this case is scheduled for October 1, 2018.

[5] Specifically, the parties stipulated to the admissibility of all documents attached as exhibits to FCRE's "Stipulation and Brief" (dckt. 385) filed on April 9, 2018.

known as A & B Associates, L.P. remains a viable limited partnership under Georgia law, eligible to be a debtor under Chapter 11 pursuant to 11 U.S.C. § 109(d), and that the petition in this case was filed by its general partner with authority to do so. Accordingly, the Court will deny the Motion to Convert (dckt. 161) as to this narrow ground. By separate order the Court will also deny the Motion to Convert on all other grounds asserted by FCRE, and this case will proceed to confirmation. This Opinion constitutes the Court's Findings of Fact and Conclusions of Law. To the extent that any findings of fact herein are construed to be conclusions of law, they are hereby adopted as such. To the extent that any conclusions of law herein are construed to be findings of fact, they are hereby adopted as such.

## II. JURISDICTION

This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a), and the Standing Order of Reference signed by then Chief Judge Anthony A. Alaimo on July 13, 1984. This is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(1).

## III. FINDINGS OF FACT

As a preliminary matter, the sources of information regarding the Debtor's formation and subsequent history are limited to the stipulated documents and to the testimony of Mr. Kettles. No other witness with personal knowledge has testified in this case as to matters relating to the limited partnership agreement, amendments to the same, the admission and withdrawal of limited and general partners from the inception of the limited partnership, or the intentions of those parties to the limited partnership agreement. A number of attorneys participated in the preparation of amendments to the limited partnership agreement, the

4

formation of corporate general partners over the years, and efforts to resurrect administratively-dissolved entities. None of those attorneys appeared as witnesses. Moreover, Mr. Kettles himself did not become a party to the limited partnership until 1990. Thus, the Court has heard no testimony regarding the initial formation of the limited partnership in November of 1976 or regarding the initial financing for the construction of the apartment complex. Nevertheless, the Court can make certain limited findings regarding the history of the limited partnership prior to Mr. Kettles' acquisition (through one or more entities) of an interest in the Debtor.[6]

A. Formation of the Limited Partnership and Identity of Early General Partners

As set forth in the Limited Partnership Agreement of A & B Associates, L.P. (the "Limited Partnership Agreement") (FCRE Ex. 1)[7], the Debtor is a limited partnership organized under Georgia law on November 1, 1976, for the purpose of "developing and operating 96 two-story garden type apartments known as the Versailles Apartments[8] . . . on approximately 10.2 acres . . . located in Beaufort County, [South Carolina]." (FCRE Ex. 1, p. 1). The original general partner was PHB, Inc. ("PHB"), the name of which apparently was later changed to The Uniflex Corporation ("Uniflex")[9] (FCRE Ex. 6, p. 1), which owned

---

[6] Unfortunately, Mr. Kettles passed away on June 7, 2018. (Dckt. 468-2).

[7] This designation shall refer to documents submitted by FCRE at the hearing on April 16, 2018. The same documents are available as exhibits to Dckt. 385.

[8] The name of the Property was subsequently changed from the Versaille Apartments to the August on Southside.

[9] An amendment to the Limited Partnership Agreement dated December 29, 1977, was signed by W. Jack Hamilton, III, "for The UNIFLEX Corporation, formerly PHB, Inc." (FCRE Ex. 6, p. 1). As stated in the August 2, 1978 amendment, "[t]he partnership hereby

a 25.03% interest.[10] (FCRE Ex. 1, p. 13). The limited partnership interests were acquired by a variety of individuals and trusts.

The Limited Partnership Agreement was amended several times between 1976 and 2015. Many of these are minor changes, reflecting a realignment of limited partnership interests. Other amendments reflect changes in the identity of general partners for this limited partnership and the ownership interests held by such general partners. Still other amendments to the Limited Partnership Agreement were made as a condition of obtaining financing from various lenders. Apart from these amendments to the Limited Partnership Agreement, the record is devoid of information about the Debtor's activities until Mr. Kettles became involved in 1990. His history with the Debtor requires some elaboration.

Mr. Kettles began working as a corporate officer for Uniflex in the late 1970s. (Transcript, pp. 68, 74). In the mid-1980s, Mr. Kettles left Uniflex and began working as a certified public accountant. (Transcript, p. 79). On February 2, 1988, an entity called Montgomery Management Corp. ("MMC") was incorporated by H. Bruce Montgomery ("Mr. Montgomery") and Bette F. Montgomery. (FCRE Ex. 15). Although Mr. Kettles and Mr. Montgomery shared office space, Mr. Kettles testified that he was not involved with MMC. (Transcript, p. 88). On October 3, 1990, an entity called Montgomery Management Corp. II ("MMC II") was incorporated. (FCRE Ex. 16). Mr. Kettles testified that both he and

---

acknowledges that the Uniflex Corporation is the same corporation as PHB, Inc., same having been accomplished by a simple change of the corporate name." (FCRE Ex. 9, p. 2).

[10] The Limited Partnership Agreement was executed by James T. Bell, President of PHB, and by W. Jack Hamilton, III, who owned a 3.57% limited partnership interest. (FCRE Ex. 1, p. 13).

Mr. Montgomery had ownership interests in MMC II. (Transcript, p. 89).

On December 27, 1990, a Certificate of Limited Partnership, executed by Mr. Montgomery, was filed with the Georgia Secretary of State identifying MMC II as the general partner of the Debtor. (FCRE Ex. 17). The record contains no documentation as to how or when MMC II became the general partner. Mr. Kettles, however, testified that MMC II acquired its interest as general partner from Uniflex. (Transcript, p. 89).

On October 1, 1993, an entity called The August Group, Inc. (the "August Group") was incorporated under Georgia law. (FCRE Ex. 18). According to Mr. Kettles, the August Group came about as a result of a conversation he had with Mr. Montgomery in August[11] of 1993 in which they decided to create a corporation for the purpose of replacing MMC II as general partner of the Debtor. (Transcript, pp. 93-95). Mr. Kettles could not recall whether Mr. Montgomery initially owned any interest in the August Group. (Transcript, pp. 92, 94). If so, Mr. Kettles bought out such interest early on, leaving Mr. Kettles as the August Group's sole owner. (Transcript, p. 92).

Mr. Kettles testified that on January 1, 1996,[12] he bought out (either in his individual capacity or through the August Group[13]) Mr. Montgomery's interest in MMC II,

---

[11] As Mr. Kettles explained, the August Group was named after the month of August, when this conversation took place. (Transcript, p. 95).

[12] At the April 16, 2018 hearing, Mr. Kettles initially could not recall when this transaction took place. (Apr. 16, 2018 Tr, p. 96). The only evidence for the date of January 1, 1996, is an amendment to the Limited Partnership Agreement signed on December 14, 1999. (FCRE Ex. 19, p. 1).

[13] Mr. Kettles' testimony on this point was somewhat inconsistent. He originally indicated that he personally bought out Mr. Montgomery's interest. (Transcript, p. 90). Subsequently, he stated that it was the August Group that acquired the stock of MMC II.

leaving Mr. Kettles as the sole shareholder of that entity, as well. (Transcript, p. 90). Although Mr. Kettles made reference to the existence of a transfer document evidencing this January 1, 1996 transaction, no such contemporaneous documentation has been produced. (Transcript, p. 114). Mr. Kettles then "merged" MMC II with the August Group, which was the surviving corporation following the merger.[14] (Transcript, pp. 90, 92, 96). Apparently, no documentation was filed with the Georgia Secretary of State to effectuate this merger, although Mr. Kettles testified that he informed the Internal Revenue Service that the two entities had merged.[15] (Transcript, p. 97).

Sometime during 1999, the Debtor sought to refinance its long-term debt[16] and identified General Electric Capital Corporation ("GECC") as a potential lender. At this point, it must have occurred to the Debtor or to Mr. Kettles that documentation of the admission of the August Group as the general partner, backdated to 1996, would be useful in preparing to borrow $2,459,000.00 from GECC.[17] To that end, on December 14, 1999, Mr. Kettles, "as sole shareholder of a dissolved corporation" (MMC II) and as President of the August Group,

_____

(Transcript, p. 107).

[14] In explaining the reason for this merger, Mr. Kettles stated, "My name isn't Montgomery, and so when Bruce was out of it, then . . . I thought that it would be best to not have Montgomery in [the corporate name]." (Transcript, pp. 95-96).

[15] According to Mr. Kettles, MMC II and the August Group had separate taxpayer identification numbers. (Transcript, p. 97).

[16] The Debtor's existing loan with the Government National Mortgage Association, by assignment from First National Bank of Florida, was due to mature in July of 2018. In connection with that loan, on January 14, 1977, First National Bank of Florida was granted a mortgage on the Property by the Debtor, acting through its general partner PHB. (Dckt. 289-3).

[17] See Dckt. 289-10 (GECC loan documents).

executed an amendment to the Limited Partnership Agreement (the "first December 14, 1999

Amendment").[18] (FCRE Ex. 19). This amendment provides in full as follows:

> This Amendment is entered into effective as of the 1st day of January, 1996, by and between Montgomery Management II Corp., administratively dissolved Georgia corporation ("Montgomery") and August Group, Inc., a Georgia corporation ("August").
>
> ### WITNESSETH:
>
> WHEREAS, Montgomery was the General Partner of A&B Associates, L.P., a Georgia limited partnership ("A & B"), pursuant to that Limited Partnership Agreement dated November 1, 1976, as modified and amended (the "Partnership Agreement") and owned a 20.224% general partnership interest in A & B; and
>
> WHEREAS, the certificate of partnership for A & B Associates, L.P., was filed with the Georgia Secretary of State on December 27, 1990; and
>
> WHEREAS, as of January 1, 1996, August acquired all of the stock of Montgomery, caused Montgomery to transfer its 20.224% general partnership interest in A & B to August and subsequently allowed Montgomery to be dissolved;[19] and
>
> WHEREAS, as of January 1, 1996, L. Christopher Kettles owned 100% of the stock in Montgomery and 100% of the stock in August and was the sole director and officer of each corporation; and
>
> WHEREAS, the parties hereto desire to amend the Partnership Agreement and certificate of Limited Partnership to reflect that August is now the General Partner of A & B,
>
> NOW, THEREFORE, for and in consideration of the mutual promises, obligations and agreements contained herein, and other good and valuable

---

[18] The Court will use this designation to avoid confusion with the second amendment executed on the same date. (FCRE Ex. 21).

[19] This amendment suggests that instead of a merger of MMC II with the August Group, MMC II transferred its interest as general partner and then dissolved. According to the Georgia Secretary of State's website, MMC II was administratively dissolved on July 4, 1998. (Debtor's Ex. 41). Inexplicably, this same Exhibit "41" reflects that MMC II was somehow reformed on July 30, 2007. *Id.* But MMC II had no further involvement with the Debtor.

consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

1. Montgomery hereby withdraws as a General Partner of the Partnership and transfers all right, title and interest as General Partner of the Partnership to August.

2. The Partnership Agreement and Certificate is hereby amended to admit August to the Partnership as General Partner in accordance with the terms and conditions of the Partnership Agreement, as amended. All references in the Partnership Agreement to the General Partner shall be deemed, on and after the date of this Amendment, to refer to August.

3. By execution of this Amendment, August as General Partner, specifically adopts and approves each and every provision of the Partnership Agreement, as amended, and specifically ratifies and agrees to be bound by all actions undertaken by the Partnership and the partners prior to this date and in accordance with the terms of the Partnership Agreement.

4. August is the General Partner of A & B and owns a 20.224% general partnership interest in the capital, profits, losses and cash flow of A & B.

5. The Partnership has obtained the requisite vote of the Limited Partners in accordance with the provisions of the Partnership Agreement for the withdrawal of Montgomery as a General Partner of the Partnership and for the admission of August as General Partner. The Partnership has also obtained the consent of the Limited Partners for the appointment of August with full power to act as the true and lawful attorney in fact of the Limited Partners, as provided in Section 11 of the Partnership Agreement.

6. Except as otherwise provided herein, the Partnership Agreement and Certificate of Limited Partnership shall remain in full force and effect.

(FCRE Ex. 19). This first December 14, 1999 Amendment (made effective, retroactively, to January 1, 1996) was consented to by 61.926%[20] of the limited partnership interests, in addition to the 20.224% interest of the August Group. (FCRE Ex. 19, pp. 5-24). All consent

---

[20] There appears to be a duplicate consent form for limited partner Cecilia M. Davidson. (FCRE. Ex. 19, pp. 21, 23). The 61.926% figure was calculated without adding this apparent duplicate.

forms were signed by the limited partners in December of 1999, although on various dates throughout the month. Mr. Kettles testified that this amendment "was a cleanup-type thing" made in connection with the later admission of ABGP, Inc., as general partner. (Transcript, p. 104). At times, FCRE has pointed out certain alleged weaknesses in the admission of the August Group,[21] but the Court finds that this entity was properly admitted as general partner in place of MMC II by virtue of the first December 14, 1999 Amendment.

B. <u>ABGP, Inc. Becomes General Partner Under the GECC Loan</u>

As a condition of financing, GECC required that a single-purpose entity be established to serve as the Debtor's general partner holding a one-percent interest. (Transcript, pp. 93, 111, 115). To this end, a corporation called ABGP, Inc. (hereinafter "ABGP I" to avoid confusion with the corporate entity of the same name created on November 4, 2010) was formed under Georgia law on December 13, 1999. (FCRE Ex. 20). This entity was assigned Control # K951295 by the Georgia Secretary of State. (FCRE Ex. 20).

On December 14, 1999, on the heels of the amendment confirming the admission of the August Group as the Debtor's general partner in 1996, Mr. Kettles executed a *second* document entitled "Amendment to the Agreement and Certificate of Limited Partnership for A&B Associates, L.P., a Georgia Limited Partnership" (the "second

---

[21] *See* Dckt. 358, p. 10 ("[T]he limited partners apparently had no knowledge regarding the transfer of the general partner interests or the fact that August Group had, in fact, been acting as General Partner since January 1, 1996, without proper admission as the General Partner and in violation of Sections 14, 15 and 16 of the LP Agreement, until the execution of this 1996 Amendment in December 1999."). It is not clear from the record what the limited partners knew about this change and when they knew it.

December 14, 1999 Amendment"). (FCRE Ex. 21). This document confirmed the admission

of ABGP I as the Debtor's general partner to *replace* the August Group. (FCRE Ex. 21, p.

2). It also confirmed the transfer of a one-percent interest as general partner from the August

Group to ABGP I, resulting in the reduction of the August Group's interest in the Debtor

from 20.224% to 19.224%. (FCRE Ex. 21, p. 3). This interest of the August Group was

reclassified as a "Special Limited Partner" interest, resulting in the withdrawal of the August

Group from general partner responsibilities and liabilities. (FCRE. Ex. 21, p. 2). The second

December 14, 1999 Amendment was consented to by 82.15% of the limited partnership

interests, including the interests of the August Group and of ABGP I. (FCRE Ex. 21, pp. 8-

26). As with the first December 14, 1999 Amendment, these consent forms were signed by

the limited partners on various dates throughout December, concurrent with the GECC loan

origination. *Id.* Thus, as of December 14, 1999, ABGP I was the Debtor's sole general

partner. FCRE has not challenged the admission of ABGP I.

C. Administrative Dissolution of ABGP I

        After ABGP I became the Debtor's general partner on December 14, 1999, the

limited partnership continued with its ownership and operation of the Property. It is

undisputed, however, that on July 9, 2005, ABGP I was administratively dissolved by the

Georgia Secretary of State. Apparently, this occurred solely as a result of Mr. Kettles' failure

to pay, in two successive years, the $50.00 annual fee. (Transcript, pp. 124-25, 127). Mr.

Kettles testified that at the time, he owned "a dozen or so corporations." (Transcript, pp.

125). On a Saturday morning every March, Mr. Kettles would pay the annual fee for each

of his corporations using the control number from the receipt from the prior year. (Transcript, pp. 125). According to Mr. Kettles, at some point he must have misplaced a prior year's receipt for ABGP I, and he therefore failed to pay that entity's annual fee for two consecutive years prior to the administrative dissolution in 2005. (Transcript, p. 126). Mr. Kettles testified that the Georgia Secretary of State did not notify him of the missed payments, and thus he was unaware of the administrative dissolution. (Transcript, p. 126).

D. The January 1, 2006 Amendment

On January 1, 2006, an "Amendment to the Agreement and Certificate of Limited Partnership for A&B Associates, L.P., a Georgia Limited Partnership" (the "January 1, 2006 Amendment") took effect. (FCRE Ex. 22). This document purported to amend the Limited Partnership Agreement as follows:

> This Amendment is entered into effective as of the 1st day of January, 2006, by and among the undersigned and binding on all partners of A&B Associates, L.P., a Georgia limited partnership.
>
> . . .
>
> WHEREAS, the parties hereto desire to amend the Partnership Agreement to evidence the admission of new Limited Partners and the retirement of other Limited Partners as of December 15, 2005, and to reflect other changes to the Partnership Agreement;
>
> NOW, THEREFORE, for and in consideration of the mutual promises, obligations and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned (being the General Partner and the majority-in-interest of the Limited Partners each voting as a class)[22] do hereby agree as follows:

---

[22] The Limited Partnership Agreement provided from its inception that it could only be amended by majority vote. See (FCRE Ex. 1, p. 12) ("20.2 Modifications. No change or modification of this Agreement shall [be] valid or binding upon the Partners, nor shall any

13

1. The Partnership Agreement is hereby amended to provide that as of the Effective Date the capital interest in the Partnership is owned as follows (all Partners being Limited Partners except as noted):

. . .

[Here follows a list of the partners, each with a corresponding percentage partnership capital interest.]

. . .

The above list reflect [sic] the buyout of certain Limited Partners and the recent admission of others, all in accordance with the provisions of the Partnership Agreement. The concepts of AClass I@ [sic] or AClass II@) [sic] Limited Partners or ASpecial [sic] Limited Partner@ [sic] are hereby abolished and henceforth all Limited Partners shall have the same rights and obligations under the Partnership Agreement.

2. Notwithstanding any other provision of this Agreement, without the consent of Partners holding a total of 87% partnership interest in the Partnership, the General Partner shall have no authority to *sell or lease, or otherwise dispose of all or substantially all of the assets of the Partnership or to amend, modify or alter this provision.*[23]

. . .

(FCRE Ex. 22) (emphasis added). This January 1, 2006 Amendment has several puzzling features. It was signed only by Mr. Kettles as President of (then administratively-dissolved) ABGP I and as President of the August Group, which entity is identified on the signature page as "Majority of Interest of Limited Partners." (FCRE Ex. 22, p. 4). It was not consented

---

waiver of any term or [c]ondition in the future, unless such change or modification or waiver shall [be] in writing and signed by the General Partner and the majority-in-interest [of] the Limited Partners, each voting as a class.").

[23] This provision will hereinafter be referred to as the "87% Requirement."

14

to in writing by any limited partners other than the August Group.[24] Further, the amended list of partners in this document identifies Mr. Kettles in his individual capacity as owning a 20% interest in the Debtor and identifies the August Group as owning a 51% interest. (FCRE Ex. 22, p. 2). According to this list, ABGP I still owned a one-percent interest as general partner. (FCRE Ex. 22, p. 2).

In explaining the features of this document, Mr. Kettles testified that at some point prior to January 1, 2006, he offered to buy out all of the limited partners. (Transcript, p. 118). Some of the limited partners accepted this offer, and this was how Mr. Kettles personally acquired 34% of the limited partnership interests, although there is no documentation in the record evidencing these transactions. (Transcript, p. 119). Other limited partners declined Mr. Kettles' offer but agreed to have their interests reduced. (Transcript, p. 118, 120). Subsequently, Mr. Kettles sold 12% to John Christopher Williams and Mary Ellen Williams, 1% to Christopher J. Williams and Diana D. Williams, and 1% to Michael D. Williams, leaving Mr. Kettles with the 20% interest reflected in the January 1, 2006 Amendment. (Transcript, p. 118-19).

Mr. Kettles did not recall precisely how the August Group's interest in the Debtor increased from 19.224% on December 14, 1999, to 51% on January 1, 2006. (Transcript, pp. 122-23). He testified only that the August Group acquired this interest from other limited partners, and he was unable to produce any supporting documentation for these transactions. (Transcript, p. 123). Based on Mr. Kettles' credible testimony, the Court finds

---

[24] As the majority-in-interest of the limited partners, the August Group's vote was enough to amend the Limited Partnership Agreement.

that at the time the January 1, 2006 Amendment was executed, he was unaware that ABGP I had been administratively dissolved on July 9, 2005. (Transcript, pp. 124, 127-28).

E. Request for Reinstatement of ABGP I

Mr. Kettles testified that, at some point, his attorneys learned of the administrative dissolution of ABGP I and advised him to seek reinstatement from the Georgia Secretary of State. (Transcript, pp. 128-29). On March 28, 2008, Mr. Kettles signed a Request For Reinstatement Application Of Administratively Dissolved Entity.[25] (FCRE Ex. 23). The document appears to have been faxed to the Office of the Secretary of State on the same day it was signed. (FCRE Ex. 23; Transcript, pp. 132-33). For reasons that are not clear, ABGP I was not reinstated. (Transcript, p. 130). However, neither is there evidence that the request was rejected. Possibly, the Georgia Secretary of State simply did not respond to the request. (Transcript, p. 133). At the time, Mr. Kettles believed that ABGP I was not reinstated because he had failed to request reinstatement within a two-year period[26] following administrative dissolution, and thus he took no further action in furtherance of reinstatement. (Transcript, p. 133-34).

F. Refinancing with Coastal Federal and Incorporation of ABGP II

Meanwhile, the existing ten-year loan with GECC, which had originally prompted the incorporation of ABGP I on December 13, 1999, matured on January 1, 2010.

---

[25] This Request for Reinstatement acknowledges the July 9, 2005 date of administrative dissolution of ABGP I. (FCRE Ex. 23).

[26] As discussed below, the Court concludes that the applicable limitation period for ABGP I to seek reinstatement was five years, not two years.

(Dckt. 289-10, p. 7). The Debtor continued to make monthly payments to GECC after the maturity date, and the record does not reflect that GECC declared a formal default of the balloon payment that came due. At some point, the Debtor began negotiating new financing with Coastal Federal Credit Union ("Coastal Federal"). By this time, Mr. Kettles and his attorneys were aware that ABGP I had not been reinstated by the Georgia Secretary of State. (Transcript, p. 134). The record is silent as to Coastal Federal's knowledge of this fact.

According to Mr. Kettles, Coastal Federal (like GECC) required an amendment to the Limited Partnership Agreement to provide for the formation and admission of a new corporate general partner. (Transcript, p. 137). The Debtor accommodated this request. On November 4, 2010, an amendment to the Limited Partnership Agreement (the "November 4, 2010 Amendment") took effect.[27] (FCRE Ex. 25). This amendment was executed by Mr. Kettles as President of "ABGP, Inc., a Georgia Corporation" and as President of the August Group (the "Majority of Interest of Limited Partners"). (FCRE Ex. 25, p. 5). It added the following relevant provisions to the Limited Partnership Agreement:

> 2. <u>Certain Prohibited Activities</u>. The Partnership shall only incur indebtedness in an amount necessary to acquire, operate and maintain the Property. For so long as any mortgage lien in favor of Coastal Federal Credit Union, or its

---

[27] FCRE Exhibit 25 includes a second amendment with an effective date of November 2, 2010. This document is identical to the November 4, 2010 Amendment apart from its effective date and signature page, which was signed by a different witness and notary public. Mr. Kettles had no explanation for the origin of this document or of its relationship to the November 4, 2010 Amendment. (Transcript, p. 138). This November 2, 2010 document does not have a signature date, although it has two time stamps indicating that it was faxed. The first time stamp, which appears on every page of the document, states "Nov 02 2010 11:11," while the second time stamp appears only on the signature page and states "Nov 02 2010 2:39PM." (FCRE Ex. 25).

successors or assigns (the "First Mortgage") exists on any portion of the Property, the Partnership shall not incur, assume, or guaranty any other indebtedness. For so long as the First Mortgage exists on any portion of the Property, the Partnership shall not dissolve or liquidate, or consolidate or merge with or into any other entity, or convey or transfer its properties and assets substantially as an entity or transfer any of its partnership interests to any entity. For so long as the First Mortgage exists on any portion of the Property, the Partnership will not voluntarily commence a case with respect to itself, as debtor, under the Federal Bankruptcy Code or any similar federal or state statute without the unanimous consent of all of the Partners of the Partnership. For so long as the First Mortgage exists on any portion of the Property, no material amendment to this Partnership Agreement may be made without first obtaining approval of the mortgagee holding the First Mortgage on any portion of the Property.

. . .

4. Separateness Covenants. For so long as the First Mortgage exists on any portion of the Property, in order to preserve and ensure its separate and distinct identity, in addition to the other provisions set forth in the Partnership Agreement, the Partnership shall conduct its affairs in accordance with the following provisions:

. . .

m. It shall have a corporate general partner which shall be organized to be a single purpose, "bankruptcy remote" entity with organizational documents substantially similar to the organizational documents of the current corporate general partner of the Partnership.

. . .

5. Dissolution. The partnership shall not terminate or dissolve solely as a consequence of the bankruptcy or insolvency of one or more of the general partners of the Partnership, but the Partnership shall continue so long as there remains a solvent general partner of the Partnership. Subject to applicable law, dissolution of the Partnership shall not occur so long as the Partnership remains owner of the Property subject to the First Mortgage.

(FCRE Ex. 25, pp. 2-4). Importantly, Section 4(m) of this amendment contemplated the

admission of a new corporate general partner, although the name of that entity was not set

18

out.

On the same day that this amendment was signed, November 4, 2010, the Secretary of State filed a Certificate of Incorporation for a new ABGP, Inc. (hereinafter "ABGP II"). (FCRE Ex. 24).[28] This new corporation was allowed to use the identical name, ABGP, Inc., and was assigned Control # 10076518 by the Georgia Secretary of State.[29] (FCRE Ex. 24, p. 1). According to the Certificate of Incorporation, the express purpose of forming ABGP II was as follows:

> (i) To acquire a general partnership interest in and act as general partner of A & B Associates, L.P., a Georgia limited partnership (the "Partnership") which is engaged solely in the ownership, operation and management of the real estate project known as August on Southside Apartments located in Port Royal, South Carolina (the "Property"), pursuant to and in accordance with these Articles of Incorporation and the Partnership's Limited Partnership Agreement; and

> (ii) to engage in such other lawful activities permitted to corporations by the Business Corporation Code of the State of Georgia as are incidental, necessary or appropriate to the foregoing.

(FCRE Ex. 24, p. 3).

With respect to the November 4, 2010 Amendment to the Limited Partnership

---

[28] The Secretary of State's time stamp on the Articles of Incorporation of ABGP II indicates that it was filed on November 4, 2010, at 11:30 a.m. (FCRE Ex. 24, p. 2). The Secretary of State's time stamp on the November 4, 2010 Amendment to the Limited Partnership Agreement indicates that it was filed on November 8, 2010, at 1:14 p.m. (FCRE Ex. 25, p. 2).

[29] ABGP II had the same taxpayer identification number as ABGP I. (Transcript, pp. 140-42). It is true that Mr. Kettles should have applied for a new taxpayer identification number. *See* 26 U.S.C. § 6109; 26 C.F.R. § 31.6011(b)-1. FCRE insinuates that Mr. Kettles violated 26 C.F.R. § 31.6011(b)-1 "in an apparent effort to make it appear that ABGP [I] and ABGP [II] were, in fact, the same entity." (Dckt. 358, p. 13). Nevertheless, it is clear that ABGP I and ABGP II were separate corporations. Whether ABGP II violated applicable Treasury regulations has no bearing on the matters before the Court.

19

Agreement made at Coastal Federal's behest, Mr. Kettles was unable to confirm whether he signed as President of the administratively-dissolved ABGP I or of the newly-created ABGP II. It is clear, however, that he executed this document after mailing the Articles of Incorporation for ABGP II to the Georgia Secretary of State on November 3, 2010. (Transcript, p. 138). The Court therefore finds that whether he signed on behalf of ABGP II as the newly-admitted general partner or on behalf of ABGP I as the outgoing general partner, ABGP II was the unnamed corporate general partner referenced in Section 4(m) of the amendment.

Thus, over five years after the administrative dissolution of the limited partnership's sole general partner, Mr. Kettles essentially took steps to install as general partner a sort of corporate doppelgänger.[30] He was able to secure use of the same corporate name[31] for the new general partner, and because he controlled both the ownership and management of these two corporate entities, his transfer of the 1% interest from ABGP I to ABGP II was seamless, and apparently paperless. (Transcript, pp. 140-42).[32] To all outward appearances, then, the Debtor continued to be a properly organized limited partnership under Georgia law with a valid corporate general partner.

---

[30] Mr. Kettles could not recall why ABGP II was not incorporated until 2010 or whether Coastal Federal specifically requested the creation of this entity. (Transcript, p. 134).

[31] Under Georgia law, after five years of inactive status of a corporate entity, the name becomes available to anyone seeking to form a new entity under that name. O.C.G.A. § 14-2-1422(b).

[32] Mr. Kettles testified that neither ABGP I nor ABGP II had any assets apart from the interest in the Debtor. (Transcript, p. 141).

G. General Partner Certification in Support of FCRE's April 2015 Refinance.

In April of 2015, approximately four-and-a-half years after borrowing from Coastal Federal, the Debtor again sought new financing, this time from FCRE. In preparation for extending credit to the Debtor, FCRE appears to have engaged in meaningful due diligence. Among the documents that Mr. Kettles was required to execute in his representative capacity as President of ABGP, Inc., was a Certificate of General Partner (dckt. 385-27), which set forth, in relevant part, the following representations:

> 1. That ABGP, Inc., a Georgia corporation (the "**General Partner**") is the managing general partner of A & B Associates, L.P., a Georgia limited partnership (hereinafter referred to as the "**Partnership**").
>
> 2. That the undersigned has knowledge of the facts certified in this Certificate, and the undersigned has the power and authority to execute this Certificate.
>
> 3. That attached hereto as Exhibit "B" is a true, correct and complete copy of the Partnership Agreement of the Partnership (the "**Partnership Agreement**"), that attached hereto as Exhibit "C" is a true, correct and complete copy of the Certificate of Partnership of the Partnership, and that there have been no amendments, modifications, transfers or assignments thereto except as attached hereto.
>
> 4. That, the undersigned, as General Partner of the Partnership, has full power and authority, without the consent or approval of any other party or entity, to execute and deliver on behalf of the Partnership . . . [all] . . . documents and instruments as the undersigned may deem necessary or advisable to enable the Partnership to fulfill all obligations necessary in order to obtain a loan from FCRE REL, LLC, a Delaware limited liability company, in the principal amount of $3,900,000.00 (the "**Loan**") . . . .

(Dckt. 385-27, p. 1) (emphasis in original). Mr. Kettles executed this Certificate of General Partner on April 15, 2015, as President of "ABGP, Inc., a Georgia corporation," which is identified as the Debtor's general partner. (Dckt. 385-27, p. 3). The documents attached to

21

this Certificate of General Partner, comprising 87 pages, were as follows:

**Exhibit "A"** - A one-page legal description of the Property. (Dckt. 385-27, p. 4).

**Exhibit "B"** - A cover sheet stating "Copy of Partnership Agreement begins on the following page." This cover sheet is followed by a series of documents as follows:

(i) The Limited Partnership Agreement of A & B Associates, L.P. of November 1, 1976 (FCRE Ex. 1), with attached as Exhibit "A" the one-page property description, and a two-page Certificate of Partnership and Salesman. (Dckt. 385-27, pp. 6-21).

(ii) The first December 14, 1999 Amendment (FCRE Ex. 19) and the limited partners' consent forms. (Dckt. 385-27, pp. 22 - 51).[33]

(iii) The January 1, 2006 Amendment. (Dckt. 385-27, pp. 52-56; FCRE Ex. 22).

(iv) A one-page document from the Georgia Secretary of State with a print date of February 27, 2006, purporting to be a certified copy of documents relating to the Debtor. Nothing is attached that seems to correspond with this certificate, but it references Control # K100418. (Dckt. 385-27, p. 57).

(v) The document dated November 2, 2010 (FCRE Ex. 25, pp. 6-9), that is otherwise identical to the November 4, 2010 Amendment. (Dckt. 385-27, pp. 58-61).

(vi) An amendment to the Limited Partnership Agreement dated April 15, 2015, concurrent with the FCRE loan origination. (Dckt. 385-27, pp. 62-64; FCRE Ex. 26).

**Exhibit "C"** - A cover sheet stating "Copy of Certificate of Partnership begins on the following page." This cover sheet is followed by a series of documents as follows:

---

[33] The second December 14, 1999 Amendment, by which ABGP I was admitted as general partner in place of the August Group, was not included in this 87-page collection of documents.

(i) A one-page document from the Georgia Secretary of State with a print date of February 27, 2006, purporting to be a certified copy of documents relating to the Debtor.[34] The next attached page is virtually illegible but was issued by Georgia Secretary of State Max Cleland. (Dckt. 385-27, pp. 66-67).[35]

(ii) A Certificate of Limited Partnership of A & B Associates, L.P. dated December 12, 1990, recorded with the Georgia Secretary of State on December 27, 1990, which states that the general partner is MMC II. (FCRE Ex. 17). The next page is the related data entry form. These two documents were executed by Mr. Montgomery in his capacity as President of MMC II. (Dckt. 385-27, pp. 68-69).

(iii) Documents issued by the South Carolina Secretary of State reflecting that as of April 2, 2015, the Debtor was in good standing as a foreign (i.e. Georgia) limited partnership. (Dckt. 385-27, pp. 70-72).

(iv) A Certificate of Existence of A & B Associates, L.P., issued by the Georgia Secretary of State on April 2, 2015. (Dckt. 385-27, p. 73).

(v) A document entitled "Consent Action by all Directors of ABGP, Inc." Dated April 15, 2015, this document authorized Mr. Kettles to execute the loan documents with FCRE. (Dckt. 385-27, pp. 74-75).

(vi) A Corporate Certificate executed by Sharan Kettles, as Secretary of ABGP, Inc., with an attached certificate of good standing for that same entity reflecting the date of incorporation of November 4, 2010 (the date on which ABGP II was incorporated). The Articles of Incorporation for ABGP II are attached as Exhibit "B" to this Corporate Certificate. (Dckt. 385-27, pp. 76-86).[36]

(vii) The final document is another Exhibit "C", the Resolution of

---

[34] This is a copy of the document appearing at Dckt. 385-27, p. 57.

[35] This appears to be the same document (FCRE Ex. 17, p. 1) generated by the Georgia Secretary of State in response to the Certificate of Limited Partnership of A & B Associates, L.P. dated December 12, 1990, and recorded with the Secretary of State on December 27, 1990.

[36] Buried among these documents is a two-page document from the South Carolina Secretary of State indicating that as of April 2, 2015, ABGP, Inc., a Georgia corporation, was in good standing. Strangely, this document also reflects that this corporation had a "reinstatement" on November 23, 2010. (Dckt. 385-27, pp. 80-81).

ABGP, Inc. authorizing all actions as the Debtor's general partner to enter into the loan transaction with FCRE. (Dckt. 385-27, p. 87).

What this collection of documents does *not* reveal is that ABGP I was administratively dissolved in 2005 and that Mr. Kettles attempted, unsuccessfully, to have it reinstated in 2008. It appears that FCRE did not inquire as to the status of the general partner (ABGP I), which ABGP II was created to replace. And the Debtor, acting, as always, through Mr. Kettles, did not volunteer that in 2010, as part of Coastal Federal's requirement that a new general partner be formed, it had ABGP I transfer its interest as general partner to a newly-created corporation of the same name. The Court does not find this non-disclosure either sinister or fraudulent. The Court finds that Mr. Kettles had a subjective belief that he properly caused ABGP II to be admitted as the new general partner in November of 2010 and therefore that ABGP II had the authority to effectuate the loan transaction with FCRE.

On April 15, 2015, the same date that Mr. Kettles signed the Certificate of General Partner, he executed the Loan Agreement (Claim 2-1, Part 3); the Promissory Note (Claim 2-1, Part 4); and the Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing (Claim 2-1, Part 5) with FCRE. The principal amount of the loan was $3,900,000.00. (Claim 2-1, Part 4, p. 2). In connection with this loan, Mr. Kettles, as President of ABGP, Inc. and of the August Group, executed an amendment to the Limited Partnership Agreement which, among other things, required the Debtor not to "seek or effect the liquidation, dissolution, winding up, liquidation [sic], consolidation, or merger, in whole or in part, of Partnership nor permit any constituent party of Partnership to do any of the foregoing . . . ." (FCRE Ex. 26, p. 3).

24

H. FCRE Declares a Default of the Loan

From the date of the loan until the filing of its bankruptcy on February 3, 2017, the Debtor never failed to make its monthly payment to FCRE. Nor has the Debtor ever failed to make timely post-petition payments. But after FCRE was unable to securitize[37] this loan as originally contemplated, it undertook a very aggressive posture toward certain, and varied, alleged *non-monetary* defaults.[38] This culminated in an attempted seizure of the Property by FCRE on July 20, 2016.

FCRE's attempted seizure of the Property led in turn to the filing of a complaint against FCRE by the Debtor on August 15, 2016, in the Court of Common Pleas, County of Beaufort, South Carolina, Case No. 2016-CP-07-1778, alleging that FCRE improperly declared a non-monetary default and unlawfully removed the Debtor from the Property. (Dckt. 219-2). The following day, August 16, 2016, Judge Marvin H. Dukes, III, Master in Equity and Special Circuit Judge for Beaufort County, South Carolina, issued an Order Granting Temporary Injunction, which restored the Debtor to the management of the Property. (Dckt. 66-2). On September 6, 2016, FCRE filed an answer, counterclaims, and a

---

[37] As Mary Davenport, FCRE's Executive Vice President, explained the securitization process, it is a business platform by which a lender may originate a loan, not for a portfolio, and not to hold the debt for a 20- or 30-year period, during which the lender's funds would be tied up. Instead, securitization allows the lender to recover its principal when it sells these loans, sometimes at a profit, and then put that money out again in new loans. (Dckt. 353, pp. 4-6).

[38] On July 18, 2016, FCRE issued to the Debtor and to Mr. Kettles a Notice of Event of Default based upon both the alleged physical deterioration of the Property and an alleged increase in criminal activity in the area. (Dckt. 41-2). On November 21, 2016, FCRE issued a second Notice of Event of Default based upon the Debtor's alleged check-cashing services, in violation of a requirement in the Loan Agreement that the Debtor remain a single-purpose entity. (Dckt. 41-3). On December 13, 2016, FCRE issued a third Notice of Event of Default based upon the alleged presence of mold in the Property. (Dckt. 41-4).

third-party complaint against Mr. Kettles in that case. (Dckt. 66-3). On September 23, 2016,
Judge Dukes entered an Order Granting Plaintiff's Motion for Contempt, finding that FCRE
failed to comply with the temporary injunction. (Dckt. 66-4). FCRE appealed both the
temporary injunction and the finding of contempt, which are consolidated under Appellate
Case No. 2016-001899 in the South Carolina Court of Appeals. (Dckt. 66-5).[39]

I. Filing of the Bankruptcy Petition

On February 3, 2017, the Debtor filed its Voluntary Petition for Non-
Individuals Filing for Bankruptcy (the "Original Petition") under Chapter 11 of the
Bankruptcy Code. (Dckt. 1). This Original Petition was signed by Mr. Kettles in his alleged
capacity as "Managing General Partner" of the Debtor. (Dckt. 1, p. 22). The Debtor also filed
its List of Equity Security Holders identifying 18 limited partners and the following *general*
partners:

| Name . . . | Security Class | Number of Securities | Kind of Interest |
|---|---|---|---|
| ABGP, Inc. | General Partner | 1% | General Partner |
| L. Christopher Kettles | General Partner | 20% | General Partner |
| The August Group, Inc. | General Partner | 51% | General Partner |

(Dckt. 1, pp. 20-21). As pointed out by FCRE in its Emergency Motion of FCRE REL, LLC
For Appointment of Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a), filed February 17,
2017, the Debtor's only general partner is ABGP, Inc. (Dckt. 32, p. 27). Thus, *Mr. Kettles*

---

[39] Following notice of the Debtor's bankruptcy (dckt. 66-6), the appeal was held in
abeyance until this Court relinquished jurisdiction. (Dckt. 66-7). On May 16, 2017, the Court
entered an Order granting stay relief with respect to FCRE's appeal.

was not the Debtor's "Managing General Partner".

In its amended Petition (dckt. 49), filed days later on February 24, 2017, the Debtor corrected the capacity in which Mr. Kettles signed the petition. The Court finds that Mr. Kettles properly signed the amended Petition as "L. Christopher Kettles for ABGP, Inc.," which correctly identified him as the authorized representative of the Debtor's "Managing General Partner." (Dckt. 49, p. 4). The Debtor also corrected its List of Equity Security Holders to indicate that ABGP, Inc. was the sole general partner with a 1% interest and that the August Group and Mr. Kettles in his individual capacity were merely limited partners, not general partners. (Dckt. 46, pp. 4-5).

J. FCRE Challenges the Debtor's Eligibility

As this Chapter 11 case progressed, FCRE began to suggest that the Debtor lacked authority to file bankruptcy. In its Motion to Convert filed on June 13, 2017, FCRE argued for the first time that Mr. Kettles lacked the requisite ownership interests to file the bankruptcy petition. (Dckt. 161, pp. 9-10). In its objection to the Debtor's Disclosure Statement Proposed September 29, 2017 (dckt. 265), FCRE argued that the administrative dissolution of ABGP I on July 9, 2005, left the Debtor without a valid general partner, thereby resulting in the dissolution of the Debtor itself under Georgia limited partnership law, and that since that date the Debtor's activities should have been limited to winding up its affairs. (Dckt. 289, pp. 5-8). FCRE has further developed this argument in its supplemental briefs. (Dckt. 333, 358, 388, 418, 475).

K. The Ratification

FCRE's repeated challenges to the Debtor's authority to file bankruptcy finally elicited a response from the Debtor. On January 10, 2018, Mr. Kettles, both in his individual capacity (as owner of a 20% limited partnership interest) and as President of the August Group (of which Mr. Kettles was the sole shareholder and which held a 51% limited partnership interest), executed a document entitled "Ratification and Confirmation of Actions Related to A & B Associates, L.P., a Georgia Limited Partnership" (the "Ratification"). (FCRE Ex. 30). This document provides in full as follows:

> Comes now, L. Christopher Kettles, who on oath deposes and says that the recitals set forth below are true and correct to the best of his information and belief and that this document represents his ratification of the facts set forth herein.

> RECITALS:

> A. A&B Associates, L.P., a Georgia limited partnership ("A&B") was organized on November 1, 1976.

> On December 27, 1990, as a way to elect that the partnership be governed by the Georgia Limited Partnership Act of 1988, A & B Associates, L.P., a Georgia limited partnership, filed a "Certificate of Limited Partnership" with the Georgia Secretary of State. The Secretary of State acknowledged receipt by stating that A & B Associates, L.P., a filing under prior Georgia Limited Partnership Act(s) has filed with the Secretary of State as of the filing/effective date . . . . an amendment to its certificate of limited partnership to incorporate the provisions of the revised uniform limited partnership act of 1988 as provided by the laws of the state of Georgia, and the fees therefore have been paid. (See Exhibit 20-M)[40]

> On January 1, 1996, the Limited Partnership Agreement of A & B Associates, L.P. was amended specifically identifying the November 1, 1976, Limited

---

[40] The exhibits labeled "20-M," "20-S," "20-O," "20-P," "20-T," "20-U," and "20-Q" were not tendered into evidence because they are duplicates of FCRE's exhibits. (Dckt. 385).

Partnership Agreement as modified and amended, in effect, adopting the 1976 Limited Partnership Agreement terms as amended. This new amendment was to make The August Group, Inc., which is a Georgia corporation, the Managing General Partner. (See Exhibit 20-N)

B. The August Group, Inc., a Georgia corporation ("August Group"), was incorporated October 1, 1993. The sole shareholder was and always has been L. Christopher Kettles.

C. ABGP, Inc., a Georgia corporation ("ABGP") was incorporated on December 13, 1999. The sole shareholder was and always has been L. Christopher Kettles. (See Exhibit 20-S)

D. On December 14, 1999, the Agreement and Certificate of Limited Partnership for A&B Associates, L.P., a Georgia limited partnership, was amended to remove August Group as Managing General Partner, transfer a 1% partnership interest to ABGP, and make ABGP the Managing General Partner. The August Group retained a 19.224% Percentage Partnership Capital Interest. (Exhibit 20-O)

E. On July 9, 2005, ABGP was administratively dissolved by the Georgia Secretary of State for failure to pay its annual registration. ABGP, [sic] continued to exist as a dissolved corporation with the right to wind up its affairs, but was unaware of its status and did not intend to wind up its affairs. It continued to fulfill its obligations as Managing General Partner of A&B.

F. On January 1, 2006, ABGP, as General Partner of A&B, executed an Amendment to the Agreement and Certificate of Limited Partnership for A&B Associates, L.P. to evidence the admission and withdrawal of limited partners. The amendment was also executed by August Group, Inc., which now held a majority 51% of the limited partnership interests. The amendment provided that the "Partnership shall continue to be governed by the terms and conditions of the Partnership Agreement." Upon execution of this amendment, ABGP was still a dissolved corporation in the process of winding up its affairs, and still within the 2 year window for full reinstatement. (See Exhibit 20-P)

G. On March 28, 2008, ABGP filed an application for reinstatement with the Georgia Secretary of State. There was no response was [sic] received from the Secretary of State. ABGP continued to fulfill its obligations as General Partner of A&B, notwithstanding its status as a corporation in the process of winding up its affairs. (See Exhibit 20-T)

H. On November 4, 2010, a new entity with the same name as ABGP was created by filing Articles of Incorporation with the Secretary of State. ABGP, Inc. formed 11-4-2010 had the same shareholders, directors and officers as ABGP, and the same taxpayer identification number, and was formed for the purpose of replacing ABGP as General Partner of A&B. (See Exhibit 20-U)

I. On November 4, 2010, ABGP (formed 11-4-2010) as general partner, and August Group, which owned a majority of the limited partnership interests, executed an Amendment to the Agreement and Certificate of Limited Partnership for A&B. The amendment referred to ABGP (formed 11-4-2010) and August Group, respectively as "the undersigned (being the General Partner and majority in interest of the Limited Partners each voting as a class)", and provided that the Partnership shall continue to be governed by the terms and conditions of the Partnership Agreement. (See Exhibit 20-Q)

The officers executing the amendment on behalf of ABGP (formed 11-4-2010) were L. Christopher Kettles, as President, and Sharan Kettles, as Secretary, and the officers executing the amendment on behalf of August Group, Inc., were L. Christopher Kettles, as President, and Sharan Kettles, as Secretary. L. Christopher Kettles was the sole shareholder of the original ABGP and would have been the sole owner of any interest in the A&B general partnership interests retained by the original ABGP.

NOW, THEREFORE, L. Christopher Kettles, individually, as owner of a 20.0% limited partnership interest in A & B Associates, L.P., and as the sole owner and President of The August Group, Inc., as owner of a 51.0% limited partnership interest in A & B Associates, L.P., as the sole shareholder of ABGP, Inc., and as the President and director of ABGP, Inc. [ABGP, Inc. incorporated 11/4/2010], as General Partner of A&B; and The August Group, Inc. as the owner of the majority of interests of limited partners in A&B; hereby ratify and confirm the following:

1. ABGP was, since December 14, 1999, the General Partner of A&B until such time as it was replaced by ABGP (formed 11-4-2010) on November 4, 2010, and all actions taken by ABGP prior to November 4, 2010 are hereby ratified and affirmed.

2. The Amendment to the Agreement and Certificate of Limited Partnership for A&B, dated November 4, 2010, transferred all partnership interests held by ABGP, as General Partner, to ABGP (formed 11-4-2010), as General Partner, and changed the General Partner of A&B from ABGP to ABGP (formed 11-4-2010). In the event that said amendment failed to adequately describe said

transactions, said transactions are hereby retroactively implemented, ratified and affirmed.

3. A&B Associates, L.P. was at all times since 1976, a Georgia limited partnership validly formed and existing under the laws of the State of Georgia.

4. All actions taken by ABGP (formed 11-4-2010), as General Partner of A&B, are hereby ratified and affirmed and shall be considered fully valid and binding on A&B as of the effective date of said actions.

This Ratification and Confirmation of Actions are hereby executed and delivered as of the date stated below.

This 10th day of January, 2018.

(FCRE Ex. 30). Attached as an Addendum to this Ratification is a chronology of the Debtor's history from its creation in 1976 through the execution of the Ratification in 2018. (FCRE Ex. 30, pp. 5-8). This Ratification contains a few incorrect facts and misstates certain legal principles.[41] Ultimately, the Court finds that the Ratification is not crucial to the validity of all of the intervening actions taken by the Debtor's general partner but is consistent with the Court's finding that the limited partnership was properly continued.

## IV. CONCLUSIONS OF LAW

The limited partnership known as A & B Associates, L.P. was properly formed on November 1, 1976, and has continued to operate the August on Southside apartment complex through the present day. No general partner or limited partner has *ever* sought

---

[41] The Ratification confuses the assets of ABGP I with those of Mr. Kettles. (FCRE Ex. 30, p. 2) ("Kettles was the sole shareholder of the original ABGP and would have been the sole owner of any interest in the A&B general partnership interests retained by the original ABGP."). It incorrectly states that ABGP I had a two-year period in which to seek reinstatement (FCRE Ex. 20, p. 2), a position that the Debtor later abandoned. (Dckt. 391, p. 10). And it is internally inconsistent as to whether ABGP I entered a winding up period. (FCRE Ex. 30, pp. 1-2).

dissolution of the limited partnership. The *only* party challenging the viability of the limited partnership is a creditor, FCRE, which had no involvement with the Debtor prior to April 15, 2015. Now, FCRE asks this Court to reach back in time to July 9, 2005, to declare, as a consequence of the administrative dissolution of the Debtor's corporate general partner for failure to pay nominal fees, that the limited partnership itself was dissolved, that its activities were limited to winding up its affairs, that all of its subsequent actions (including two multimillion-dollar loan transactions) were undertaken impermissibly, and that it cannot reorganize its business in this bankruptcy case. This the Court will not do.

A. Positions of the Parties

As this case progressed, the parties pursued discovery, conducted numerous examinations under Rule 2004 of the Federal Rules of Bankruptcy Procedure, and exchanged various documents. With the benefit of additional information about the Debtor's organizational history, FCRE's arguments have evolved somewhat since its Motion to Convert (dckt. 161) was filed on June 13, 2017. There, FCRE argued that Mr. Kettles, who owned or controlled (directly or indirectly) only a 72% interest in the Debtor, lacked the requisite ownership interest to file the Chapter 11 petition on the Debtor's behalf pursuant to the 87% Requirement set forth in the January 1, 2006 Amendment. (Dckt. 161, p. 9). FCRE has not pursued this argument, and the Court finds that the 87% Requirement did not bar the Debtor from filing this Chapter 11 reorganization case.[42]

_____

[42] The 87% Requirement provides as follows: "Notwithstanding any other provision of this Agreement, without the consent of Partners holding a total of 87% partnership interest in the Partnership, the General Partner shall have no authority to sell or lease, or otherwise dispose of all or substantially all of the assets of the Partnership or to amend, modify or alter this

As discussed above, FCRE first challenged the Debtor's status as a valid limited partnership, based on the administrative dissolution of ABGP I, in its objection (dckt. 289) to the Debtor's Disclosure Statement Proposed September 29, 2017. (Dckt. 265). More recently, in its Memorandum of Authorities (dckt. 388) filed on April 11, 2018, FCRE succinctly summarized its own arguments as follows:

(1) The administrative dissolution of ABGP, Inc. (the sole general partner of Debtor) on July 9, 2005 resulted in a dissolution of the limited partnership, A&B Associates, L.P.;

(2) A&B Associates, L.P. is a dissolved limited partnership, and is restricted to activities which constitute the "winding up of affairs" within the meaning of O.C.G.A. § 14-9-803;

(3) While A&B Associates, L.P. (as a dissolved limited partnership) may seek bankruptcy relief, it is limited to liquidation, and cannot pursue a Chapter 11 reorganization; and

(4) The attempted ratification dated January 10, 2018 is not sufficient to change the status of A&B.

(Dckt. 388, pp. 1-2).

For its part, the Debtor contends that any infirmities in its limited partnership status following the administrative dissolution of ABGP I were cured by the incorporation

---

provision." (FCRE Ex. 22, pp. 2-3). Based on this language, FCRE contends that Mr. Kettles lacked the necessary 87% partnership interest in the Debtor to file the Chapter 11 petition. (Dckt. 161, p. 9). It is true that Mr. Kettles only owned or controlled a 72% interest in the Debtor. Specifically, he owned a 20% interest as limited partner in his individual capacity, a 51% interest as limited partner via the August Group (of which he was the sole shareholder), and a 1% interest as general partner via ABGP, Inc. (of which he was the sole shareholder). (Dckt. 46, pp. 4-5). This 72% interest, of course, does not meet the 87% threshold. The Court, however, finds that the 87% Requirement is not applicable in this case. The Debtor, acting through Mr. Kettles as the authorized representative of the general partner ABGP, Inc., filed this Chapter 11 case seeking reorganization. There has been no suggestion that ABGP, Inc., intends "to sell or lease, or otherwise dispose of all or substantially all of the assets of the Partnership."

33

and admission of ABGP II, that FCRE is estopped from denying that the Debtor is a valid limited partnership, and that by its Ratification the Debtor agreed to be bound by all prior actions taken by ABGP I and ABGP II. (Dckt. 391, pp. 1-3, 17).

B. Section 109(d)

"Eligibility to be a debtor is governed by § 109 of the Bankruptcy Code." *In re Charles Street African Methodist Episcopal Church of Boston*, 478 B.R. 73, 82 (Bankr. D. Mass. 2012). Subsection (d), which governs eligibility to file a case under Chapter 11, provides as follows:

> (d) Only a railroad, *a person that may be a debtor under chapter 7 of this title* (except a stockbroker or a commodity broker), and an uninsured State member bank, or a corporation organized under section 25A of the Federal Reserve Act, which operates, or operates as, a multilateral clearing organization pursuant to section 409 of the Federal Deposit Insurance Corporation Improvement Act of 1991 may be a debtor under chapter 11 of this title.

11 U.S.C. § 109(d) (emphasis added). In this case, the Debtor's eligibility is based on its alleged status as a "person that may be a debtor under chapter 7" of the Bankruptcy Code. Subsection (b), which governs eligibility for Chapter 7, provides that, subject to certain exceptions not applicable here, "[a] person may be a debtor under chapter 7 of this title[.]" 11 U.S.C. § 109(b). "The term 'person' includes individual, partnership, and corporation[.]" 11 U.S.C. § 101(41). A limited partnership qualifies as a person under this definition. *See In re Energy Partners, Ltd.*, 422 B.R. 68, 79 (Bankr. S.D. Tex. 2009). Thus, the Debtor's status as a person under § 101(41), and therefore its eligibility to file this Chapter 11 case under § 109(d), depends on whether it is a valid limited partnership under Georgia law. FCRE contends that it is not. Accordingly, the Court must turn to Georgia law to determine

whether the Debtor is a valid limited partnership. *See In re Westover Hills Ltd.*, 46 B.R. 300, 303 (Bankr. D. Wyo. 1985) ("The question of existence of a limited partnership is to be determined by state law.").

## C. Applicable Georgia Limited Partnership Statute

At the time the Debtor was organized on November 1, 1976, Georgia limited partnerships were governed by the Uniform Limited Partnership Act, now codified at O.C.G.A. §§ 14-9A-1, *et seq.*, which applied to limited partnerships formed after February 15, 1952. Under this statute, the term "limited partnership" is defined as follows:

> A limited partnership is a partnership formed by two or more persons under Code Section 14-9A-20, having as members one or more general partners and one or more limited partners. The limited partners as such shall not be bound by the obligations of the partnership.

O.C.G.A. § 14-9A-2. In 1988, Georgia adopted the Revised Uniform Limited Partnership Act, O.C.G.A. §§ 14-9-100, *et seq.*, which became effective as to all limited partnerships formed on or after July 1 of that year. O.C.G.A. § 14-9-1201. However, O.C.G.A. § 14-9-1201 provides for the following election for limited partnerships already in existence prior to the effective date of the act:

> (b) A domestic limited partnership formed before July 1 of the year in which this chapter becomes effective may voluntarily elect, in accordance with any provision in its partnership agreement permitting it to do so or by complying with the procedures provided in its partnership agreement for amending the partnership agreement, to adopt the provisions of this chapter and thereafter may become subject to its provisions as of July 1 of the year in which this chapter becomes effective by filing with the Secretary of State at any time after April 15 of the year in which this chapter becomes effective a certificate of limited partnership that complies with this chapter or a certificate of amendment that would cause its certificate of limited partnership to comply with this chapter and that, in each case, specifically states that the limited partnership is electing to

adopt the provisions of this chapter. Upon the later of July 1 of the year in which this chapter becomes effective or the filing of a document complying with the immediately preceding sentence, all provisions of this chapter shall thereafter apply to the limited partnership.

(c) A domestic limited partnership formed before July 1 of the year in which this chapter becomes effective that does not adopt the provisions of this chapter pursuant to subsection(b) of this Code section shall continue to be governed by Article 1 or Article 2 of Chapter 9A of this title, as applicable.

O.C.G.A. § 14-9-1201(b), (c). In other words, the Revised Uniform Limited Partnership Act does not apply to a limited partnership formed prior to July 1, 1988, *unless* the limited partnership specifically elected to be covered by the new act.

In this case, nowhere in the record is there any document in which the Debtor specifically elected to be covered under the Revised Uniform Limited Partnership Act. However, as noted above, a Certificate of Limited Partnership, executed by Mr. Montgomery on behalf of MMC II (then the Debtor's general partner), was filed with the Georgia Secretary of State on December 27, 1990. (FCRE Ex. 17, p. 2). In response to this filing, the Georgia Secretary of State generated a document entitled "Certificate of Limited Partnership Filing." Although this document is barely legible, it appears to read as follows:

Certificate of Limited Partnership Filing

I, Max Cleland, Secretary of State of the State of Georgia, do hereby certify, under the seal of my office, that

A & B Associates, L.P.

a filing under prior Georgia Limited Partnership Act(s)

has filed with the Secretary of State filing/effective date set forth above [i.e. December 27, 1990] a Certificate of Limited Partnership ["of" or "or"] an amendment to its Certificate of Limited Partnership *to incorporate the*

> *provisions of the Revised Uniform Limited Partnership Act of 1988* as provided
> by the laws of the State of Georgia, and the fees therefore have been paid as
> provided by law, and that attached hereto is a true copy of said certificate of
> amendment.
>
> Witness my hand and official seal, in the City of Atlanta, and the State of
> Georgia on the date set forth below.
>
> Date Certificate: [illegible, but possibly "01/14/91"]

(FCRE Ex. 17, p. 1) (emphasis added). Inexplicably, the attached Certificate of Limited

Partnership itself makes no reference whatsoever to any election under the Revised Uniform

Limited Partnership Act. (FCRE Ex. 17, p. 2). The only other document referencing a

supposed election is the post-petition Ratification filed on January 10, 2018, which states that

the December 27, 1990 Certificate of Limited Partnership was "a way to elect that the

partnership be governed by the Georgia Limited Partnership Act of 1988 . . . ." (FCRE Ex.

30, p. 1).

At the hearing held on April 16, 2018, the parties stipulated that the Debtor

properly elected to be covered under the Revised Uniform Limited Partnership Act pursuant

to O.C.G.A. § 14-9-1201(b).[43] (Transcript, p. 27-28). Having reviewed the record, the Court

agrees and finds that the Revised Uniform Limited Partnership Act is the applicable Georgia

limited partnership statute. Additionally, the statutory scheme contemplates that "in any case

not provided for" under the Revised Uniform Limited Partnership Act, the provisions of the

Uniform Partnership Act, O.C.G.A. §§ 14-8-1, *et seq.*, "shall govern." O.C.G.A. § 14-9-

1204.

---

[43] In its brief filed on April 13, 2018, the Debtor acknowledged that it "elect[ed] to
become bound by the 1988 Limited Partnership Act . . . ." (Dckt. 391, p. 9).

A brief history of the Revised Uniform Limited Partnership Act is in order. In 1976, the National Conference of Commissioners on Uniform State Laws approved this model act, which was further revised in 1985. Jerome L. Kaplan, Kaplan's Nadler Georgia Corporations, Limited Partnerships & Limited Liability Companies, § 17:2 (Sept. 2018 update). Georgia's version of this statute, effective April 15, 1988, was based on the 1985 revision, albeit with some important differences. *Id.*

Critically, the Revised Uniform Limited Partnership Act is simply a series of *default rules* that apply where the limited partnership agreement is silent. *Trauner v. Thadikamalla (In re Thadikamalla)*, 481 B.R. 232, 238 (Bankr. N.D. Ga. 2012) (Diehl, J.) ("[N]o formal partnership document or agreement was executed by any of the Partners, so the default rules under the Georgia Revised Limited Partnership Act govern the Court's analysis."). Courts in other states have interpreted their respective versions of the act the same way. *See, e.g., Hanaway v. Parkesburg Grp., LP*, 168 A.3d 146, 159 (Pa. 2017) ("'A limited partnership is a creature of both statute and contract.' . . . As such, a limited partnership agreement defines the parties' rights and responsibilities, and [Pennsylvania's Revised Uniform Limited Partnership Act] supplies default provisions where the agreement is silent."); *In re LJM2 Co-Investment, L.P.*, 866 A.2d 762, 777 (Del. Ch. 2004) ("'[B]y statute, the parties to a Delaware limited partnership have the power and discretion to form and operate a limited partnership in an environment of private ordering according to the provisions in the limited partnership agreement.' Only 'if the partners have not expressly made provisions in their partnership agreement or [] the agreement is inconsistent with

mandatory statutory provisions, . . . will [a court] look for guidance from the statutory default rules . . . .'"").

The Georgia Revised Uniform Limited Partnership Act includes numerous prefatory clauses stating that a particular provision applies "[u]nless otherwise provided in writing in the partnership agreement . . . ." *See, e.g.,* O.C.G.A. §§ 14-9-602(a)(9); 14-9-803(b). Accordingly, the Court will consider whether relevant provisions of the Debtor's Limited Partnership Agreement control under the facts of this case, in which case some of the statutory default rules may *not* apply.

D. Effect on Limited Partnership of Dissolution of Corporate General Partner

The issue at the heart of this case is FCRE's contention that, under Georgia law, the administrative dissolution of ABGP I brought to an end the limited partnership known as A & B Associates, L.P., rendering it ineligible to be a debtor. To reach this conclusion, FCRE asks the Court to travel thirteen years back in time to unravel the status of ABGP I as corporate general partner. And to begin this unraveling, FCRE would have the Court first tug on those statutory provisions that require a limited partnership to have at least one general partner.

FCRE's argument goes something like this. Under the Georgia Revised Uniform Limited Partnership Act, a limited partnership is "a partnership formed in accordance with Code Section 14-9-201 by two or more persons under the laws of this state and *having one or more general partners* and one or more limited partners." O.C.G.A. § 14-9-101(8) (emphasis added). Here, it is undisputed that ABGP I had been the Debtor's sole

general partner since December 14, 1999. On July 9, 2005, however, ABGP I was administratively dissolved based on Mr. Kettles' failure to pay, for two consecutive years, the $50 annual fee for that entity. The consequences to the Debtor were fairly immediate, FCRE argues. And that is because, pursuant to O.C.G.A. § 14-9-602(a)(9),

> (a) A person ceases to be a general partner of a limited partnership upon the occurrence of one or more of the following events:
>
> . . .
>
> (9) Unless otherwise provided in writing in the partnership agreement or approved by written consent of all partners at the time, **in the case of a general partner that is a corporation**, the filing of a certificate of the corporation's dissolution or the equivalent for the corporation or the revocation of its charter and the lapse of 90 days after notice to the corporation of revocation without a reinstatement of its charter . . . .

O.C.G.A. § 14-9-602(a)(9) (emphasis added). In other words, this statute provides that a corporation ceases to be a general partner upon the occurrence of either of two alternatives: (1) the filing of a certificate of dissolution or the equivalent; or (2) the revocation of a corporation's charter and the corporation's failure to have its charter reinstated within 90 days of receiving notice of that revocation.[44]

What do the terms "certificate of dissolution" and "revocation of charter"

---

[44] FCRE appears to have consistently misread this provision as allowing a dissolved corporate general partner to seek reinstatement within 90 days regardless of whether a certificate of dissolution was filed or its charter was revoked. (Dckt. 358, p. 14; dckt. 388, p. 3). In fact, the plain language of the statute indicates that the 90-day reinstatement period *only* applies when a corporation's charter is revoked, not when a certificate of dissolution is filed. The Comment following § 14-9-602(a)(9), which was prepared under the supervision of the Joint Committee on Partnership Law of the Real Property and Corporate and Banking Law Sections of the State Bar of Georgia, supports this interpretation. *See* Comment to O.C.G.A. § 14-9-602(a)(9) ("Subsection (a) differs from RULPA Section 402 by clarifying that . . . (2) a corporate partner does not withdraw on revocation of its charter until it has been given an opportunity to have the charter reinstated . . . .").

mean? The notion of revoking a corporation's charter appears to be an artifact of earlier law governing corporations and thus is not applicable in this case. *See Venable Bros. v. Southern Granite Co.*, 135 Ga. 508 (1910) ("A corporation is an artificial person, created by law for specific purposes, the limit of whose existence, powers, and liberties is fixed by its charter.").[45] On the other hand, the term "certificate of dissolution" references, indirectly, O.C.G.A. § 14-2-1421. Under this provision, the Georgia Secretary of State is required to notify a corporation that grounds for dissolution exist. And, under § 14-2-1421(b),

> (b) If the corporation does not correct each ground for dissolution or demonstrate to the reasonable satisfaction of the Secretary of State that each ground determined by the Secretary of State does not exist within 60 days after notice is provided to the corporation, *the Secretary of State shall administratively dissolve the corporation by signing a certificate of dissolution that recites the ground or grounds for dissolution and its effective date.* The Secretary of State shall file the original of the certificate.

O.C.G.A. § 14-2-1421(b) (emphasis added). If these procedures were followed with respect to ABGP I, then presumably the Georgia Secretary of State would have filed a certificate of dissolution. Unfortunately, this document does not appear in the record before the Court. Indeed, the first documentary reference to the administrative dissolution of ABGP I appears in Mr. Kettles' request for reinstatement dated March 28, 2008. (FCRE Ex. 23).

---

[45] *See also De Loach v. Bennett*, 156 Ga. 633 (1923) ("Without an acceptance of the charter or articles of incorporation, express or implied, there can be no corporation."); *Meinhard, Schaul & Co. v. Bedingfield Mercantile Co.*, 4 Ga. App. 176 (1908) ("Corporations are creatures of the law, and can only come into existence in the manner prescribed by law. Unless the charter was granted, and thereafter had been accepted by the incorporators, and thereupon an organization had been perfected in compliance with the provisions of the charter, all of the agreements of the incorporators were nugatory, and absolutely void and of no effect in creating a corporation.") Under current law, the corporate existence begins with the filing of articles of incorporation pursuant to O.C.G.A. § 14-2-203(a). The required contents of the articles of incorporation are set forth in O.C.G.A. § 14-2-202.

Nevertheless, the parties have stipulated that ABGP I was administratively dissolved on July 9, 2005, apparently due to nonpayment of fees. Thus, FCRE contends that ABGP I ceased to be the Debtor's general partner pursuant to O.C.G.A. § 14-9-602(a)(9). Importantly, this statutory provision is a default rule, applicable "[u]nless otherwise provided in writing in the partnership agreement." O.C.G.A. § 14-9-602(a)(9). It nevertheless applies, according to FCRE, because "[t]here is nothing in the Limited Partnership Agreement . . . that specifically addresses 'dissolution.'" (Dckt. 388, p. 3).

The next thread in FCRE's argument is O.C.G.A. § 14-9-101(3), which defines the term "event of withdrawal of a general partner" as "an event that causes a person to cease to be a general partner as provided in Code Section 14-9-602." If ABGP I ceased to be a general partner under O.C.G.A. § 14-9-602(a)(9), then this would have constituted an event of withdrawal of a general partner under O.C.G.A. § 14-9-101(3). Such an event of withdrawal would then, in turn, have invoked O.C.G.A. § 14-9-801(3), which provides as follows:

**A limited partnership is dissolved and its affairs must be wound up** upon the first of the following to occur:

. . .

(3) An event of withdrawal of a general partner unless:

(A) There remains at least one other general partner and the written provisions of the partnership agreement permit the business of the limited partnership to be carried on by the remaining general partner or general partners alone or together with new general partners, and that partner or those general partners do so; or

(B) Within 90 days after the withdrawal, all partners other than the

> general partner with respect to which the event of withdrawal has
> occurred (or such partners as are provided for in the written provisions
> of the partnership agreement) agree in writing to continue the business
> of the limited partnership and, if there is no remaining general partner,
> to the appointment, effective as of the date of withdrawal, of one or
> more new general partners . . . .

O.C.G.A. § 14-9-801(3) (emphasis added). Subsection (3)(A) does not apply in this case

because ABGP I was the sole general partner. So, FCRE contends, unless all remaining

partners agreed in writing within 90 days to continue the limited partnership and to appoint

one or more general partners, the event of withdrawal of ABGP I would have resulted in the

dissolution of A & B Associates, L.P. Based on Mr. Kettles' testimony, prior to 2008 none

of the limited partners were aware that ABGP I had been administratively dissolved. Thus,

within 90 days of July 9, 2005, there was no written agreement to continue the business of

the limited partnership and to appoint a new general partner. Following the lapse of the 90-

day period, FCRE contends, the limited partnership would itself have been dissolved under

O.C.G.A. § 14-9-801(3).

FCRE goes on to argue that, as a dissolved limited partnership, the Debtor's

activities would have been limited to winding up its affairs pursuant to O.C.G.A. § 14-9-803,

which provides as follows:

> (a) After dissolution, except as provided in the partnership agreement,[46] the
> general partners who have not withdrawn or, if none, the limited partners may
> wind up the limited partnership's affairs but, if one or more of such general
> partners have engaged in wrongful conduct, or upon other cause shown, the
> court may wind up the limited partnership's affairs upon the application of a
> partner, his legal representative, or assignee.

---

[46] The Limited Partnership Agreement arguably does otherwise provide, as discussed
below in Section E.

43

(b) Unless otherwise provided in writing in the partnership agreement, the persons winding up the limited partnership's affairs may, in the name of, and for and on behalf of, the limited partnership:

> (1) Prosecute and defend suits, whether civil, criminal, or administrative;

> (2) Settle and close the limited partnership's business;

> (3) Dispose of and convey the limited partnership's property for cash;

> (4) Discharge the limited partnership's liabilities; and

> (5) Distribute to the partners any remaining assets of the limited partnership.

O.C.G.A. § 14-9-803. According to FCRE, "[w]hile there is no Georgia authority on point, general law is that the partnership cannot continue in business but must confine its activities to winding up its affairs." (Dckt. 388, p. 6). FCRE acknowledges that "[t]here appears to be no time limit within which a limited partnership is required to complete the winding up of its partnership affairs."[47] (Dckt. 388, p. 6).

Having supposedly established that the Debtor was dissolved under Georgia limited partnership law, FCRE concludes by citing numerous bankruptcy cases which, collectively, appear to stand for the proposition that a dissolved entity cannot seek reorganization under Chapter 11 but, at most, may only liquidate its assets under Chapter 11 or Chapter 7. *See, e.g., C-TC 9th Avenue Partnership v. Norton Co. (In re C-TC 9th Avenue Partnership)*, 113 F.3d 1304, 1309 (2d Cir. 1997) (holding "that a partnership in dissolution is not a 'person' eligible to avail itself of reorganization in Chapter 11"); *In re Superior Boat*

---

[47] "[D]issolution does not equate to termination of the Partnership. A limited partnership continues to exist after dissolution until there is cancellation of the certificate." *Thadikamalla*, 481 B.R. at 238 (citing O.C.G.A. §§ 14-9-203, 14-9-206(c)).

*Works, Inc.*, 438 B.R. 878,  886 (Bankr. N.D. Miss. 2010) (holding that a dissolved corporation was eligible to seek liquidation under Chapter 11); *In re StatePark Bldg. Grp., Ltd.*, 316 B.R. 466, 475 (Bankr. N.D. Tex. 2004) (holding that a dissolved limited partnership was eligible to file a Chapter 11 case for the purpose of liquidation); *In re Hagerstown Fiber Limited Partnership*, 226 B.R. 353, 358 (Bankr. S.D.N.Y. 1998) (holding that a dissolved partnership was not eligible to file a Chapter 11 case for purposes of reorganization *or* liquidation but was eligible to seek liquidation under Chapter 7); *In re Shea & Gould*, 214 B.R. 739, 747 (Bankr. S.D.N.Y. 1997) (holding that a dissolved partnership was eligible to seek liquidation under Chapter 11). Thus, as a dissolved limited partnership, A & B Associates, L.P. would have been ineligible to file this Chapter 11 case seeking reorganization. Accordingly, FCRE argues, this case should be dismissed or the Debtor should be forced to liquidate the Property, whether in this Chapter 11 case or in a case under Chapter 7.

E. The Limited Partnership Agreement Otherwise Provides

FCRE makes a compelling argument. If every one of its premises is correct, then the administrative dissolution of the general partner ABGP I on July 9, 2005, led inexorably to the Debtor's destruction as a limited partnership, rendering it ineligible to file this bankruptcy case. But the Court finds that one of FCRE's premises is *not* correct, namely that ABGP I ceased to be a general partner under O.C.G.A. § 14-9-602(a)(9) when a certificate of dissolution was (presumably) filed by the Georgia Secretary of State. Indeed, this statutory provision is not applicable because, by its terms, it only applies "[u]nless

45

otherwise provided in writing in the partnership agreement . . . ." O.C.G.A. § 14-9-602(a)(9).

Contrary to FCRE's assertion, the Limited Partnership Agreement *does* otherwise provide.

First, Section 4 of the Limited Partnership Agreement[48] governs the term of the partnership. Under Section 4.1,

> 4.1 The term of the Partnership shall commence upon the filing for [re]cord of the Agreement of Limited Partnership in the office of the Clerk [of] the Superior Court of Fulton County and shall continue until May 31, 1996;[49] [pr]ovided, however, that the Partnership shall be terminated and dissolved [pr]ior to such date upon:
>
> . . .
>
> > c) the transfer by the General Partner of its entire interest [in] the Partnership in breach of the covenant contained in Section 16.2 [here]of unless all of the then Limited Partners elect a new General Partner *[to] continue the Partnership*;
> >
> > d) the happening of a Disabling Event, as defined in Section 18 [he]reof, to the General Partner unless all of the then Limited Partners elect [a] new General Partner to *continue the Partnership*;
> >
> > . . .
> >
> > f) a material breach by the General Partner of any covenant contained herein unless a majority in interest of the Limited Partners elect *to continue the Partnership* notwithstanding any such breach.
>
> . . .

---

[48] A small portion of the left-hand margin of this document, which appears to have been copied several times since 1976, is not visible, causing the beginning of several words to be cut off. Where indicated, the Court has attempted to fill in these lacunae.

[49] This date was subsequently extended by various amendments to the Limited Partnership Agreement and is not in dispute in this case. Currently, the end of the limited partnership's term is set for May 31, 2020. (FCRE Ex. 17, p. 2). At the April 16, 2018 hearing, counsel for the Debtor represented that this period would be further extended by the terms of the Debtor's Chapter 11 plan. (Transcript, pp. 194-95).

(FCRE Ex. 1, p. 2) (emphasis added). Section 18, which governs the liquidation and

dissolution of the limited partnership, is also relevant. It provides in pertinent part:

> 18.1 <u>Method of Liquidation.</u> Upon the termination of the Partnership [p]ursuant
> to Section 4 hereof, the General Partner shall proceed to liquidate [t]he
> Partnership's assets and to dissolve the Partnership . . . .

> 18.2 <u>Date of Dissolution.</u> The partnership shall terminate and dissolve when all
> or substantially all of the property owned by the partnership shall have been
> disposed of in accordance with Section 18.1 above.

(FCRE Ex. 1, p. 11). Section 18.1 presumes that there will be a general partner capable of

liquidating the assets of the limited partnership. And Section 18.2 states that the limited

partnership will dissolve when the Property is sold.

Although Section 4.1(d) indicates that the term "disabling event" is defined in

Section 18, the applicable provision is actually Section 17. It is Section 17.1 that governs the

termination of a general partner, to wit:

> 17.1 General Partner. Except as otherwise provided in Section 4.1 e)[50] [h]ereof,
> *in the event the General Partner* (hereinafter referred to as the ["]Disabled
> General Partner") *terminates*, has its net worth decline to less than 15% of the
> total Limited Partners' equity capital accounts, becomes legally insolvent or
> bankrupt, or withdraws from the Partnership in breach of the covenant contained
> in Section 14 hereof (each of which events are hereinafter referred to as a
> "Disabling Event"), *the Partnership shall continue* and the Partnership interest
> of the Disabled General Partner shall [b]e converted into a Limited Partner's
> interest with the same rights in income as the Disabled General Partner had with
> respect to its interest [a]s a General Partner; provided, however, that the
> Disabled General Partner or its personal representative, as the case may be, shall
> become a substituted Limited Partner only upon compliance with the same terms
> and conditions applicable to a transferee of a Limited Partner pursuant to
> [S]ection 16 hereof; *provided further that a Disabling Event shall not [s]erve*

---

[50] Under Section 4.1 (e), the partnership will be terminated and dissolved upon "the sale
for cash by the Partnership of all or substantially [a]ll of its interest in the Tract and any
improvements thereon . . . ." (FCRE Ex. 1, p. 2). That provision does not apply in this case.

> *to terminate the Partnership if the majority-in-interest of the [L]imited Partners agree, within sixty days thereafter, to elect a successor [G]eneral Partner to serve in the place of the Disabled General Partner.* Such [s]uccessor General Partner shall have all of the rights and liabilities of the previous General Partner, except that the successor shall not have the rights [t]o the General Partner's profit and equity interest in the Partnership if such [G]eneral Partner has already assigned such interest pursuant to Section 16.2 [h]erein.

(FCRE Ex. 1, p. 11) (emphasis added). This provision, although not a model of clarity, states that, in the event that the general partner "terminates," the limited partnership will continue so long as the majority-in-interest of the limited partners elect a successor general partner within 60 days. Admittedly, when ABGP I was administratively dissolved, the limited partners did not comply with Section 17.1. No successor general partner was elected within 60 days after July 9, 2005. Nevertheless, the Court finds that the limited partners continued the business of the limited partnership.

The Limited Partnership Agreement reflects a simple business model, namely construction, ownership, and management of an apartment complex:

[Se]ction 3. Purpose of Partnership

3.1 The primary purpose of the Partnership shall be to develop the [Pr]operty and to construct thereon for rental and investment purposes the [96] unit apartment project in accordance with the plans and specifications [la]beled "Versailles Apartments".

(FCRE Ex. 1, p. 2). This is a long-term proposition. To be sure, the limited partnership could elect to sell the Property at any point along the way. But the provisions of the Limited Partnership Agreement reflect an intention to continue the operation of the Property. And that is exactly what the limited partners did. Notwithstanding the administrative dissolution of the corporate general partner, the limited partnership continued to operate the apartment

complex as if nothing had changed. And, in both 2010 (with Coastal Federal) and 2015 (with

FCRE), the limited partnership sought and obtained new financing. In connection with the

first of these loans, the November 4, 2010 Amendment to the Limited Partnership Agreement

provided as follows:

> 5. Dissolution. The Partnership shall not terminate or dissolve *solely as a consequence of the bankruptcy or insolvency of one or more of the general partners* of the Partnership, but *the Partnership shall continue so long as there remains a solvent general partner* of the Partnership. Subject to applicable law, *dissolution of the Partnership shall not occur as long as the Partnership remains owner of the Property subject to the First Mortgage.*

(FCRE Ex. 25, p. 4) (emphasis added). Thus, through their conduct, including the execution

of this amendment, the limited partners evinced an intent to continue the business of the

limited partnership.

Moreover, the Limited Partnership Agreement by its terms contemplated the

admission and withdrawal of general partners:

> 16.2 Transfer of General Partner's Interest. The General Partner [h]ereby covenants and agrees that it will not sell, assign, or transfer all or [a]ny part of its interest in the Partnership to any person, firm, or corporation *[w]ithout the majority-in-interest consent of the Partners*. Nothing in [t]his agreement shall prohibit the General Partner from transferring its [p]rofit and equity interest in the Partnership to anyone of its choice [w]hich is permissible and constitutes a valid transfer, so long as the [G]eneral Partner is subject to the obligations herein at the time of [t]ransfer, which is specifically permissible.

> 16.3 Permitted Transfer of General Partner's Interest. In the event the [G]eneral Partner transfers all or any part of its interest in the Partnership [t]o a third party with the consent of the Partners pursuant to Section 16.2 [a]bove, *the Partnership shall continue* and the transferee of such interest shall [b]e admitted to the Partnership as a General Partner with the same interest in [t]he Partnership capital, profits, losses, tax items, and distributable income as [t]he transferring General Partner had with respect to the transferred interest in [t]he Partnership; provided, however, that any such transferee shall be subject [t]o the terms and

conditions of this Agreement and shall promptly upon demand of [t]he Limited Partners execute a consent to be bound by such terms and con[d]itions.

(FCRE Ex. 1, p. 10) (emphasis added). Consistent with the intent (if not the letter) of these provisions, the identity of the general partner has changed from PHB (renamed Uniflex) to MMC II to the August Group to ABGP I (prior to its administrative dissolution). The Court thus finds that the Limited Partnership Agreement was designed to facilitate the regime changes represented by these new general partners and, further, to avoid an unnecessary disruption in the business of the limited partnership.

The Court's conclusion is consistent with the "policy of freedom of contract and maximum flexibility" embodied in the Revised Uniform Limited Partnership Act. 59A Am. Jur. 2d *Partnership* § 796 (August 2018 update). The "basic approach" of this act "is to permit partners to have the broadest possible discretion in drafting their partnership agreements . . . ." *Id.* "The partners may make any agreement between themselves that they deem desirable so long as it is not in violation of prohibitory statutory provisions, the common law, or public policy." *Id.* Here, the limited partners have freely chosen to continue the business of the limited partnership, and the Court will not nullify their decision.

F. Georgia's Uniform Partnership Act Also Supports Continuation of the Limited Partnership

The Court would reach the same conclusion even if the limited partnership *was* dissolved, whether by operation of § 14-9-602(a)(9) or by the limited partners' failure to comply with Section 17.1 of the Limited Partnership Agreement. This is because, under O.C.G.A. § 14-9-1204, the provisions of Georgia's Uniform Partnership Act shall govern in any case not provided for under the Revised Uniform Limited Partnership Act. The Court

finds that this provision authorizes the continuation of a limited partnership's business pursuant to O.C.G.A. § 14-8-38 ("Right of partners to application of partnership property"), which provides in relevant part as follows:

> (a) Unless otherwise agreed by the partners in the partnership agreement, *at the time of the transaction or at any other time, including but not limited to, an agreement to continue the business of the partnership, when dissolution is caused in any way,* other than wrongfully either in contravention of the partnership agreement or as a result of other wrongful conduct of a partner, any partner, or the legal representative of the estate of a deceased partner, as against his copartners and all persons claiming through them in respect of their interests in the partnership, may have the partnership property applied to discharge its liabilities and the surplus applied to pay in cash or its equivalent the net amount owing to the respective partners. The foregoing provision shall not apply if dissolution is caused by expulsion of a partner in accordance with the terms of a partnership agreement.
>
> . . .
>
> (b) Unless otherwise agreed by the partners in the partnership agreement at the time of the transaction or at any other time, when dissolution is caused wrongfully either in contravention of the partnership agreement or as a result of other wrongful conduct of a partner, the rights of the partners shall be as follows:
>
> . . .
>
>> (2) *The partners who have not caused the dissolution wrongfully may, if they all so agree at the time of the transaction or if the partnership agreement so provides, continue the business in the same name,* either by themselves or jointly with others, and for that purpose may possess the partnership property. If the partners continue the business, they shall pay to any partner who has caused the dissolution wrongfully the value of his interest in the partnership at the dissolution less any damages or other amounts recoverable under subparagraph (B) of paragraph (1) of this subsection and obtain his discharge or appropriately hold him harmless from all present or future partnership liabilities.

O.C.G.A. § 14-8-38 (emphasis added).

This statute plainly contemplates that, when dissolution is caused "in any way" (except wrongfully), the remaining partners can agree "at any . . . time" to "continue the business of the partnership." The Comment to O.C.G.A. § 14-9-801, which governs events triggering the dissolution of a limited partnership, supports the Court's interpretation. This Comment, which was prepared under the supervision of the Joint Committee on Partnership Law of the Real Property and Corporate and Banking Law Sections of the State Bar of Georgia, states that "the [limited] partnership business can be continued after dissolution pursuant to Section 14-8-38, which applies pursuant to Section 14-9-1204." Comment to O.C.G.A. § 14-9-801. Based on the aforementioned actions of the limited partners to continue the operation of the apartment complex, the Court finds that they elected to continue the limited partnership notwithstanding any dissolution.

For these reasons, the administrative dissolution of ABGP I did not render the limited partnership unviable. It *did* necessitate admitting a new general partner. And so the question remains: Did ABGP I have the power to hand off its interest as general partner to a new general partner?

G. Applicable Time Period to Request Reinstatement of a Dissolved Corporation

Business corporations organized under the laws of Georgia are governed by the Georgia Business Corporation Code, O.C.G.A. §§ 14-2-101, *et seq.* Under this statute, a corporation is required to pay a $50 annual fee. O.C.G.A. § 14-2-122(3). Mr. Kettles testified that he must have failed to pay this fee on behalf of ABGP I for two successive years. This oversight then authorized the administrative dissolution of ABGP I pursuant to

O.C.G.A. § 14-2-1420(2), which provides as follows:

> The Secretary of State may commence a proceeding under Code Section 14-2-1421 to dissolve a corporation administratively if:
>
> . . .
>
> (2) The corporation does not deliver its annual registration to the Secretary of State, together with all required fees and penalties, within 60 days after it is due.

O.C.G.A. § 14-2-1420(2). The procedures for administrative dissolution are then set forth in O.C.G.A. § 14-2-1421.

As the parties have stipulated, ABGP I was administratively dissolved on July 9, 2005, and the Court has found that some time passed before Mr. Kettles realized this. On March 28, 2008, he requested reinstatement of ABGP I. For unknown reasons, the Georgia Secretary of State did not respond to this request. At the time, Mr. Kettles believed that Georgia law required an administratively-dissolved corporation to seek reinstatement within two years and that the Secretary of State's failure to respond was due to the expiration of this two-year period. (Transcript, p. 133-34).

Under Georgia law, a corporation that is administratively dissolved has a limited time within which to seek reinstatement, and the expiration of that limitation period may affect the post-dissolution actions that such corporation is permitted to undertake. However, the controlling statutory provision, O.C.G.A. § 14-2-1422, has been amended several times over the years, creating uncertainty as to which limitation period applies to ABGP I. In their briefs and oral arguments, the parties have variously suggested that the applicable limitation period for ABGP I to seek reinstatement was either two years, five

years, or an indefinite length of time.[51] This issue therefore requires some discussion.

In 1988, Georgia adopted a version of § 14-2-1422 that required applications

for reinstatement to be filed within two years of dissolution:

> (a) A corporation administratively dissolved under Code Section 14-2-1421 may apply to the Secretary of State for reinstatement within two years after the effective date of dissolution.

1988 Ga. Laws 1219. In 1995, this section was amended to provide for a five-year period:

> (a) A corporation administratively dissolved under Code Section 14-2-1421 may apply to the Secretary of State for reinstatement within five years after the effective date of dissolution.

1995 Ga. Laws 975. A 1997 amendment, however, contained no time limit for reinstatement:

> (a) A corporation administratively dissolved under Code Section 14-2-1421 may apply to the Secretary of State for reinstatement.

1997 Ga. Laws 1165. It was this 1997 version of the statutory text, which did not provide any

time limit, that was in effect when ABGP I was administratively dissolved on July 9, 2005.

In 2008, Georgia adopted yet another version of § 14-2-1422 that again

featured the five-year limitation period:

> (a) A corporation administratively dissolved under Code Section 14-2-1421 may apply to the Secretary of State for reinstatement within five years after the effective date of such dissolution.

---

[51] In its objection to the Debtor's initial disclosure statement, FCRE argued that the applicable time period was two years. (Dckt. 289, p. 7). In its Memorandum of Authorities, FCRE acknowledged that it is not clear whether the applicable time period was two years or five years. (Dckt. 388, p. 2). FCRE's current position is that the five-year period in the 2008 amendment applied retroactively to the July 9, 2005 administrative dissolution of ABGP I, so that it could not be revived after July 9, 2010. (Dckt. 418, p. 2). In its Ratification, the Debtor asserted that the two-year period was applicable. (FCRE Ex. 30, p. 2). However, the Debtor's current position is that on July 9, 2005, "there was no time limit by which a corporation must request reinstatement." (Dckt. 391, p. 10) (emphasis omitted).

2008 Ga. Laws 256. This language was not changed by a 2011 amendment, and thus the current version of the statute contains the five-year period for seeking reinstatement. FCRE would have the Court apply this five-year limitation period retroactively to July 9, 2005, based on subsection (e), which provides as follows:

> (e) This Code section shall apply to all corporations administratively dissolved under Code Section 14-2-1421 or any similar former statute, regardless of the date of dissolution.

O.C.G.A. § 14-2-1422(e). On the other hand, the Debtor asserts, with no elaboration, that such retroactive application would be "unconstitutional." (Dckt. 391, p. 10).

On this narrow issue, the Court agrees with FCRE. As a general rule, Georgia "[l]aws prescribe only for the future; they cannot impair the obligation of contracts nor, ordinarily, have a retrospective operation." O.C.G.A. § 1-3-5. However, this general rule is subject to certain exceptions. As the Supreme Court of Georgia has stated, "[s]tatutes of limitation should not be applied retroactively unless the legislature expressly provides for retroactive application or unless the examination of the statute as a whole clearly demonstrates an intent by the legislature for retroactive application." *McNeal Constr. Co. v. Wilson*, 271 Ga. 540, 541 (1999) (citing *Canton Textile Mills v. Latham*, 253 Ga. 102, 103 (1984)). *See also Polito v. Holland*, 258 Ga. 54, 55 (1988) ("Generally statutes prescribe for the future and that is the construction to be given unless there is a clear contrary intention shown.").

Here, § 14-2-1422(e), effective in 2008, states that the five-year limitation period for seeking reinstatement "shall apply to all corporations administratively dissolved

under Code Section 14-2-1421 or *any similar former statute, regardless of the date of dissolution.*" O.C.G.A. § 14-2-1422(e) (emphasis added). By this language, the legislature expressly provided for retroactive application of the five-year period.[52] Accordingly, the Court finds that at the time of administrative dissolution on July 9, 2005, the five-year period to seek reinstatement applied.[53] This period then expired on July 9, 2010. It is undisputed that, despite Mr. Kettles' request on March 28, 2008, ABGP I was not reinstated within the applicable five-year period.

The issue of reinstatement, however, is not the end of the Court's inquiry in this case. Notwithstanding Mr. Kettles' failure to have ABGP I reinstated, under Georgia law, administratively-dissolved corporations continue to exist and are permitted to take certain actions. *See Fulton Paper Co., Inc. v. Reeves*, 212 Ga. App. 314, 316-17 (1994) ("[The administratively-dissolved corporation] continued to exist as a corporate entity and . . . was likewise authorized to carry on business, albeit for very limited purposes. This is true regardless of whether [the corporation] was ultimately reinstated under OCGA § 14-2-1422."). Were the actions of ABGP I following its administrative dissolution in accordance with the limitations imposed under Georgia law?

---

[52] Retroactive application would be necessary to avoid an entire generation (1997-2008) of dissolved Georgia corporations that might remain dormant for years.

[53] In *GC Quality Lubricants, Inc. v. Doherty, Duggan & Rouse Insurors*, 304 Ga. App. 767 (2010), the Court of Appeals of Georgia simply assumed that the five-year limitation period applied to a corporation administratively dissolved on July 9, 2005, coincidentally the same date on which ABGP I was administratively dissolved. *Id.* at 769 ("Pursuant to OCGA § 14-2-1422(a), however, an administratively dissolved corporation 'may apply to the Secretary of State for reinstatement within five years after the effective date of such dissolution.'").

H. Permissible Corporate Actions After Administrative Dissolution

What did ABGP I do after its administrative dissolution on July 9, 2005? The record reflects that it did two things. First, acting through Mr. Kettles, it executed the January 1, 2006 Amendment to the Limited Partnership Agreement. Second, it allegedly transferred its interest as the Debtor's general partner to ABGP II. Were these permissible actions for an administratively-dissolved corporation to take? In other words, what can an administratively-dissolved corporation do?

Section § 14-2-1421 of the Georgia Business Corporation Code, which sets forth the procedures for administrative dissolution and the effect thereof, provides in relevant part as follows:

. . .

(c) *A corporation administratively dissolved continues its corporate existence but may not carry on any business except that necessary to wind up and liquidate its business and affairs under Code Section 14-2-1405.* Winding up the business of a corporation administratively dissolved may include the corporation's proceeding, at any time after the effective date of the administrative dissolution, (1) in accordance with Code Section 14-2-1406[54] to notify known claimants, and (2) to mail or deliver, with accompanying payment of the cost of publication, a notice containing the information specified in subsection (b) of Code Section 14-2-1407[55] for publication in accordance with subsection (b) of Code Section 14-2-

---

[54] Known claimants must be notified pursuant to § 14-2-1406, which provides that "[a] corporation that has filed a notice of intent to dissolve may dispose of the known claims against it by following the procedure described in this Code section." O.C.G.A. § 14-2-1406(a).

[55] Under § 14-2-1407(a), "[a] corporation that has filed a notice of intent to dissolve may include in the notice of its intent to dissolve published under Code Section 14-2-1403.1 a request that persons with claims against the corporation present them in accordance with subsection (b) of this Code section." O.C.G.A. § 14-2-1407(a).

1403.1.[56] Upon such notice, claims against the administratively dissolved corporation will be limited as specified in Code Sections 14-2-1406 and 14-2-1407, respectively.

(d) The administrative dissolution of a corporation does not terminate the authority of its registered agent.

O.C.G.A. § 14-2-1421 (emphasis added).[57] Thus, following administrative dissolution, the corporation may only take actions necessary to wind up its affairs. Subsection (c) identifies two actions that a corporation may take during this winding up period: (1) notifying the corporation's known claimants; and (2) mailing or delivering certain additional notices of dissolution. But this list is not exhaustive.

Section 14-2-1421 also states that an administratively-dissolved corporation may take certain actions enumerated in O.C.G.A. § 14-2-1405 ("Effect of notice of intent to dissolve"), which appears in the portion of the Georgia Business Corporation Code governing voluntary dissolution. This section provides as follows:

A corporation that has filed a notice to dissolve continues its corporate existence but may not carry on any business except that appropriate to wind up and liquidate its business and affairs, including:

(1) Collecting its assets;

(2) Disposing of its properties that will not be distributed in kind to its

---

[56] Under § 14-2-1403.1(a), "[t]ogether with the notice of intent to dissolve provided for in Code Section 14-2-1403, the corporation shall deliver to the Secretary of State an undertaking . . . that the request for publication of a notice of intent to voluntarily dissolve the corporation and payment therefor will be made as required by subsection (b) of this Code section." O.C.G.A. § 14-2-1403.1(a).

[57] Here, the record includes neither the notice of determination referenced in § 14-2-1421(a) nor the certificate of dissolution referenced in § 14-2-1421(b). Nevertheless, it is undisputed that the corporate entity known as ABGP I was administratively dissolved on July 9, 2005.

shareholders;

(3) Discharging or making provision for discharging its liabilities;

(4) Distributing its remaining property among its shareholders according to their interests; and

(5) Doing every other act necessary to wind up and liquidate its business and affairs.

O.C.G.A. § 14-2-1405. Clearly, this is not an exhaustive list, either. In any event, the statutory scheme recognizes that certain actions must or may be taken by, or on behalf of, an administratively-dissolved corporation. This reflects the legislature's recognition that administrative dissolution has far-reaching consequences and that an abrupt ending would work real harm. Thus, the question before the Court is whether the actions of ABGP I following its administrative dissolution were "necessary to wind up and liquidate" the business and affairs of that entity. Several Georgia cases bear on this issue.

*Gas Pump, Inc. v. General Cinema Beverages of North Florida, Inc.*, 263 Ga. 583 (1993), is the seminal case involving the permissible activities of an administratively-dissolved corporation under Georgia law. The history of that case, originally filed in the United States District Court for the Southern District of Georgia on March 21, 1991, deserves some attention. As set forth by the district court, the facts in *Gas Pump* were as follows:

Gas Pump, a corporation owned by Jack Karesh, purchased soft drinks from the Defendants for resale to customers in the Savannah area. In May of 1988, the Georgia Secretary of State administratively dissolved Gas Pump for failure to satisfy the state's annual filing and fee requirements for a Georgia corporation. Gas Pump did not seek reinstatement within two years, as permitted by the Georgia statute. Therefore, Gas Pump was a dissolved corporation when it filed this civil antitrust suit, in the spring of 1991, alleging that the Defendants conspired to fix prices in the soft drink industry between 1979 and 1985.

*Gas Pump, Inc. v. General Cinema Beverages of North Florida, Inc.*, CV: 491-100, 2011 WL 13248863, at *1 (S.D. Ga. Dec. 18, 1991) (Edenfield, J.). In a motion for summary judgment, the defendants argued that Gas Pump, as an administratively-dissolved corporation, lacked capacity to file the antitrust suit. Judge Edenfield agreed, holding that the antitrust claims were "in no way connected to Gas Pump's dissolution or winding up." *Id.* at *3. On appeal, the Eleventh Circuit determined that no Georgia case directly addressed the issue and therefore certified the following question to the Supreme Court of Georgia:

> Whether a corporation that is administratively dissolved pursuant to § 14-2-1421 of the Official Code of Georgia Annotated has the capacity to bring a federal antitrust claim?

*Gas Pump, Inc. v. General Cinema Beverages of North Florida, Inc.*, 982 F.2d 478, 479-80 (11th Cir. 1993).

On November 8, 1993, the Supreme Court answered the certified question by holding that Gas Pump lacked capacity to bring the antitrust suit due to "the expiration of the time in which an administratively-dissolved corporation continues its existence." *Gas Pump, Inc. v. General Cinema Beverages of North Florida, Inc.*, 263 Ga. 583 (1993). More specifically, the Supreme Court stated:

> The expiration of the time for reinstatement puts a stamp of finality on the demise of the corporation-it can no longer be resuscitated. The unavoidable conclusion is that the corporation cannot, after the time its demise is deemed complete, *initiate any activity*. To permit a suit to be initiated in the name of the dissolved corporation after that time would be to sanction a form of legal necromancy, reanimation of the empty husk of a dead corporate entity. We reject, therefore, Gas Pump's assertion that the legal existence of an administratively-dissolved corporation continues indefinitely and without practical limit on its ability to conduct any business which it asserts is necessary to winding up its affairs. Read

> together §§ 14-2-1421, and 14-2-1422 provide a period of two years in which an administratively-dissolved corporation can initiate activities necessary to the winding up and liquidation of its affairs and business. If it is not reinstated during that period, *it can take no further action.*

*Id.* at 584 (emphasis added). Despite stating in broad language that an administratively-dissolved corporation "cannot . . . initiate any activity" and "can take no further action," the Supreme Court immediately qualified its holding on this certified question as follows:

> Because the limits which Georgia statutes place on the activities of administratively-dissolved corporations are based on *fact-sensitive criteria, i.e., whether the particular act is "necessary" for the winding up of the corporation's business* and, in the case of filing a lawsuit, whether the action is filed within the time that the corporation can still undertake necessary activities, *the question posed by the Eleventh Circuit cannot be answered in an absolute fashion that will apply to every administratively-dissolved corporation.* However, as to Gas Pump's capacity to maintain the federal antitrust action at issue in this case, the answer must be in the negative: it does not have that capacity.

*Id.* (emphasis added). At any rate, on January 19, 1994, the Eleventh Circuit affirmed Judge Edenfield's holding that Gas Pump did not have the capacity to file the antitrust suit. *Gas Pump, Inc. v. General Cinema Beverages of North Florida, Inc.*, 12 F.3d 181, 182 (11th Cir. 1994). Notably, on appeal, Gas Pump's sole shareholder raised the argument that the company had the present ability to assign its antitrust claim to him. *Id.* The Eleventh Circuit rejected this argument, stating that "[b]ecause the two-year period [to seek reinstatement] has expired, Gas Pump may no longer initiate any activity, including assigning the claim to [the shareholder]." *Id.*

The principles set forth by the Supreme Court of Georgia in *Gas Pump* have been applied in several subsequent cases. *See, e.g., GC Quality Lubricants, Inc. v. Doherty, Duggan & Rouse Insurors*, 304 Ga. App. 767, 770 (2010) (holding that an administratively-

dissolved corporation lacked capacity to bring action for property damage after the expiration of the two-year survival statute for asserting claims under O.C.G.A. § 14-2-1410); *Deere & Co. v. JPS Dev., Inc.*, 264 Ga. App. 672, 673 (2003) (holding that a dissolved corporation lacked capacity to bring renewal action for breach of warranty after the expiration of the two-year winding up period); *Exclusive Prop., Inc. v. Jones*, 218 Ga. App. 229, 229-30 (1995) (holding that an administratively-dissolved corporation's maintenance of a legal malpractice lawsuit was not a necessary part of winding up its affairs). *But cf. Fulton Paper Co., Inc. v. Reeves*, 212 Ga. App. 314, 316-17 (1994) (holding that an administratively-dissolved corporation was authorized to carry on business for limited purposes, and thus that a corporate officer was not personally liable on a "nonexistent principal" theory). None of these cases, however, are directly on point with the instant case, where the post-dissolution actions of ABGP I consisted only of executing an amendment to the Limited Partnership Agreement and of transferring an interest to ABGP II.

Applying the principles of *Gas Pump* to this case, the Court reiterates the Supreme Court's statement that its holding does not apply to every administratively-dissolved corporation. *Gas Pump, Inc.*, 263 Ga. at 584. The holding in *Gas Pump* was that a corporation lacked capacity to file an antitrust lawsuit after the expiration of its two-year period for seeking reinstatement. *Id.* Beyond this narrow holding, the Supreme Court instructed that whether a specific action taken by an administratively-dissolved corporation is "necessary" for winding up is a question "to be decided on a case by case basis" using "fact-sensitive criteria." *Id.* (noting as an example of such a fact-sensitive criterion "*in the case of filing a*

*lawsuit*, whether the action is filed within the time that the corporation can still undertake necessary activities . . . ."). Thus, although the Supreme Court stated that, after the period for seeking reinstatement expires, an administratively-dissolved corporation "cannot . . . initiate any activity" and "can take no further action," these statements do not foreclose the possibility that ABGP I could transfer to ABGP II its interest in A & B Associates, L.P.[58] *Id.*

Returning to the statutory language, the Georgia Business Corporation Code provides that an administratively-dissolved corporation "may not carry on any business except that necessary to wind up and liquidate its business and affairs . . . ." O.C.G.A. § 14-2-1421(c). The term "winding up," though not defined in the statute, generally refers to "[t]he process of settling accounts and liquidating assets in anticipation of a partnership's or a corporation's dissolution." *Winding Up*, Black's Law Dictionary (10th ed. 2014). In *Gas Pump*, Judge Edenfield explained that the word "necessary," which is also not defined in the statute, "may import absolute physical necessity or inevitability or it may import that which is only convenient, useful, appropriate, suitable, proper, or conducive to the end sought." *Gas Pump, Inc.*, 2011 WL 13248863, at *3 (quoting Black's Law Dictionary 928 (5th ed. 1979)). The statute appears to support this broad definition of that term. *Compare* O.C.G.A. § 14-2-1421(c) (referencing actions that are "necessary" under § 14-2-1405) *with* O.C.G.A. § 14-2-1405 ("A corporation that has filed a notice to dissolve continues its corporate existence but may not carry on any business except that *appropriate* to wind up and liquidate its business

---

[58] Accordingly, the Court respectfully disagrees with Judge Hagenau's statement that "[T]he law in Georgia is clear that after the reinstatement period ends, an administratively dissolved corporation ceases to exist." *Gebhardt v. McKeever (In re McKeever)*, 550 B.R. 623, 637 (Bankr. N.D. Ga. 2016).

and affairs . . . .").

Under this standard, the Court finds that the execution of the November 1, 2006 Amendment to the Limited Partnership Agreement was permissible under Georgia law. This amendment merely amended the list of partners to the limited partnership to "reflect the buyout of certain Limited Partners and the recent admission of others," to reclassify the various interests in the Debtor, to make certain changes to the distribution of distributable income and distributable capital, and to require the consent of 87% of the limited partnership interests before the general partner may "sell or lease, or otherwise dispose of all or substantially all of the assets of the Partnership . . . ." (FCRE Ex. 22, pp. 1-3). These changes to the Limited Partnership Agreement were consistent with and appropriate to the winding up of the business of ABGP I.

What about the transfer from ABGP I to ABGP II of the interest as the Debtor's general partner? Was this necessary or appropriate to the winding up of ABGP I? The Court finds that it was. Notwithstanding its administrative dissolution on July 9, 2005, which commenced a five-year winding up period, the Court finds that ABGP I continued its corporate existence for the purposes of winding up its affairs through and until the incorporation of ABGP II on November 4, 2010. At that time, Mr. Kettles, who was the sole shareholder of both corporate entities, properly transferred the interest as general partner from the administratively-dissolved ABGP I to the newly-incorporated ABGP II.[59] That interest,

---

[59] In Georgia, a business corporation may also be voluntarily dissolved. *See* O.C.G.A. §§ 14-2-1401, *et seq.* Under these provisions, "[u]pon filing of articles of dissolution the corporation shall cease to exist, except for the purpose of actions or other proceedings, which may be brought against the corporation by service upon any of its last executive officers named

which was the sole asset of ABGP I, then became the sole asset of ABGP II. The November 4, 2010 Amendment to the Limited Partnership Agreement explicitly provided for the creation of a new corporate general partner. Although ABGP II was not identified by name, the Court finds that ABGP II was the entity intended to be the new general partner.

Supporting the Court's conclusion is the fact that ABGP I and ABGP II both had the same *raison d'etre*, namely to serve as the general partner of A & B Associates, L.P. Specifically, the Articles of Incorporation of ABGP I provide as follows:

> The Corporation's business and purpose shall consist solely of the following:
>
> (i) To acquire a general partnership interest in and act as general partner of A & B Associates, L.P., a Georgia limited partnership (the "Partnership"), which is engaged solely in the ownership, operation and management of the real estate project known as Versailles Apartments located in Port Royal, South Carolina (the "Property"), pursuant to and in accordance with these Articles of Incorporation and the Partnership's Limited Partnership Agreement; and
>
> (ii) to engage in such other lawful activities permitted to corporations by the Business Corporation Code of the State of Georgia as are incidental, necessary or appropriate to the foregoing.

(FCRE Ex. 20, p. 3). Likewise, the Articles of Incorporation of ABGP II state:

> The Corporation's business and purpose shall consist solely of the following:

---

in its last annual registration, and except for such actions as the shareholders, directors, and officers take to protect any remedy, right, or claim on behalf of the corporation, or to defend, compromise, or settle any claim against the corporation, all of which may proceed in the corporate name." O.C.G.A. § 14-2-1408(b). Further, "[d]eeds or other transfer instruments requiring execution after the dissolution of a corporation may be signed by any two of the last officers or directors of the corporation and shall operate to convey the interest of the corporation in the real estate or other property described." O.C.G.A. § 14-2-1408(c). An administratively-dissolved corporation should be able to do what a voluntarily-dissolved corporation can do in this regard. *See* O.C.G.A. § 14-2-1421(c), 14-2-1405. Here, the November 4, 2010 Amendment was executed by the two remaining officers of ABGP I, Mr. Kettles and Sharan Kettles.

(i) To acquire a general partnership interest in and act as general partner of A & B Associates, L.P., a Georgia limited partnership (the "Partnership"), which is engaged solely in the ownership, operation and management of the real estate project known as August on Southside Apartments located in Port Royal, South Carolina (the "Property"), pursuant to and in accordance with these Articles of Incorporation and the Partnership's Limited Partnership Agreement; and

(ii) (ii) [sic] to engage in such other lawful activities permitted to corporations by the Business Corporation Code of the State of Georgia as are incidental, necessary or appropriate to the foregoing.

(FCRE Ex. 24, p. 3). By virtue of its administrative dissolution on July 9, 2005, ABGP I lost the ability to carry on indefinitely as the Debtor's general partner. On its deathbed, when it could no longer fulfill its sole purpose in life, it passed that responsibility on to a new entity, ABGP II. In so doing, ABGP I fulfilled its fiduciary duties to the limited partnership and to the other limited partners. *See Hendry v. Wells*, 286 Ga. App. 774, 783-84 (2007) ("In addition to a limited partner's enumerated and contractual rights, in Georgia, partners owe fiduciary duties to one another, including a duty to act in the 'utmost good faith' . . . and with 'the finest loyalty.' . . . Accordingly, general partners also owe fiduciary duties to the limited partners, which the limited partners are entitled to assert."). Thus, if the only action that ABGP I could undertake following its administrative dissolution was to wind up its affairs, then it did so successfully.

It is true that in *Gas Pump*, after the Supreme Court of Georgia answered the certified question, the Eleventh Circuit rejected the shareholder's argument that the administratively-dissolved corporation could assign its antitrust claim to him. *Gas Pump*, 12 F.3d at 182. In *Exclusive Properties, Inc. v. Jones*, the Court of Appeals of Georgia rejected a similar argument, explaining that the administratively-dissolved corporation's "cause of

66

action against defendants is not a corporate asset to which [the corporation's] former shareholders became legally entitled upon [the corporation's] administrative dissolution." *Exclusive Prop.*, 218 Ga. App. at 230. These cases, however, do not preclude the transfer of ownership from ABGP I to ABGP II, for two reasons. First, in both of these cases, the relevant asset was the right to initiate a lawsuit, not an interest as general partner in a limited partnership, as is the case here. Second, and more importantly, Mr. Kettles, the sole shareholder of both ABGP I and ABGP II, did not transfer that asset to himself. Instead, he created a new entity, which shared the same purpose, to receive that asset.

Nor, as previously mentioned, was there anything sinister about Mr. Kettles' use of the same corporate name, ABGP, Inc., for the entity created on November 4, 2010. Under Georgia law,

> The Secretary of State shall reserve the name of a corporation administratively-dissolved under Code Section 14-2-1421 for such corporation's specific use for a period of five years after the effective date of the dissolution or until the corporation is reinstated, whichever is sooner.

O.C.G.A. § 14-2-1422(b). Thus, it was merely a happy coincidence that the corporate name became available on July 9, 2010, five years after the administrative dissolution of the original entity of that name. The incorporation of ABGP II on November 4, 2010, and the transfer of an interest as general partner to that entity were not part of any scheme to hoodwink FCRE, which had no relationship with the Debtor until April 15, 2015. Indeed, ABGP II was created in connection with the loan transaction with Coastal Federal, and there is no evidence in the record that Coastal Federal had any qualms about the Debtor's status as a valid limited partnership under Georgia law.

## I. ABGP Properly Exercised its Power of Attorney

The post-dissolution actions of ABGP I were also consistent with provisions of the Limited Partnership Agreement that invested the power of attorney in the Debtor's general partner, to wit:

[Section] 11. Power of Attorney.

11. Grant of Power. Each Limited Partner hereby irrevocably [con]stitutes and appoints the General Partner with full power to act as [his] true and lawful attorney, in his name, place and stead, to make, [execute], consent to, swear to, acknowledge, record and file:

a) a Certificate of Limited Partnership under the applicable [indecipherable] of any jurisdiction in which the General Partner deems such filing to [be] necessary or desirable;

b) any certificate or other instrument which may be required to [be] filed by the Partnership or the Partners under the laws of the State of [Georgia] and under the applicable laws of any other jurisdiction to the [extent] that the General Partner deems such filing to be necessary or desirable;

c) any and all amendments or modifications to the Certificate of [Limited] Partnership filed under the laws of the State of Georgia; or to any [other] instrument described above;

d) all certificates and other instruments which may be required [to] effectuate the dissolution and termination of the Partnership pursuant [to] the provisions of this Agreement;

e) any and all consents or other instruments deemed necessary or [desi]rable by the General Partner for the admission of new Limited or General [Part]ners pursuant to this Agreement; and

f) any regulatory agreement and/or any other document [w]hich may be required by the FHA in connection with any loan secured [o]r to be secured by the property of the Partnership and insured or to [b]e insured by the FHA.

g) all such other instruments as the General Partner may deem necessary or desirable to carry out the provisions of this Agreement in accordance with its terms.

*11.2 Irrevocability of Power. It is expressly understood, intended, and agreed by each Limited Partner for himself, his successors and assigns that the grant of the power of attorney to the General Partner pursuant to Section 11.1 above is coupled with an interest, is irrevocable and shall survive its termination or bankruptcy or the transfer of its profit and equity interest in the Partnership.*

(FCRE Ex. 1, pp. 8-9) (emphasis added). Through its admission as general partner pursuant to the second December 14, 1999 Amendment to the Limited Partnership Agreement, ABGP I received this broad grant of power of attorney, which included the power (subject to the majority-in-interest consent, which it obtained) to amend the Limited Partnership Agreement and to effectuate the admission of a new general partner. And, pursuant to section 11.2 of the Limited Partnership Agreement, this power of attorney survived the termination of the general partner. Thus, the only actions taken by ABGP I following its administrative dissolution, namely the execution of the January 1, 2006 Amendment and the transfer of an interest as general partner to ABGP II, were authorized under the irrevocable grant of power of attorney set forth in the original Limited Partnership Agreement. The Court finds that ABGP I properly exercised its power of attorney in connection with the winding up of its business.

Without trying to define the absolute outer limits of what an administratively-dissolved corporation can do or, acting through its authorized agents, have done for it, the Court concludes that it was permissible and proper for ABGP I to convey its interest as general partner in the Debtor to ABGP II in November of 2010. The Court further finds that ABGP II was properly admitted as general partner pursuant to the November 4, 2010

Amendment to the Limited Partnership Agreement, which expressly contemplated the admission of "a corporate general partner which shall be organized to be a single purpose, 'bankruptcy remote' entity with organizational documents substantially similar to the organizational documents of the current corporate general partner [i.e. ABGP I] of the Partnership." (FCRE Ex. 25, p. 4).

J. Corporation by Estoppel

    Finally, the Debtor contends that, under the doctrine known as corporation by estoppel, FCRE should be prohibited from challenging the legal existence of the limited partnership. Specifically, the Debtor states as follows:

> FCRE made a loan to Debtor, A & B, in April, 2015. At that time, before and since, FCRE has dealt with ABGP, Inc. as the General Partner of Debtor, A & B, as well as having dealt with Debtor, A & B, as a limited partnership in its loan relationship. The long standing [sic] doctrine of corporation by estoppel was codified in Georgia O.C.G.A. § 14-5-4. The cases citing that statute recognize the doctrine of corporation by estoppel. The statute states: "The existence of a corporation claiming a charter under color of law cannot be collaterally attacked by persons who have dealt with it as a corporation. Such persons are estopped from denying its corporate existence." (Civil Code 1895, § 1862; Civil Code 1910, § 2226; Code 1933, § 22-714; Code 1933, § 22-5103, enacted by Ga. L. 1968, p. 565, § 1; O.C.G.A. § 14-5-4). Although there is not a similar statute as to limited partnerships, there is no reason that the doctrine would not apply in this case as to Debtor and its legal existence under Georgia law.

(Dckt. 391, p. 2-3). It is true that under Georgia law, as codified at O.C.G.A. § 14-5-4, "one who deals with a corporation as such an entity cannot . . . deny the legality of the corporate existence . . . ." *BP Prod. North America, Inc. v. Southeast Energy Grp., Inc.*, 282 F. App'x 776, 780 (11th Cir. 2008) (per curiam) (quoting *Gardner v. Marcum*, 292 Ga. App. 369, 665 (2008)). However, this doctrine applies only to corporations. Absent any authority to extend

the doctrine to limited partnerships, the Court declines to do so.

## V. CONCLUSION

It bears repeating that the record contains no evidence that the Debtor has failed to make a monthly principal and interest payment on its long-term debt since 1976. There is life yet in this limited partnership.[60] For the reasons set forth above, the Court finds that A & B Associates, L.P. is a valid limited partnership under the laws of Georgia and that it is eligible to seek reorganization in this Chapter 11 bankruptcy case. The Court further finds that the Debtor's corporate general partner was properly admitted and had the authority, acting through Mr. Kettles, to file the petition. Accordingly, the Court will deny, in part, FCRE's Motion to Convert (dckt. 161) in a separate order consistent with this Opinion.

Dated at Savannah, Georgia, this 26th day of September, 2018.

Edward J. Coleman, III, Judge
United States Bankruptcy Court
Southern District of Georgia

---

[60] The feasibility of the Debtor's plan is another matter for another day. While the monthly operating reports filed by the Debtor in the first eight months of 2018 reflect a healthy revenue stream, the Court has not assessed the profitability, or lack thereof, that these 2018 monthly operating reports may reflect.