# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Savannah Division

**FILED**
**Lucinda B. Rauback, Clerk**
**United States Bankruptcy Court**
**Savannah, Georgia**
*By cmm at 10:29 am, Mar 29, 2019*

)
)
)
)
)
)
In re:                                              )
                                                    )          Chapter 11
A & B Associates, L.P.,                             )
                                                    )          Number 17-40185-EJC
          *Debtor*.                                 )
                                                    )
                                                    )
                                                    )
                                                    )
                                                    )
                                                    )

## OPINION ON CONFIRMATION OF DEBTOR'S AMENDED CHAPTER 11 PLAN

### I. INTRODUCTION

Pending before the Court is the Amended Chapter 11 Plan (the "Amended Plan") (dckt. 374) filed by A & B Associates, L.P. (the "Debtor"), which was scheduled for confirmation on October 1, 2018. The Debtor, a limited partnership organized under the laws of the State of Georgia, filed this Chapter 11 reorganization case on February 3, 2017. (Dckt. 1). The Debtor owns and operates a 96-unit apartment complex in Beaufort County, South Carolina, known as August on Southside (the "Property"). The Debtor's principal creditor

is FCRE REL, LLC ("FCRE"), which holds a first priority lien in the Property.

On the eve of the confirmation hearing, the Court entered an Opinion (dckt. 509) and Order (dckt. 510) denying, in part, FCRE's Motion Pursuant to 11 U.S.C. § 1112(b) to Convert this Case to a Case under Chapter 7 and for the Appointment of a Chapter 7 Trustee (the "Motion to Convert"). (Dckt. 161). In its Motion to Convert, FCRE argued that the debtor was ineligible to file for reorganization under Chapter 11 based on the administrative dissolution in 2005 of its *former* general partner, ABGP, Inc. The Court held that the Debtor was a properly formed limited partnership, still in good standing, with a valid corporate general partner. (Dckt. 509, p. 71).

Unresolved at the time of the confirmation hearing was the Debtor's Objection to Claim #2 of FCRE REL, LLC (the "Claim Objection") (dckt. 208), as well as the remaining grounds asserted by FCRE in its Motion to Convert. (Dckt. 161).[1] Additionally, FCRE filed a Motion for Post-Petition Attorney's Fees Pursuant to 11 U.S.C. § 506(b) (the "§ 506(b) Motion"). (Dckt. 491). The total amount sought by FCRE in the § 506(b) Motion was $1,207,042.14 (including default interest). On December 28, 2018, FCRE filed its Supplemental Motion for Post-Petition Fees (dckt. 566), claiming a total of $1,457,471.52 through December 28, 2018.[2] (Dckt. 566, pp. 2-3).

---

[1] At the very beginning of this case, on February 17, 2017, FCRE filed an Emergency Motion for Appointment of Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a). (Dckt. 32). That matter came on for hearing on February 24, 2017. The Court declined to appoint a trustee and continued the matter indefinitely, advising counsel that the motion would only be scheduled for another hearing upon a specific request. FCRE has not renewed that motion.

[2] The total amount claimed includes the following: attorneys' fees through December 28, 2018, of $1,005,678.31; out of pocket expenses of $73,786.96; and default interest for the period from March 6, 2017, through December 6, 2018, of $378,006.26. (Dckt. 566-1, p. 1).

The confirmation hearing took place on October 1, 2018. The Court heard testimony from three witnesses: (1) Sharan Sheppard Kettles ("Mrs. Kettles"), the widow of L. Christopher Kettles ("Mr. Kettles"); (2) Jerry McNair ("Mr. McNair"), an expert for the Debtor who offered his opinion on the feasibility of the Debtor's plan of reorganization; and (3) Mary F. Davenport ("Ms. Davenport"), a representative of FCRE who offered a contrary analysis of feasibility. Ms. Davenport also testified about the appropriate interest rate to be applied to its secured claim pursuant to *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004). At the conclusion of the confirmation hearing, the Court took the matter under advisement.[3]

Based on the testimony and evidence presented at the October 1, 2018 hearing, as well as a review of the evidence in the record from prior hearings, the Court finds that the Debtor has not met its burden of proof on all the requirements of 11 U.S.C. § 1129 necessary to confirm this cramdown plan. Among other shortcomings, the plan failed to provide for the "fair and equitable" treatment of FCRE's claim. Most importantly, the Court finds that the plan is not feasible. The lack of feasibility is, in turn, based on four primary factors. First, the Debtor proposed to pay FCRE's secured claim at the non-default contract interest rate of 4.04% as opposed to what the Court finds to be the appropriate *Till* rate of 7.25%. Second, the management of the Debtor was handled for decades by Mr. Kettles, but he passed away on June 7, 2018. The Court finds that the current management lacks the requisite skills and experience to manage the Debtor's operations. Third, although there was a substantial equity cushion in the Property as of the petition date, FCRE is entitled to post-petition fees,

---

[3] The Court also asked the parties to brief the issue of *materiality* with respect to the Debtor's alleged non-monetary defaults of the loan agreement.

expenses, and default interest exceeding $1,100,000.00 as an oversecured creditor pursuant to 11 U.S.C. § 506(b) and this additional debt would further argue against feasibility. Fourth, the Debtor's expert did not present a persuasive analysis of feasibility.

For these reasons, and others addressed below, the Court will deny confirmation. Additionally, the Court will resolve the Debtor's Claim Objection (dckt. 208, dckt. 387) by estimating the disputed portion of FCRE's claim, and will grant in part FCRE's § 506(b) Motion. (Dckt. 491, dckt. 566). The Court will schedule a continued hearing on the remaining grounds for conversion asserted in FCRE's Motion to Convert[4] (dckt. 161), and at that hearing the Court will determine whether this case should be dismissed, converted to Chapter 7, or subject to some other disposition.

This Opinion constitutes the Court's Findings of Fact and Conclusions of Law. To the extent that any findings of fact herein are construed to be conclusions of law, they are hereby adopted as such. To the extent that any conclusions of law herein are construed to be findings of fact, they are hereby adopted as such.

## II. JURISDICTION

This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a), and the Standing Order of Reference signed by then Chief Judge Anthony A. Alaimo on July 13, 1984. This is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(L).

---

[4] In its Opinion on Motion to Convert to Chapter 7 (dckt. 509), the Court erroneously stated that it would deny the Motion to Convert (dckt. 161) on all grounds asserted by FCRE. The Court's Order Denying in Part Motion to Convert to Chapter 7 (dckt. 510) denied the Motion to Convert only as to the issue of the Debtor's eligibility to file.

### III. FINDINGS OF FACT

A. <u>Introduction</u>

This case involves a two-party dispute between the owner of an apartment complex and its lender. The Debtor's principal, Mr. Kettles, a certified public accountant by training, had ably managed the Property through various entities controlled by him since 1990. When FCRE agreed to refinance the Property, the apartment complex had an appraised value of $5,375,000.00. The original loan from FCRE was $3,900,000.00. Thus, there was a substantial equity cushion. Since April 15, 2015, when the loan closed, the Debtor never failed to make a single principal and interest payment to FCRE. As a result, the principal loan balance at the time of the confirmation hearing on October 1, 2018, had been reduced to approximately $3,670,000.00. (10/1/18 Transcript[5] pp. 164, 170, 224; 10/1/18 Ex.[6] "FCRE-166"; 10/1/18 Ex. "D-1" p. 2). As of the confirmation hearing, occupancy rates were good, rental rates had been increased, and monthly revenues appeared consistent and sufficient to service the original principal debt as well as operating expenses; the Debtor was also setting aside sums to meet larger repairs and maintenance expenses. Based on these metrics, FCRE's prospects for having its debt repaid in full would seem assured.

But what actually transpired between these parties after the loan closing is,

---

[5] The various hearing transcripts and their corresponding docket numbers are as follows: 1/10/18-1/12/18 Transcript (dckt. 353), 2/5/18-2/6/18 Transcript (dckt. 434, dckt. 436), 2/21/18 Transcript (dckt. 370), 4/16/18 Transcript (dckt. 438), 10/1/18 Transcript (dckt. 544), 12/18/18 Transcript (dckt. 568), and 1/7/19 Transcript. (Dckt. 576).

[6] The various exhibit logs and their corresponding docket numbers are as follows: 2/24/17 (dckt. 51), 4/27/17 (dckt. 121), 1/10/18 (dckt. 350), 2/5/18 (dckt. 361), 4/16/18 (dckt. 396), 10/1/18 (dckt. 527), and 1/7/19. (Dckt. 572).

frankly, a long story. Put simply, FCRE intended all along to sell its loan through a securitization process. The loan documents reflected that intention. (1/10/18 Ex. "C-105" p. 56). That securitization process failed, according to FCRE, due to undisclosed conditions of the Property that scared away prospective investors. Unable to sell the loan, FCRE declared certain non-monetary defaults under the loan agreement. Immediately thereafter, on July 20, 2016, FCRE exercised its claimed self-help remedies and, with the assistance of local law enforcement, removed the Debtor's management team from the Property, installed a new third-party managing entity, took control of all the rents, and barred the Debtor and its agents from the Property.

The Debtor responded by filing suit in state court in South Carolina, where it obtained an injunction restoring it to possession and management of the apartment complex. In September and October of 2016, FCRE filed appeals[7], which remain pending 30 months later, of both the injunction and a contempt order issued by the South Carolina court. By the time the Debtor filed this bankruptcy case on February 3, 2017, FCRE claimed $894,853.63 in pre-petition attorneys' fees, expenses, default interest, hedge losses on its failed securitization, and sums that the South Carolina court had ordered FCRE to return to the Debtor and attorneys' fees FCRE paid pursuant to that court's contempt order. (Claim 2-2, p. 3). FCRE filed a proof of claim for $4,696,401.78. (Claim 2-2, p. 2).

Two years in Chapter 11 have only made things worse for the Debtor. As an

---

[7] On September 12, 2016, FCRE appealed the Injunction Order. (Dckt. 66-5, p. 10). On October 20, 2016, FCRE appealed the Contempt Order. (Dckt. 66-5, p. 10). The appeals are consolidated under Appellate Case No. 2016-001899. (Dckt. 66-5, p. 10).

oversecured creditor, FCRE now seeks an additional $1,457,471.52 in post-petition attorneys' fees, expenses, and default interest pursuant to 11 U.S.C. § 506(b). (Dckt. 566). As of the confirmation hearing, FCRE claimed a total debt of more than $6,000,000.00. The Debtor's plan proposes to pay FCRE only about $3,700,000.00 and at only the 4.04% contract rate of interest; any additional portion of its claim based on pre-petition fees and expenses would be paid as a balloon payment in seven years. Notwithstanding the fact that the Debtor has never missed a principal or interest payment, however, its plan is not feasible. That is, in part, because the Court finds the appropriate cramdown rate of interest to be 7.25% and because the debt owed to FCRE has grown substantially by virtue of its entitlement to post-petition fees and expenses under § 506(b).[8]

This Opinion sets forth the many disputes between the parties in some detail, which in turn informs the Court's treatment of FCRE's claims for pre-petition attorneys' fees and expenses, as well as its claims for post-petition fees and expenses under § 506(b). While the Court finds unreasonable some of FCRE's legal positions and the resulting attorneys' fees, most of FCRE's efforts in this bankruptcy case have been necessary and reasonable. The Debtor's proposed plan of reorganization has other defects precluding confirmation, which the Court will address. Finally, the Court must determine the next step in this process: conversion to Chapter 7, dismissal, or something else.

---

[8] The Debtor's Amended Plan (dckt. 374) makes no provision for FCRE's claimed § 506(b) fees, expenses, and interest, nor does the First Amendment to the Debtor's Amended Plan. (Dckt. 559).

B. <u>Formation and Financing of the Debtor's Limited Partnership</u>

On November 1, 1976, the Debtor was organized as a limited partnership under Georgia law for the express purpose of "developing and operating 96 two-story garden type apartments known as the Versailles Apartments[9] . . . on approximately 10.2 acres . . . located in Beaufort County, [South Carolina]." (4/16/18 Ex. "FCRE-1" p. 1). The Debtor financed the construction of the apartment complex with its initial loan of $1,868,700.00 with First National Bank of Florida, which received a mortgage on the Property, on January 14, 1977. (Dckt. 289-3).[10] Little is known of the Debtor's history between 1977 and 1990, when Mr. Kettles became involved through his ownership interest in the Debtor's then general partner, Montgomery Management Corp. II. (4/16/18 Transcript, p. 89). Mr. Kettles would be instrumental in managing the Debtor's operations until his death twenty-eight years later.[11]

The Debtor refinanced the Property three times over the next forty years, first with General Electric Capital Corporation ("GECC") in 1999 and then with Coastal Federal Credit Union ("Coastal Federal") in 2010. (4/16/18 Transcript pp. 115, 135-37). In April of 2015, approximately four-and-a-half years after borrowing from Coastal Federal, the Debtor again obtained new financing, this time from FCRE. On April 15, 2015, FCRE made a loan to the Debtor in the principal amount of $3,900,000.00 pursuant to a written loan agreement

---

[9] The name of the Property was subsequently changed from the Versailles Apartments to the August on Southside.

[10] Later assigned to the Government National Mortgage Association, that loan was due to mature in July of 2018. (Dckt. 289-3).

[11] For a more detailed account of the Debtor's organizational history and Mr. Kettles' involvement, *see* the Court's Opinion on Motion to Convert to Chapter 7. (Dckt. 509, pp. 5-20).

8

(the "Loan Agreement") executed by Mr. Kettles and FCRE on that same date. (1/10/18 Ex. "C-105"). Also on that date, Mr. Kettles executed a written promissory note (the "Promissory Note") in favor of FCRE in the principal amount of $3,900,000.00. (1/10/18 Ex. "C-106"); a Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "Mortgage") (1/10/18 Ex. "C-107"); and a Guaranty of Recourse Obligations and Environmental Indemnity Agreement (the "Guaranty"). (2/5/18 Ex. "C-122").

C. FCRE's Unsuccessful Attempt to Securitize the Loan

The Loan Agreement and related documents executed by Mr. Kettles on behalf of the Debtor's general partner were detailed, lengthy, and fully designed to protect FCRE's interest in the Property and to maximize its opportunity to recover its investment. More importantly from FCRE's perspective, the loan documents were designed to fulfill certain underwriting requirements that would allow FCRE to market the loan through a securitization process. FCRE attempted to do just that. Ms. Davenport, the Executive Vice President of both Freedom Mortgage Corp. and its wholly-owned subsidiary FCRE, was able to describe the mechanics of this process:

> The intent of all of the loans originated through FCRE REL, LLC was to be securitized or sold as a whole loan . . . both of those defined as secondary market transactions.
>
> . . .
>
> Securitization is essentially a combination of a large number of loans into what they call a pool. They are offered as public securities under the securities laws of 1932-33. They're also private bonds which are offered under Blue Sky laws, but the ones that we're talking about here predominantly are publicly-offered securities, and it is a combining of a large group of mortgages, let's say one hundred, that combine into a billion-dollar average balance on a portfolio, and

institutional investors . . . are then classified as to credit quality from the rating agencies. The standard rating agencies are Moody's, Standard & Poor's, Fitch. There are a couple of other smaller [ones], but those are the three dominant ones, so these rating agencies would rate these particular securities on what they call a tranche, which would be a slice level of each of the securities, so you would have your triple A, double A, single A, triple B plus, triple B minus, and then non-investment-grade rated.

. . .

[Each of these tranches] is based upon the creditworthiness of the rollup of each individual loan in the pool as a whole, so the average of all hundred loans that are in the pool, the creditworthiness of each of those, because each loan will have very distinct and different characteristics.

. . .

It is a way to originate loans not for portfolio. If you think about a mortgage that has a ten- or a twenty- or a thirty-year life, if you put money out and you have to hold that in portfolio for 10 or 20 years, there's only a finite amount of money that you would have to do that, so you wouldn't be able to generate new business. Securitization enables lenders to have a market to sell these loans, recapture their principal that they've put out in those loans and a profit more than likely, sometimes a loss – it depends on the characteristics of the loan – and be able to put that money out again in new loans.

. . .

So it's a business platform.

(1/10/18 Transcript pp. 4-6).

In connection with the securitization process, FCRE entered into a warehouse agreement with Citibank. (1/10/18 Transcript pp. 11-12). Ms. Davenport explained this agreement as follows:

As a platform, yes, FCRE entered into a warehouse agreement with Citibank in general for all of its loan production, not just this particular loan.

. . .

10

> FCRE was a contributor to the Citibank shelf, which is the security – the public securitization vehicle. It's called a shelf, which is the Citigroup Commercial Mortgage Securities Trust.
>
> . . .
>
> And Citi's been doing this for – since the mid 90s. So this is a well-established shelf that has a series each year that is issued off of the securitization shelf. Each time you do a transaction you don't put a new shelf together. The shelf is put together and then each one is a series off of the shelf, series one, series two, series three.
>
> . . .
>
> So as a business platform, it's always a good idea to be able to get some leverage. It's not dissimilar to a home mortgage. If you could buy your house for cash, that would tie up all your money in your home. Right? If you got a mortgage and you put 25 percent down, you would have 75 percent – remaining 75 to put into a retirement account or bonds or other investments to make your money work for you. So it's the same concept, just on a business platform.
>
> So the warehouse is entered into, and the standard warehouse agreement that FCRE had with Citi was up to a 75 percent advance rate. So again, in terms of a regular mortgage, 75 percent loan-to-value. So if we did a 3.9-million-dollar loan, full face value, then Citibank, if they accepted this loan as a pledge on their warehouse, would . . . pay FCRE up to 75 percent of that principal balance.
>
> . . .
>
> And then FCRE could take that money and put that into additional loans.

(1/10/18 Transcript pp. 11-13). As part of the warehouse agreement, Citibank required FCRE

to have a hedge against floating interest rates. As Ms. Davenport explained:

> In general, so you have a fixed-rate instrument once you close a loan. The loan rate is contractually set. In this case it's 4.04. As a fixed-rate instrument it will fluctuate in price; the asset . . . itself will fluctuate in price depending upon where interest rates are.
>
> . . .

In the general market. In the general marketplace, according to what the Fed does, according to where general fixed income markets are trading.

All of our loans we're required to have a hedge, not just A & B. And anyone that has a warehouse agreement, any other business, such as FCRE, is typically required to have a hedge on each of these. And what it does is it mitigates price movements during the aggregation period on the warehouse from loan closing until the securitization and the sale of that loan into a securitization.

So as bond prices will move up and down and interest rates move up and down, if Citibank, for example, had to liquidate all of the assets on our warehouse for any reason, right, it would have a dollar price. If this coupon was 4.04 and prevailing interest rates were 5, then this loan would price in the 90 cents on the dollar because of the coupon difference. If the coupons in the market were 3 and this is a 4.04, then the dollar price of this would be in excess of 100 cents on the dollar. It's an inverse relationship.

. . .

So when you sell the loan into a – it's called lifting your hedge. So you put the hedge on the day that the loan is closed or the rate lock or whatever. In this case it was the date the loan closed because the rate lock happened simultaneously. And that stays on until we know that the loan is going into a securitization.

A securitization will have a date final of when all loans will sell. So if we know it's going to settle on January 28th, we know we will be lifting our hedge January 28th. Right? So . . . that position gets closed out and the loan gets sold.

(1/10/18 Transcript pp. 13-14).

Having made the loan to the Debtor and having taken steps in the securitization process, FCRE was ready to market the loan. One of the prospective buyers of this loan asset was Prime LNR. (1/11/18 Transcript p. 26). Ms. Davenport provided documentation to this third party. In the process, Ms. Davenport was contacted by email on April 29, 2016, by Richard Simpson ("Simpson"), who was on the securitization team at Citibank. (1/11/18 Transcript pp. 23-26). Simpson expressed concerns about both mold and criminal activity

at the Property:

> Mary,
>
> Prime/LNR passed along their site inspection report for August on Southside, which they found to be concerning. They claim a lot of what is seen in the pictures (mold, microbial growth, deferred maintenance) was not referenced in the most recent PCR. The photos do not show well.
>
> Also, the link to the news article below states that there were 156 crime incidents (assaults and batteries) reported to police at the Property in 2015 and 20 in less than two months this year (article dated Feb 23, 2016). Not a good fact pattern.
>
> http://www.wjcl.com/news/local-news/port-royal-apartment-complex-hopes-to-tackle-crime-problem/148928492/story
>
> If they have not already reached out to you directly, I'd suggest setting up a call with them to discuss these issues on Monday.
>
> Regards,
>
> Rick

(1/10/18 Ex. "D-24"). In her response later that day, Ms. Davenport assured Simpson that conditions at the Property were normal in that part of the country and that the Property was not in a high-crime area:

> Thanks, Rick. I will reach out to them.
>
> Just to be clear on this . . . the PCR was fully compliant with all industry standards. If there was any type of microbial issue, our engineers would have identified it and recommended addressing it. This area is coastal south [sic] Carolina. There is salt air and Spanish moss EVERYWHERE. Did they drive around the surrounding area and take a look at other properties in the

13

competitive set? Nichole and I did.[12]

The owners have spent over $690,000 in just the past 3 years performing continuous upgrades. They have actively relocated tenants to different apartments in separate buildings when they upgrade an entire building. This can only be done when units are available, any [sic] they have maintained a 90%+ occupancy level for a long time. They have owned the property for 20 years, and have continued to spend cap ex funds for maintenance and unit upgrades. Most their most [sic] recently completed project has been upgraded lighting and security/surveillance cameras.

We are well aware of the incident reports. In speaking with the local police chief, the police have reached out to a number of multifamily property owners and have advised them to actively call on the police if there are any incidents rather than trying to handle them on their own. A large number of the calls to the police were generated by the property management itself to move suspicious people or trouble makers off the property. In addition, the police are actively working with property owners to establish substations [sic] locations within the property grounds for a more visual police presence. The Chief advised us that the adjoining county, Jasper, has been experiencing increases in illicit behavior over the past several years. The Beaufort County enforcement teams are working diligently and cooperatively to stop any momentum into their county.

Lastly, there is a lender controlled reserve account with monthly deposits. This loan has a 1.9x DSCR, so it is hardly a cuspy [sic] situation where it could go sideways at a moment's notice. As you can see from some of the interior pictures, as units become available, the owners have been upgrading the interiors. It is simply not possible to perform these upgrades if the units are

---

[12] Ms. Davenport and Nichole Kim, FCRE's Senior Vice President, physically inspected the Property and met with the Debtor's management on December 8, 2015. (1/10/18 Transcript pp. 21-23, 32-33). Contrary to Ms. Davenport's sanguine outlook in these emails, she later testified that FCRE was "concern[ed with] the overall condition of the property. The management of the property had deteriorated significantly in just the few months since we had securitized, since we had closed the loan." (1/10/18 Transcript p. 24). According to her testimony, "We saw deterioration. We saw actually no management skills. We saw no proper reporting that would be expected in any type of professional management of a commercial property." (1/10/18 Transcript p. 24).

occupied.

I will let you know of our discussion.

Mary

(1/10/18 Ex. "D-24"). Later, on May 3, 2016, Ms. Davenport sent an email making similar assurances to several individuals at Prime Finance, another potential buyer. (1/11/18 Transcript p. 27). In the email, Ms. Davenport touted the Debtor's efforts to keep the Property in good shape and said her own inspection engineers found no mold problems:

> All-
>
> With reference to a link that was forwarded to Rick Simpson pertaining to a news interview conducted by a local paper, please see the attached Police Incident report from January 1–May 2, 2016. Also, please see comments from Capt. Griffith below. The preponderance of the reported incidents are noise complaints and civil disturbances. As disclosed in our ASR, there was a shooting incident (non-fatal) in October, which the police have concluded was random. Since that time, the property owners have been actively working with the police and local contractors to improve safety at the property. Such improvements include new perimeter fencing, updated and brighter lighting, security cameras and a police substation at the property. The TV article, in fact, pointed out that the property manager and owners are working diligently to ensure the safety of the tenants. Since the October incident, the property has maintained its occupancy levels (over 92%+ area) and there has been little impact on the cash flow. This [sic] metrics on this loan are a 1.95x NOI DSCR, a 1.82x NCF DSCR and an 11.2% DY.
>
> As to the property inspector's assumption that there is "microbial contamination", we have revisited this issue with our Engineer. A full PCR was prepared in compliance with industry standards by our certified engineer at the time of the loan origination. It was subsequently updated in April, 2016. No such contamination was discovered, nor was there any recommended remediation. The PCR was thoroughly reviewed and approved by Citibank's review

engineer for compliance at the time we pledged the loan to our warehouse. It should be pointed out that the property is located in South Carolina, on the coast. There is salt water in the air, and Spanish Moss, literally, everywhere in this region. After more discussions this week, the following is a summary from our Engineer:

*Over time, wooden fences can get covered in algae and mildew. The growth generally occurs in shaded, moist locations. This is very typical for areas such as South Carolina and more of an aesthetic problem than a significant deficiency. The safest way to clean a wooden fence of algae/mildew is using water and a scrub brush or pressure washer (use a gentle nozzle to prevent damage to the wood). If water isn't enough to remove the moss, try mising a solution of ½ cup of vinegar (or baking soda) per gallon of water. Apply this to the moss and let it sit for about 15 minutes and then scrub and rinse off. A solution of one part household bleach to two parts water also works. Once the algae/mildew has been removed, painting the fence with a paint that has an algae/mildew preventative in its formula is recommended (this is recommended but not required). This is work that can be completed by onsite maintenance staff and minimal cost.*

The borrower has confirmed that they have power washing services done on a regular basis to address this matter. The average cost for this service is around $2,500. This cleaning is generally done after the winter months. As such, the borrower is already in discussions with contractors to provide this service in the near time.

As to the exterior porches, we agree that they need repairs/replacements. The borrower has indicated that as units vacate, both interior and exterior repairs including porch work are included in their 5 year capital plan. As previously provided, the owners have owned this property for over 20 years. In the last 3 years alone, they have invested over $690,000 in various interior and exterior upgrades and improvements. We have no reason to believe that the deferred maintenance items will not be addressed. There is also a $220 per month/per unit Cap Ex reserve being escrowed by our servicer in compliance with the loan documents. These funds are Lender-controlled.

We can discuss this in more detail on the call.

Thanks.

Mary

(1/10/18 Ex. "D-25") (emphasis in original). Despite Ms. Davenport's reassurances, both prospective buyers declined to purchase the loan based on "microbial growth on various buildings and just general overall poor condition of the property." (1/10/18 Transcript pp. 15-16, 31).

According to Ms. Davenport, once the FCRE loan had been twice rejected, it "could never be securitized" and became unmarketable. (1/10/18 Transcript p. 16). At that point, "[t]he hedge was closed out when [FCRE] brought it off of the warehouse and took it back into portfolio."[13] (1/10/18 Transcript p. 16; 1/12/18 Transcript p. 140). Thus, by April or May of 2016, FCRE determined that it had a loan it could not unload. (1/10/18 Transcript pp. 22, 30-31). This created a problem for FCRE, which never intended to hold the loan as a long-term asset. It had successfully disposed of all the other loans, and only the Debtor's loan remained on the books. The Court finds that at this juncture, FCRE began to closely scrutinize all aspects of the loan transaction that might support declaring a default and

---

[13] Ms. Davenport testified that FCRE suffered a $221,755.90 loss when the hedge was closed. As she explained: "The asset had been rejected twice from sale and a securitization, which required us to repurchase the asset off of the warehouse from Citibank. So we . . . paid off the warehouse lending facility for the amount that was outstanding on that. We brought it back on our balance sheet. And since it was on our balance sheet, it was a fixed-rate instrument, we just closed out the hedge because internally we made a decision it wasn't necessary to keep it out there. The master repurchase agreement requires hedging on this. Prudently, you would continue the hedge, but we knew that this was going to be a long, drawn-out situation, so to keep this hedge on was impractical." (1/12/18 Transcript, pp. 140-41).

17

foreclosing on the Property.[14]

D. FCRE Declares a Default of the Loan

As mentioned, the Debtor never failed to make its monthly payment to FCRE

from the date of the loan until the filing of this bankruptcy on February 3, 2017. Nor has the

Debtor ever failed to make timely post-petition payments. But after FCRE was unable to

securitize the loan as originally contemplated, it undertook a very aggressive posture toward

certain, and varied, alleged *non-monetary* defaults.[15] To that end, FCRE issued to the Debtor

two documents dated July 18, 2016.[16] (1/10/18 Transcript pp. 31-32). The first, entitled

"Notice of Event of Default," recited the alleged physical deterioration of the Property and

---

[14] Ms. Davenport testified that "[a]fter [the loan] was removed from the securitization
and kicked for the second time, my team and I went back and looked at all of the financial
reports and information, rent rolls, historic financial information, from the time the loan closed
through that point in time, and every single month had massive inconsistencies, significantly
higher vacancies than we had actually believed. And then we went and looked at the deposits
that were coming through the Wells Fargo account. So at that point we had discovered that the
information that the borrower had given us was unreliable and not accurate." (1/11/18
Transcript pp. 32-33).

[15] In fairness to FCRE, there were indications of trouble between the parties even before
securitization became impossible. FCRE learned of a shooting at the Property that took place in
October of 2015. (1/10/18 Transcript p. 21). And when Ms. Davenport inspected the Property
on December 8, 2015, she learned that Ms. Pett was not a licensed property manager. (1/10/18
Transcript p. 23). Accordingly, in an email dated December 21, 2015, Ms. Davenport directed
Mr. and Mrs. Kettles (1) to either obtain licensing for Mrs. Kettles or for Ms. Pett, or to engage
a third-party manager with appropriate licensing; and (2) to engage a security service by
December 29, 2015. (1/10/18 Ex. "C-13" pp. 2-3; 1/10/18 Transcript pp. 23-28). As to the
matter of security, Mr. Kettles replied that South Carolina imposes no duty on landlords to
protect tenants from third-party criminal activity. (1/10/18 Ex. "C-13" p. 1; 1/10/18 Transcript
pp. 26-27). Regarding licensing, Mr. Kettles stated that South Carolina law provides "an
exception for owner managers." (1/10/18 Ex. "C-13" p. 1; 1/10/18 Transcript p. 27).

[16] According to Ms. Davenport, on July 18, 2016, FCRE overnighted both documents in
the same envelope for second-day delivery on July 20, 2016. (1/10/18 Transcript pp. 38-41).
She testified that mail was delivered to the Property between 9:30 a.m. and 9:45 a.m. (1/10/18
Transcript p. 41).

an alleged increase in criminal activity in the area. (1/10/18 Ex. "C-16" pp. 1-2). These were the very conditions that Ms. Davenport assured her prospective buyers were of no concern. Based on these conditions, and on other matters, the notice enumerated the following events of default:

> [T]he Lender hereby gives notice to Borrower and to Guarantor of the following Events of Default:
>
> 1. Failure of the Borrower to cause the Property to be maintained in a good and safe condition and repair, as required by Section 3.4 of the Mortgage and as incorporated into Section 10.1(a)(x) of the Loan Agreement.
>
> 2. The commission or suffering of waste to the Property, in violation of Section 3.5 of the Mortgage, and as incorporated into Section 10.1(a)(x) of the Loan Agreement.
>
> 3. Allowing the material impairment of the value of the Property, in violation of Section 3.5 of the Mortgage, and as incorporated into Section 10.1(a)(x) of the Loan Agreement.
>
> Under the terms of the Loan Agreement, there are no cure periods for these Events of Default, although Borrower has received prior notice, as described above, of each of these failures and omissions.
>
> Additionally, and without limitation of Lender's rights or remedies, notice is hereby given of the following Defaults under the Loan Agreements.
>
> a) Violation of Section 7.1 by reason of failure to provide documentation of licenses of property managers.
>
> b) Violation of Section 4.1.5 by reason of failure to provide required financial reports and by reason of missing, late, inaccurate, inconsistent and misleading tenant occupancy reports
>
> c) Violation of Section 4.1.18(a) by reason of failure to provide adequate security, including without limitation installation of security gates, video surveillance or establishment of a police substation.
>
> d) Violation of Section 9.1 by reason of Borrower's failure to remedy defects,

resulting in rejection of the Loan for Securitization.

e) Violation of Section 3.1.1(b) by reason of Borrower's change of place of business without notice to Lender

f) Violation of Section 3.1.20 by reason of permitting residential Leases of less than twelve (12) month [sic] in duration.

(1/10/18 Ex. "C-16" pp. 2-3). The notice stated that FCRE intended to hold Mr. Kettles personally responsible pursuant to the guaranty. (1/10/18 Ex. "C-16" p. 3). It further advised that FCRE intended to replace the property manager. (1/10/18 Ex. "C-16" p. 3). The second document notified the Debtor that, due to an event of default, FCRE had elected to terminate the management agreement and to install Tideland Realty, Inc. ("Tideland") as manager of the Property. (1/10/18 Ex. "C-17" pp. 1-2).

FCRE's declaration of default was immediately followed by its seizure of the Property on July 20, 2016. Accompanied by two officers of the Port Royal Police Department, Ms. Davenport entered onto the Property around 11:00 a.m. and handed copies of the Notice of Event of Default and the notice of termination of management to Amanda Pett ("Ms. Pett"), the Debtor's property manager. (1/10/18 Transcript pp. 39-43). Ms. Davenport then requested that Ms. Pett surrender the keys to the office so that Tideland could assume management responsibilities. (1/10/18 Transcript p. 40). Instead, Ms. Pett called Mr. Kettles, who asked to speak to Ms. Davenport. According to Ms. Davenport, Mr. Kettles stated, "I'm going to get a TRO out on you." (1/10/18 Transcript p. 42). When Ms. Davenport returned the phone, Ms. Pett walked out of the office. (1/10/18 Transcript p. 42). Ms. Davenport had the locks changed so that only Tideland could access the office at the

20

Property.[17] (1/11/18 Transcript p. 30).

Ms. Davenport testified that, in the following weeks, Ms. Pett remained on the Property, advising tenants to continue paying their rent to her rather than to Tideland. (1/10/18 Transcript pp. 45-46; 2/5/18 Transcript p. 19). Consequently, FCRE issued to Mr. Kettles a letter dated July 22, 2016, stating that "Ms. Pett's presence on the property as your 'management agent' is not only a breach of the Loan Agreement dated April 15, 2015, but also runs directly to your Guaranty of Recourse Obligations and Environmental Indemnity of the same date. Any and all damages that result due to Ms. Pett's actions or threats will be your personal responsibility." (2/5/18 Ex. "C-18" p. 1). The letter threatened law enforcement action should Ms. Pett continue to "stir up civil disorder[.]" (2/5/18 Ex. "C-18" pp. 1-2). On August 12, 2016, Tideland filed eviction proceedings against Ms. Pett, who occupied one of the apartments. (1/10/18 Transcript, p. 45-46).

In taking possession of the Property on July 20, 2016, FCRE relied on the following provision of the Mortgage:

> Section 7.1 REMEDIES. Upon the occurrence and during the continuation of any Event of Default, Borrower agrees that Lender may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at

---

[17] Ms. Davenport testified that, as of July 20, 2016, "[t]he property condition had deteriorated significantly in the approximate year and a few months since we had closed this loan . . . . There was mold and mildew on any number of the structures . . . . It was obvious . . . . The balconies were coming apart and coming off of the physical property. At that point the . . . fencing was down all around the pool. The [South Carolina Department of Health and Environmental Control] had declared the pool unfit for swimming, and they had yellow tape around it, yellow police tape." (1/10/18 Transcript pp. 43-44). Despite this assertion, the Court was not presented with testimony of a person with knowledge of the conditions of the Property in 2015 by which the Court could assess this claim of "deterioration."

such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

. . .

(h) the license granted to Borrower under Section 1.2 hereof shall automatically be revoked and Lender shall immediately be entitled to possession of all Rents and sums due under or arising from the Property or any rights assigned under Section 1.2 hereof whether or not Lender enters upon or takes control of the Property. In addition Lender may, without having such Event of Default, without regard to the adequacy of the security for the Debt enter into or upon the Real Property, either personally or by its agents, nominees, or attorneys with or without bringing any oath or proceeding, or by a receiver appointed by a court dispossess Borrower and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Borrower agrees to surrender possession of the Property and of such books, records and accounts to Lender upon demand, and thereupon Lender may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereon; (ii) complete any construction on the Property in such manner and form as Lender deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the Property; (iv) exercise all rights and powers of Borrower with respect to the Property, whether in the name of Borrower or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (v) require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Borrower; (vi) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise; and (vii) apply the receipts from the Property tot he payment of the Debt, in such order, priority and proportions as Lender shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, Other Charges, insurance and other expenses in connection with the Property, as well as just and reasonable compensation for the services of Lender, its counsel, agents and employees.

(1/10/18 Ex. "C-107" pp. 15-16, § 7.1(h); 2/5/18 Transcript pp. 14-15).

E. The South Carolina Litigation

FCRE's seizure of the Property prompted the Debtor to file a complaint against FCRE and Tideland on August 15, 2016, in the Court of Common Pleas, County of Beaufort, South Carolina, Case No. 2016-CP-07-1778 (the "South Carolina Case"), alleging that FCRE improperly declared a non-monetary default and unlawfully removed the Debtor from the Property. (2/24/17 Ex. "D-8"). The Debtor's Complaint included claims for breach of contract and breach of covenant of good faith and fair dealing (Count I); unjust enrichment (Count II); conversion (Count III); declaration of violation of public policy and declaration of non-default (Count IV); tortious interference with contracts (Count V); an accounting (Count VI); and a permanent injunction (Count VII). (2/24/17 Ex. "D-8" pp. 12-20).

On the same day the complaint was filed, Judge Marvin H. Dukes, III, Master in Equity and Special Circuit Judge for Beaufort County, South Carolina ("Judge Dukes"), issued an Ex Parte Temporary Restraining Order (the "TRO").[18] Also on that same day, the Debtor moved for a temporary injunction. The following day, August 16, 2016, FCRE moved to vacate the TRO. A hearing on the Debtor's motion for a temporary injunction was held before Judge Dukes on August 24, 2016. (1/10/18 Ex. "C-35" p. 1).

On August 26, 2016, Judge Dukes issued an Order Granting Temporary Injunction (the "Injunction Order"), which restored the Debtor to the management of the Property. (2/5/18 Ex. "C-115"). In the Injunction Order, Judge Dukes made the following

---

[18] The TRO does not appear in the record before this Court.

findings of fact:

1. The Plaintiff is the owner of a 96 unit residential apartment complex located in the Town of Port Royal, South Carolina.

2. FCRE REL, LLC, loaned money to the Plaintiff in connection with the property, and holds a Mortgage on Plaintiff's property. In connection with the loan, the Plaintiff also executed a promissory note, loan agreement and other documents.

3. At all times relevant to this matter, up to the present, the Plaintiff has timely paid the amounts due and owing to the Defendant FCRE REL, LLC.

4. FCRE REL, LLC, claims the existence of numerous defaults under the loan documents related to the condition of the property.

5. In July of 2016, FCRE REL, LLC, accompanied by an officer of the Port Royal Police Department, forcibly removed the Plaintiff from its property, and installed Tideland Realty, LLC, as the manager of the property. At the time that FCRE REL, LLC, took this action, it had not commenced a foreclosure or other suit, had not sought the appointment of a receiver or any other court order authorizing the actions that it took.

6. During the time that FCRE REL, LLC, was in possession of the Plaintiff's property; it collected rents from the tenants, took possession of the Plaintiff's leases, business files and personal property. Despite these actions, FCRE REL, LLC, did not apply any of the money it collected to the payment of the debt owed by the Plaintiff, and the Plaintiff's principal, L. Christopher Kettles, made the payment due in August from his personal funds.

7. The actions of FCRE REL, LLC, put the Plaintiff out of possession of its real property, its money, its business files, its leases with tenants, and its personal property.

. . .

I find that A & B Associates, L.P., has proved its entitlement to a Temporary Injunction because it has shown:

(a) Plaintiff has suffered and will suffer immediate and irreparable injury because it has been removed and excluded from its own property and business, and its personal property and funds have been seized without due process of law;

24

(b) it is suffering and has suffered immediate and irreparable injury in that its contractual relationships with its tenants have been interfered with;

(c) it is suffering and has suffered immediate and irreparable injury because its real property is being altered without its consent;

(d) it is suffering and has suffered immediate and irreparable injury because the Defendant is or has taken possession of rents from Plaintiff's tenants without due process of law, and its contracts that are secured by its real property are thus being interfered with;

(e) in the absence of a Temporary Injunction, the status quo will be irretrievably lost, as the Plaintiff's business will be destroyed;

(f) the loss of the Plaintiff's business is irreparable damage for which no legal remedy exists;

(g) the Plaintiff has made out a prima facie case for the claims asserted in the Verified Complaint.

. . .

(2/5/18 Ex. "C-115" pp. 2-6). Accordingly, Judge Dukes ordered the following:

1. The Plaintiff shall have possession of its real property described above and all of its money, business files, leases, and personal property without hindrance or interference from the Defendants, and the Plaintiff is entitled to maintain and manage its property as it sees fit.

2. No later than 12:00 Noon, on Friday, August 26, 2016, the Plaintiff is required to have a licensed property manager in place at the property.

3. No later than 12:00 Noon, on Friday, August 26, 2016, the Defendants shall return and turn over to Plaintiff all of Plaintiff's money, including, but not limited to, all leases, applications, paperwork, files, tools as referenced in Christopher Kettles' affidavit, all money received from rents, and to return of all money removed from any of Plaintiff's bank accounts, including reserve accounts, and to provide a full accounting of all such money and any expenses Defendants have paid or incurred with Plaintiff's money.

. . .

(2/5/18 Ex. "C-115" p. 6).

On September 6, 2016, FCRE filed an answer, counterclaims, and a third-party complaint against Mr. Kettles in that case. (2/5/18 Ex. "C-113"). For its first counterclaim, FCRE declared the entire balance of the debt due and payable as of September 5, 2016, in the amount of $3,817,869.09. (2/5/18 Ex. "C-113" pp. 20-25). FCRE also asserted claims for appointment of a receiver, fraud in the inducement, fraud, breach of contract, and quantum meruit. (2/5/18 Ex. "C-113" pp. 25-30). FCRE's third-party complaint against Mr. Kettles contained a single claim for breach of the Guaranty. (2/5/18 Ex. "C-113" p. 31).

On September 8, 2016, the Debtor filed a motion seeking to hold FCRE in contempt for violating the Injunction Order by "fail[ing] to return to [the Debtor] rental income, reserve account funds, and personal property." (1/10/18 Ex. "C-35" p. 2). The Debtor further alleged that FCRE "continued to interfere with [the Debtor's] business and had altered sweeping instructions on [the Debtor's] bank accounts, and had imposed a claim of default interest on the loan." (1/10/18 Ex. "C-35" p. 2). FCRE filed a response on September 15, 2016, denying that it violated the Injunction Order, and a hearing was held on the following day. (1/10/18 Ex. "C-35" p. 3). On September 23, 2016, Judge Dukes entered an Order Granting Plaintiff's Motion for Contempt (the "Contempt Order"). (1/10/18 Ex. "C-35"). In the Contempt Order, Judge Dukes made the following findings of fact:

Specifically, FCRE REL, LLC has violated the Temporary Injunction by:

1. Failing to return to Plaintiff all of the rental money FCRE REL, LLC, or its agent, collected while it was in control and possession of Plaintiff's Real Property;

2. Failing to return to Plaintiff all of the money that was swept from any reserve accounts that Plaintiff owned or had an interest in;

3. Failing to return to Plaintiff any overpayment funds that Plaintiff made on the August 2016 debt service payment;

4. Charging default interest against Plaintiff; and,

5. Changing the sweeping instructions on Plaintiff's Wells Fargo bank account such that the money in the account would sweep into an account owned or controlled by FCRE REL, LLC.

(1/10/18 Ex. "C-35" pp. 3-4). Judge Dukes reiterated that his intention in the Injunction

Order was to reestablish the status quo that existed before FCRE declared a default. (1/10/18

Ex. "C-35" p. 4). Based on FCRE's violations of the Injunction Order, Judge Dukes ordered

the following:

1. FCRE REL, LLC is ordered to return to Plaintiff the sum of Fifty Six Thousand Seven Hundred Seventy Four and 94/100 ($56,774.92) Dollars, being the funds either collected by FCRE REL, LLC, or removed from its accounts, and the overpayment made to FCRE REL, LLC, with the August, 2016, payment.

2. Defendant FCRE REL, LLC is ordered to return all default interest that was charged to Plaintiff and that which was paid by Plaintiff, in the amount of Twenty Five Thousand Five Hundred Thirty Two and 76/100 ($25,532.76) Dollars;

3. Defendant FCRE REL, LLC is ordered to pay Plaintiff's attorney fees that Plaintiff has incurred as a result of its willful and contemptuous conduct. The amount of the Attorney fees awarded to Plaintiff are as set forth in the Affidavits of Timothy Granitz and Curtis Coltrane, in the total amount of Fourteen Thousand Three Hundred Thirty Nine and no/100 ($14,339.00) Dollars.

4. FCRE REL, LLC, has proposed, and the Court has accepted, a proposal for the handling of funds remaining in the Wells Fargo bank account (Account #4246161459), as follows: (1) the Wells Fargo bank account (Account #4246161459) will be closed effective September 23, 2016; (2) FCRE REL, LLC, shall direct Wells Fargo to deliver the sum of Fifteen thousand seven

hundred forty five Dollars ($15,745) (representing a September rent payment by
the Beaufort Housing Authority) to counsel for A & B Associates, L.P.; (3) Any
remaining amounts in the DACA after customary and usual Bank fees and the
minimum balance requirement shall be delivered to counsel for A & B
Associates, L.P. (4) A & B Associates, L.P. shall deposit rent payments into its
own operating account, until further Order of this Court; (5) FCRE REL, LLC,
shall notify the Beaufort Housing Authority that until further Order of the Court,
it shall deliver any payments for rent related to August on Southside directly to
A & B Associates, L.P.; and (6) neither the closure of the Wells Fargo bank
account as of September 23, 2016, nor the failure of the Borrower to make any
deposits into that account, or any DACA account, after September 23, 2016 will
be asserted as an Event of Default under the Loan Documents. The foregoing is
incorporated in this Order.

(1/10/18 Ex. "C-35" pp. 6-8). FCRE appealed both the temporary injunction and the finding

of contempt, with both appeals consolidated under Appellate Case No. 2016-001899 in the

South Carolina Court of Appeals. (Dckt. 66-5).

Pursuant to 11 U.S.C. § 362(a)(1), the Debtor's bankruptcy filing on February

3, 2017, operated as a stay of the South Carolina Case. Accordingly, on March 7, 2017, the

South Carolina Court of Appeals entered the following order:

The respondent, A & B Associates, L.P., notified the Court that it has filed for
Chapter 11 bankruptcy. Accordingly, this appeal is held in abeyance until the
bankruptcy court relinquishes jurisdiction. *See Bragg v. Bragg*, 347 S.C. 16, 24,
553 S.E.2d 251, 255-56 (Ct. App. 2001) ("Because the bankruptcy court has
exclusive jurisdiction over the debtor's assets, no action can be maintained in
state court to enjoin assets within the bankruptcy court's jurisdiction.") The
respondent must provide the Court with a status update every sixty (60) days.

(Dckt. 66-7). On May 16, 2017, this Court entered an Order on Amended Motion for Relief

from Stay (dckt. 130) authorizing FCRE to pursue its appeal in the South Carolina Case.

F. FCRE Declares Two More Defaults

On November 21, 2016, FCRE issued a second Notice of Event of Default

based upon the Debtor's alleged check-cashing services, in violation of a requirement in the Loan Agreement that the Debtor remain a single-purpose entity. (1/7/19 Ex. "FCRE-1"). This second Notice of Default, directed to Mr. Kettles, stated as follows:

> On November 16, 2016, you executed the sworn Affidavit of L. Christopher Kettles (the "Affidavit"), which was filed with the Court of Common Pleas, Beaufort County, SC in support of your Motion for Contempt docketed at Case No. 2016-CP-07-1778. Upon review of your sworn statements in this affidavit, FCRE REL, LLC ("FCRE") hereby gives notice to A&B Associates, L.P. ("A&B" or the "Borrower") and to L. Christopher Kettles (the "Guarantor") of the Event of Default under the Loan Documents for failure of the Borrower to remain a Single Purpose Entity, as required by Section 3.1.22(b) of the Mortgage and as incorporated into Section 10.1(a)(xi) of the Loan Agreement. Specifically, you swear under oath:
>
> *"10. Amanda Pett did not have a bank account during the entirety of her employment at August on Southside. A&B allowed Ms. Pett to cash her paychecks with cash that was on hand."*
>
> *"11. Ms. Pett also cashed a check in the amount of $7,363.54, which was made payable from the law firm Finger, Melnick & Brooks, P.A. The cash received by Ms. Pett was from rental payments".*
>
> Based upon these sworn statements, you have admitted and acknowledged that the Borrower, A&B Associates, L.P. ("A&B") was providing check cashing services.[19]
>
> Under the terms of the Loan Agreement, there is no cure period or remedy for this Event of Default. Due to the fact that your actions can never be remedied, FCRE has suffered irreparable harm.

(1/7/19 Ex. "FCRE-1") (emphasis in original). On December 13, 2016, FCRE issued a third Notice of Event of Default based upon the alleged presence of mold in the Property. (1/7/19

---

[19] Despite this characterization by FCRE, the Court does not find that the Debtor was in the check cashing business in violation of the single purpose entity provision of the loan documents. While perhaps not reflecting good accounting practices, this was an accommodation to an employee and nothing more.

Ex. "FCRE-2"). This Notice of Default stated as follows:

On or about December 8, 2016, pursuant to a verified subpoena response, FCRE REL, LLC ("FCRE") received the Beaufort Housing Authority ("BHA") Inspection History Listing Report dated 4/1/2014 - 11/14/2016 (the "Report"). A review of this Report evidenced that A & B Associates, L.P. ("A & B" or "Borrower") was notified by the BHA on at least four (4) separate occasions of the existence of mold in four (4) separate residential units at August on Southside (the "Property") prior to the April 15, 2015 loan closing date.

. . .

On April 8, 2015, and in conjunction with the loan closing, A&B and L. Christopher Kettles (the "Guarantor") executed a User Questionnaire for Velocity Consulting, Inc. (The "Questionnaire") stating that it/he had no knowledge of any environmental issues at the property. Furthermore, on or about March 9, 2015, Sharan Kettles, the property manager agent specifically stated "She was not aware of any mold problems on-site."

FCRE hereby gives notice to A&B Associates, L.P. ("A&B" or the "Borrower") and to L. Christopher Kettles (the "Guarantor") of the Event of Default under the Loan Documents for failure to disclose that it/he had specific knowledge as to the existence of mold and/or other Hazardous Substances at the Property prior to the loan closing.

Under the terms of the Loan Agreement, there is no cure period or remedy for this Event of Default. Due to the fact that your actions can never be remedied, FCRE has suffered irreparable harm.

In addition, the Report also evidenced that A & B Associates, L.P. was put on notice at least five (5) separate times of the existence of mold in five (5) separate residential units at the Property after the loan closing, from April 15, 2015 through November 14, 2016. Furthermore, on or about March 4, 2016, Amanda Pett, the property manager agent specifically stated "She was not aware of any mold problems on-site."

FCRE hereby gives notice to A&B Associates, L.P. ("A&B" or the "Borrower") and to L. Christopher Kettles (the "Guarantor") of the Event of Default under the Loan Documents for failure to disclose that it/he had specific knowledge as to the existence of mold at the Property during the loan term from April 15, 2015 through present.

. . .

FCRE has received information sufficient to suspect that an environmental condition has occurred. Therefore, a Phase II Environmental Site Assessment with a test for Mold and other Hazardous Materials report will be commissioned in order to assess the extent of the damages and any potential remediation for the damages. A & B will be responsible for the payment of the costs for the Environmental Site Assessment Report, as well as the remediation of the environmental contamination to its fullest extent.[20]

. . .

(1/7/19 Ex. "FCRE-2"). For reasons that are not perfectly clear, the Debtor determined that bankruptcy represented a good option in the face of these continued demands by FCRE.[21]

G. The Debtor Files for Bankruptcy Relief

    (i) Early Procedural Disputes in the Bankruptcy Case

        On February 3, 2017, the Debtor filed its Voluntary Petition for Non-Individuals Filing for Bankruptcy (the "Original Petition") under Chapter 11 of the Bankruptcy Code. (Dckt. 1). On February 6, 2017, the Debtor filed its Emergency Motion for Order Authorizing Use of Cash Collateral Held by FCRE REL, LLC Pursuant to 11 U.S.C. § 363 and Providing Adequate Protection (the "Motion to Use Cash Collateral"). (Dckt. 3). The Debtor amended the motion on February 7, 2017. (Dckt. 6). The Debtor also filed a Motion for Rule 2004 Examination of South Carolina Department of Labor, Licensing

---

[20] The Court finds that the BHA routinely inspected units before approving the tenant for occupancy, and that any such presence of mold had to be remediated by the Debtor prior to move-in. The Court does not find that the evidence presented was in conflict with the Debtor's pre-closing assurances that there were no environmental problems at the Property.

[21] According to the Debtor's Amended Disclosure Statement, "[a]s a direct result of FCRE's actions and demand for payment of $45,000 for a mold study, on February 3, 2017, Debtor filed this Voluntary Petition under Chapter 11[.]" (Dckt. 373, p. 10).

and Regulation and for Production of Documents (dckt. 29) because the Debtor's new property manager, Alison E. Plank Mealing, had received from that agency a Notice of Complaint requesting certain business records.[22]

FCRE's opening salvo came on February 17, 2017, when it filed an Emergency Motion for Appointment of Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a) (the "Motion to Appoint Trustee"). (Dckt. 32). The Motion to Appoint Trustee set forth several grounds for appointing a Chapter 11 Trustee, as reflected by the following section headings:

**B. The Debtor's failure to comply with the Loan Documents.**

**1. The Debtor failed to make two of the first four monthly payments in a timely manner.**

**2. The Debtor failed to maintain proper security at the Property to ensure tenant safety.**

**3. The Debtor failed to engage a properly licensed management company.**

**4. The Debtor's continued failure to correct property and security deficiencies, as well as engage a properly licensed management company.**

**5. The Debtor's continued failure to properly maintain the physical condition of the Property.**

**6. The Debtor's failure to provide true and accurate financial reports pertaining to the Property.**

**7. Additional Breaches by the Debtor.**

---

[22] At a hearing on January 11, 2018, Ms. Davenport acknowledged that she had filed "possibly half a dozen or so" complaints with the South Carolina Department of Labor, Licensing and Regulation based on her belief that the Debtor's property manager was not properly licensed. (1/11/18 Transcript pp. 16-17).

**8. Suspicious and Fraudulent Check Activities by the Debtor.**

**9. Debtor's Fraudulent Inducement to Fund the Loan.**

**C. The Debtor's Additional Breaches Following Temporary Restraining and Injunction Orders in State Court Litigation**

**D. Additional Misrepresentations by the Debtor**

**E. Kettles' Affidavit contains numerous factual misrepresentations.**

**F. Commingling of funds is further evidence of financial mismanagement.**

**G. The Debtor's Cash Collateral Budget is not adequately supported.**

**H. The Debtor made misrepresentations on the Statement of Financial Affairs.**

(Dckt. 32, pp. 5-25) (emphasis in original). That same day, FCRE filed its Objection to the Debtor's Motion to Use Cash Collateral. (Dckt. 33).

On February 22, 2017, the Debtor filed a Motion for Determination of No Default and To Establish Pendency Period Interest Rate (the "Motion for Determination") (dckt. 41) requesting that the Court declare that the Debtor never defaulted under the loan agreement and fix the contract rate of 4.04% as the applicable interest rate from the petition date through confirmation of the Debtor's plan. Two days later, on February 24, 2017, the Court held its first hearing in this case, concerning the Debtor's Amended Motion to Use Cash Collateral (dckt. 6) and FCRE's objection (dckt. 33), FCRE's Motion to Appoint Trustee (dckt. 32), and the Debtor's Motion for Determination. (Dckt. 41). After hearing testimony from Mr. Kettles and from Ms. Davenport, the Court continued indefinitely FCRE's Motion to Appoint Trustee (dckt. 32) and requested that Debtor's counsel withdraw

its Motion for Determination (dckt. 41), which request was accommodated. (Dckt. 63).[23]

The Court entered its First Interim Order Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363 ("First Interim Cash Collateral Order") on March 7, 2017. (Dckt. 52). The parties promptly engaged in a skirmish over the terms of the First Interim Cash Collateral Order, as FCRE took a dim view of certain actions by the Debtor and peppered counsel with one notice of default after another. On March 22, 2017, the Debtor filed an Emergency Motion for Clarification of First Interim Order Authorizing Use of Cash Collateral ("Motion for Clarification"). (Dckt. 64). FCRE filed a response (dckt. 79) on March 29, 2017. At an April 5, 2017 hearing on the Motion for Clarification, Debtor's counsel stated that the Debtor had received several Notices of Default from FCRE concerning the Debtor's alleged failure to comply with the First Interim Cash Collateral Order. After hearing from the Debtor and from FCRE, the Court orally ruled that there were no material defaults of the First Interim Cash Collateral Order and instructed the Debtor to file a motion to modify the First Interim Cash Collateral Order along with a consent order if the parties could reach an agreement. On April 13, 2017, the Debtor filed its Motion to Amend First Interim Order Authorizing Use of Cash Collateral (the "Motion to Amend") (dckt. 88), and attached a proposed amended cash collateral order (dckt. 88, pp. 1-16; dckt. 93) to which FCRE then filed an objection. (Dckt. 96).

Shortly after the April 5, 2017 hearing on the Motion for Clarification, the

---

[23] At the hearing, the Court warned the parties that their failure to reach compromise would likely result in significant professional fees that would be added to the debt to FCRE pursuant to 11 U.S.C. § 506(b). (2/24/17 Hearing 12:33-37 p.m., 8:26-29 p.m.).

Debtor received two new Notices of Default under the First Interim Cash Collateral Order from FCRE, and on April 7, 2017, received four additional Notices of Default. (Dckt. 97, Ex. "A"-"F"). As summarized by FCRE, these Notices of Default alleged that the Debtor was in violation of the Court's First Interim Cash Collateral Order for the following reasons:

1. Incurable Defaults

a.) The Debtor has used and continues to use post-petition cash collateral to pay for pre-petition expenses;

b.) The Debtor has transferred and continues to transfer funds to prohibited parties, in violation of the Cash Collateral Order, including Sharan Kettles . . . .

c.) The Debtor failed to obtain any written estimates from licensed contractors for any of the repairs Debtor is required to make at the property . . . [and] engaged unlicensed individuals to perform non-permitted, uninspected and unsupervised work on the property . . . .

d.) The Debtor continued to accept cash for rental payments as late as March 6, 2017 . . . .

e.) The Debtor has used and continues to use unapproved individuals for various services at the property, and the Debtor has paid these individuals from Cash Collateral . . . .

f.) The Debtor has failed to obtain any written estimates for the repairs of the balconies . . . .

g.) The Debtor has failed to engage a properly licensed property manager . . . .

h.) The Debtor has continued to permit unlicensed property management agents to collect rents, negotiate leases and handle tenant matters.

i.) The Debtor has commingled funds by depositing rental payments for a property known as Pineland Square Apartments into the Debtor's operating account at SunTrust Bank (post-petition) . . . .

35

2. <u>Repeated and Continuous Defaults</u>

a.) The Debtor has failed and continues to fail to deliver all the required reporting information under Paragraph C of the Cash Collateral Order . . . .

b.) The Debtor has failed to provide true and accurate information in the Monthly Operating Reports, resulting in the need for FCRE to repeatedly provide the Debtor with notice of a myriad of discrepancies and inaccuracies and for the Debtor to then file Amended Monthly Operating Reports.

c.) The Debtor has failed to properly document rents received from tenants, and has failed to maintain an accurate rent roll which reflects the proper tenant's names and the contractual lease terms.

d.) The Loan Agreement requires that any lease renewal be for a minimum period of one year. The Debtor has violated this provision by allowing tenants to continue to occupy the property as tenants at will . . . .

e.) The Debtor is using a form of lease which was not approved by FCRE.

f.) The Debtor continues to fail to obtain FCRE's approval for contracts, payments to contractors and other individuals, and for other expenses.

. . .

(Dckt. 107, pp. 3-6) (emphasis in original). These Notices of Default prompted the Debtor to file its Emergency Motion for Determination of No Default Under First Interim Order Authorizing Use of Cash Collateral or In the Alternative Second Motion to Amend First Interim Order Authorizing Use of Cash Collateral ("Second Motion for Determination"). (Dckt. 97). FCRE filed an objection (dckt. 107) to the Debtor's Second Motion for Determination on April 26, 2017.

The following day, April 27, 2017, the Court held a hearing on the Debtor's

Motion to Amend (dckt. 88) and Second Motion for Determination. (Dckt. 97). After considering the evidence and argument of both the Debtor and FCRE, the Court found that certain of the alleged defaults occurred prior to entry of the First Interim Cash Collateral, others were not material, and yet others were unsupported by evidence. Moreover, the Court found that all of the alleged defaults were moot based on the Court's entry of an Amended First Interim Order Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363 (the "Amended First Interim Cash Collateral Order"). (Dckt. 114). Accordingly, the Court entered an Order Denying Debtor's Motion for Determination of No Default as Moot. (Dckt. 120). Subsequently, on September 7, 2017, the Court entered its Final Order Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363 (the "Final Cash Collateral Order") (dckt. 256), which provided as follows:

> [T]he period within which the Debtor may use Cash Collateral in this case is extended through and including the entry of an order confirming a plan of reorganization, conversion of the Bankruptcy Case to one under Chapter 7 of the Bankruptcy Code, appointment of a trustee, dismissal of this Bankruptcy Case or until further order of court. All terms and conditions in the Amended Cash Collateral Order shall continue to govern the use of Cash Collateral during this extended period.

(Dckt. 256). Following entry of this Order, FCRE has not sought relief with respect to cash collateral.

On June 13, 2017, FCRE filed its Motion to Convert (dckt. 161) requesting that the Court convert this case to Chapter 7 and compel the Debtor to notify various government agencies "of the documented, actual, and suspected existence of mold and microbial growth, including the existence of such in Asbestos Containing Materials." (Dckt. 161, p. 1). Like

its Motion to Appoint Trustee (dckt. 32), FCRE's Motion to Convert set forth numerous (and similar) grounds for conversion:

### IV. Debtor's Post-Petition Mismanagement and Violations of the First Order and the Amended Order

#### A. Debtor Lacked Authority to File the Bankruptcy Petition

#### B. Debtor Failed to Employ a Licensed Property Manager

#### C. Debtor Failed to Permit Required Property Inspection to Assess Mold

#### D. Faulty Monthly Operating Reports

### V. Mold in the Tenants' Apartment Units

#### A. The Property is Suffering Substantial and Continuing Loss and Debtor has No Reasonable Chance of Rehabilitation

#### B. Debtor Has Grossly Mismanaged the Estate

#### C. Debtor Has Repeatedly Engaged in the Unauthorized Use of Cash Collateral and has Failed to Comply with a Court Order

(Dckt. 161, p. 9-24) (emphasis in original). On that same day, FCRE filed a Declaration of Mary Davenport in support of the Motion to Convert. (Dckt. 162). An additional exhibit, entitled "Summary of Monthly Operating Report Inaccurate, Incomplete, Misleading and Deficient Information" (dckt. 163), was also filed by FCRE. As this case has progressed, FCRE has filed various supplemental briefs (dckt. 333, dckt. 358, dckt. 475) to its Motion to Convert. As discussed below, the Court held hearings on the Motion to Convert on

January 10-12, 2018, and February 5-6, 2018.[24]

    (ii) <u>The New York Litigation</u>

        On May 8, 2017, FCRE initiated a proceeding against Mr. Kettles in the Supreme Court of the State of New York, County of New York (the "New York Case") by filing a Motion for Summary Judgment in Lieu of a Complaint (Dckt. 219-1) pursuant to New York Civil Practice Law and Rules § 3213. In the New York Case, FCRE asserted that under the Guaranty, the Debtor's filing of a voluntary bankruptcy petition triggered Mr. Kettles' liability for the debt. (Dckt. 219-1). FCRE sought a judgment against Mr. Kettles in the amount of $3,801,548.15, representing the total outstanding principal balance and interest accrued as of February 2, 2017, together with prejudgment and post-judgment interest, attorneys' fees, costs, and expenses. (Dckt. 219-1, p. 4).

        On July 26, 2017, Mr. Kettles and FCRE stipulated in the New York court that the "return date" for the Motion for Summary Judgment in Lieu of a Complaint would be adjourned until August 17, 2017. (Dckt. 223-1). Also on July 26, 2017, the Debtor filed its Emergency Motion Under 11 U.S.C. § 105 for Interim Stay of State Court Action Against Guarantor. (Dckt. 219). The Debtor requested that this Court exercise its authority under 11 U.S.C. § 105 to stay the New York Case against Mr. Kettles on the grounds that it would adversely affect the Debtor's reorganization. In support of this argument, the Debtor made the following representations to the Court:

    The guarantor in this case, L. Christopher Kettles, is the owner of the General

---

    [24] In the Court's Notice of Continued Hearing entered on September 25, 2018, the Motion to Convert was continued to the confirmation hearing of October 1, 2018. (Dckt. 502).

> Partner and through his companies, holds the largest ownership interest in the Debtor. *Mr. Kettles is actively involved in the management of the company. His participation is just as critical to the success of the company now as it has been over the last approximately forty (40) years.* In addition, he is a source of funding when necessary, and has in fact obligated himself to make unsecured loans to the Debtor for necessary expenses in this bankruptcy case, such as supplies for repairs, costs and administrative expenses when needed.

(Dckt. 219, pp. 6-7) (emphasis added).

Following a hearing on July 31, 2017, the Court found that the Debtor presented no evidence that the New York Case would interfere substantially with Mr. Kettles' management of the Debtor's operations, and thus the Debtor failed to carry its burden of showing that the New York Case should be enjoined pursuant to § 105. The Court therefore entered an Order (dckt. 267) denying without prejudice the Debtor's Emergency Motion. Subsequently, the New York Case was dismissed because Mr. Kettles had already been named a defendant in the prior pending action in South Carolina. (10/1/18 Transcript, p. 25).

(iii) <u>FCRE's Proof of Claim</u>

On May 17, 2017, FCRE filed a proof of claim in the amount of $4,733,901.78 secured by the Property. (Claim 2-1, p. 2). In a document entitled "Explanation of Claim," FCRE provided the following breakdown of its claim:

| | |
|---|---|
| FCRE REL, LLC - Creditor Claim | |
| Balances as of February 2, 2017 | |
| Principal Balance | $3,789,682.65 |
| Accrued Interest 1-7-2017 to 2-2-2017 | $    11,865.50 |
| | $3,801,548.15 |
| Legal Fees through February 2, 2017 | $  509,783.01 |
| Out of Pocket Expenses | $      7,308.90 |
| Accrued Default Interest Excess over | |
| Contract Rate 9/7/2016 - 1/6/2017 | $    81,114.14 |
| Return of Monies paid under Contempt Order | $    56,774.92 |
| Return of Attorney's Fees Paid | $    14,339.00 |
| Return of Default interest to Borrower | $    25,532.76 |
| Return of money transferred from DACA account | |
|   to Borrower | $    15,745.00 |
| Loss on Hedge during Holding Period | $  221,755.90 |
| Total Claim | $4,733,901.78 |

(Claim 2-1 Part 2, p. 1). Aware that the amount of FCRE's claim would be an issue, and in

an effort to nudge the case along toward confirmation, the Court entered a Notice of Status

Conference, which read as follows:

> Notice is given that a Status Conference on the following: Debtor's Appraisal of Real Estate, Debtor's Prospective Objection to FCRE REL, LLC's Proof of Claim, and any Scheduling Order needed as it relates to the Objection to Claim or Appraisal, has been scheduled in the above captioned case on:
>
> **July 18, 2017, at 11:00 AM**
> Bankruptcy Courtroom 228, U.S. Courthouse, 125 Bull St., Savannah, GA 31401
>
> The Court will take up other matters bearing on the Debtor's timely filing of a Disclosure Statement and Plan of Reorganization. FCRE REL, LLC's Counsel may participate telephonically.

(Dckt. 201). The Debtor took the hint and filed its Claim Objection (dckt. 208) on July 12,

2017. FCRE filed a response (dckt. 229) on August 11, 2017. As will be described more fully

below, the Court held hearings on the Debtor's Claim Objection on January 10-12, 2018, and

February 5-6, 2018.[25]

On February 2, 2018, FCRE amended its proof of claim, reducing the claimed amount for "legal fees through February 2, 2017" from $509,783.01 to $472,283.01. (Claim 2-2). The amount of the total claim thus decreased to $4,696,401.78. (Claim 2-2, p. 2). FCRE filed a brief in support of its amended claim on February 2, 2018. (Dckt. 357). The Debtor, in turn, filed a Supplemental Objection to Claim #2 of FCRE REL, LLC (the "Supplemental Claim Objection") (dckt. 387) on April 9, 2018. FCRE filed a response (dckt. 389) on April 13, 2018. While the Claim Objection remained unresolved as of the confirmation hearing, as discussed below, the Court has addressed the Claim Objection by estimating FCRE's pre-petition claim pursuant to 11 U.S.C. § 502(c).

(iv) Approval of the Debtor's Disclosure Statement

On September 29, 2017, the Debtor filed its Disclosure Statement (dckt. 265), which incorporated a valuation of the Property in the amount of $6,400,000.00 prepared by Brian F. Considine ("Mr. Considine"),[26] as well as its Chapter 11 Plan (the "Plan"). (Dckt. 266). The Debtor filed supplemental exhibits to its Disclosure Statement on October 10, 2017. (Dckt. 279). On October 3, 2017, the Court scheduled a hearing for January 10, 2018, on the Debtor's Disclosure Statement and on the valuation of the Property pursuant to 11 U.S.C. § 506(a). (Dckt. 270). The Court's notice fixed November 6, 2017, as the last day to

---

[25] In the Court's Notice of Continued Hearing entered on September 25, 2018, the Claim Objection was continued to the confirmation hearing of October 1, 2018. (Dckt. 502).

[26] On August 11, 2017, also in response to the Court's status conference of July 18, 2017, the Debtor filed an Appraisal Report of the Property prepared by Mr. Considine. (Dckt. 231). Mr. Considine concluded that the market value of the Property as of June 20, 2017, was $6,400,000.00. (Dckt. 231, p. 2).

file objections to the Disclosure Statement, including objections to the Debtor's valuation of the Property. (Dckt. 270).

On November 2, 2017, FCRE filed a lengthy objection to the Disclosure Statement. (Dckt. 289). Among the many aspects of the Disclosure Statement that FCRE found objectionable was the Debtor's $6,400,000.00 valuation of the Property (dckt. 289, p. 12), for which FCRE reserved the right to offer its own appraisal evidence. FCRE also challenged the Debtor's organizational history, arguing that the administrative dissolution on July 9, 2005, of the Debtor's corporate general partner, ABGP, Inc., resulted in the dissolution of the Debtor's limited partnership and rendered the Debtor ineligible to file for reorganization under Chapter 11. (Dckt. 289, pp. 5-8). Additionally, FCRE disputed the condition of the Property as described in the Disclosure Statement.

In addition to considering the Debtor's Disclosure Statement, the Court also scheduled a hearing for January 10, 2018, to January 12, 2018, on valuation of the Property, FCRE's Motion to Convert, the Debtor's Claim Objection, and the Debtor's Motion to Extend Exclusivity Period for Confirmation of Chapter 11 Plan. (Dckt. 270, dckt. 272, dckt. 327). Over the three-day hearing, the Court heard testimony from six witnesses: Captain John Griffith of the Port Royal Police Department, Ms. Davenport, Mary Smith (the grandmother of Ms. Pett and an alleged witness to the events of July 20, 2016[27]), Keith Joseph (in-house counsel for Freedom Mortgage Corp.), A. Keith Batson ("Mr. Batson," FCRE's expert

---

[27] Although the Debtor offered Mary Smith as an eyewitness to FCRE's seizure of the Property on July 20, 2016, she was unable to recognize Ms. Davenport in the courtroom. (1/11/18 Hearing 11:19 a.m.).

appraiser), and Mr. Considine (the Debtor's expert appraiser). Mr. Batson and Mr. Considine offered testimony as to the value of the Property. The Court received into evidence Mr. Batson's Appraisal Report (1/10/18 Ex. "C-42"), as well as a second appraisal completed by Mr. Considine on January 8, 2018, in response to a critique by Mr. Batson. (1/10/18 Ex. "D-26"). While Mr. Batson valued the Property at $3,700,000.00 (1/10/18 Ex. "C-42" p. 3), Mr. Considine valued the Property in his second appraisal at $6,000,000.00. (1/10/18 Ex. "D-26" p. 3). At the conclusion of the third day of that hearing, the Court granted (dckt. 344) the Debtor's motion as to the exclusivity period and continued all other matters to February 5 and 6, 2018. (Dckt. 347).

      At the February 5-6 hearings, the Court heard testimony from five witnesses: Ms. Davenport, Mr. Kettles, Mrs. Kettles, Jamie Hunt Howard (a resident at the Property), and Suzanne Michelle LoGuidice (another resident, who witnessed the events of July 20, 2016, and thereafter).

      On February 21, 2018, the Court read into the record at a status conference its findings as to the valuation of the Property. Specifically, after careful review of both experts' testimony, the Court found the value of the Property to be $5,250,000.00 as of the January 12, 2018 hearing.[28] The Court then entered an Order on Valuation. (Dckt. 365). Pursuant to

---

[28] The appraisal dates were October 31, 2017, (Mr. Batson's appraisal) and January 8, 2018 (Mr. Considine's second appraisal). In the Order on Valuation (dckt. 365, p. 2), the Court acknowledged that confirmation could be delayed for some months, that the value as of the confirmation date could be different, and that such subsequent valuation could be critical to confirmation. The Court stated that any party in interest would be free to present evidence of any change in value since the January 12, 2018 hearing. At the confirmation hearing, neither party presented evidence that the valuation had changed. (10/1/18 Transcript pp. 14-16).

the Court's instructions, the Debtor incorporated the Court's $5,250,000.00 valuation into its Amended Disclosure Statement. (Dckt. 373, p. 7).

As to the issue of the Debtor's eligibility under 11 U.S.C. § 109(d), which was raised by FCRE in both its Motion to Convert (dckt. 161, pp. 9-10) and in opposition to approval of the Disclosure Statement (dckt. 289, pp. 1-8), the Court determined that an additional evidentiary hearing would be necessary to develop a full record on the Debtor's organizational history, including the continued corporate existence of its general partner, ABGP, Inc. Accordingly, at the February 21, 2018 status conference, the Court advised counsel that an evidentiary hearing would be scheduled on these matters. At that hearing, held on April 16, 2018, Mr. Kettles testified about the Debtor's organizational history, numerous exhibits were admitted into evidence,[29] and counsel presented argument as to the Debtor's eligibility to seek reorganization under Chapter 11. The Court took the matter under advisement, and the parties briefed the issue. (Dckt. 391, dckt. 418). As it turned out, the issues raised by FCRE were complex and required the Court to review the entire organizational history of the Debtor and its successive general partners before ultimately rejecting FCRE's argument.[30] The Court finally approved the Debtor's Amended Disclosure Statement on August 29, 2018. (Dckt. 486).

(v) The Debtor's Amended Plan

The proposed plan of reorganization that came on for confirmation was filed,

---

[29] *See* dckt. 396.

[30] *See* dckt. 509, dckt. 510.

45

along with the Amended Disclosure Statement, on March 8, 2018. (Dckt. 373, dckt. 374).

The Amended Plan creates the following three classes of claims: (1) the allowed secured claim of FCRE; (2) the allowed general unsecured claims of non-insiders;[31] and (3) and the allowed general unsecured claims of insiders.[32] (Dckt. 374, pp. 2-3). The Amended Plan also provides for unclassified claims for taxes and attorneys' fees. (Dckt. 374, p. 3). The Debtor's treatment of the various classified and unclassified claims is reflected in the following table:

| Class | Claim Amount | Terms | Monthly Payment |
|---|---|---|---|
| Administrative Claims (Estimate) | $125,000.00 | Paid in full at confirmation by Mr. Kettles | $0.00 |
| Priority Claims - IRS | $0.00 | Paid in full at confirmation | $0.00 |
| Secured Claims - FCRE | $3,801,548.15 | Regular contractual monthly payments | $31,575.03 |
| General Unsecured Claims (Non-Insiders) | $6,919.72 | Paid in full within 120 days of Effective Date with 5% interest | Lump Sum Payment |
| General Unsecured Claims (Insiders) | $115,737.00 | Paid in full over 5 years at 3% interest | $2,079.64 |
| Total | $3,933,467.87 | | $33,654.67 |

(Dckt. 374, p. 3). Pertinent to this Opinion, the Debtor proposes the following treatment of FCRE's secured claim:

> . . .
>
> The Debtor shall continue making [its] regular monthly payments [of $31,575.03] to FCRE at the contract rate of interest (4.04%) for seven (7) years from April 15, 2018. The remaining balance of the debt to FCRE shall be due and payable on April 15, 2025. Debtor may pre-pay any the [sic] outstanding balance at any time without penalty . . . .

---

[31] The general unsecured claims of non-insiders are discussed in more detail below in the Court's analysis of 11 U.S.C. § 1129(a)(10).

[32] The class of general unsecured claims of insiders consists solely of the Kettles Estate based on loans allegedly made by Mr. Kettles to the Debtor. (Dckt. 374-2, p. 3).

To the extent the Court determines, based on the outcome of the Debtor's claim objection, that the claim of FCRE is higher than the principal balance as of February 3, 2017, such additional amount shall be added to the end of the loan and paid as a balloon payment at the end of the plan term (i.e. as a lump sum payment on April 15, 2025). To the extent that the Court determines, based on the outcome of the Debtor's claim objection, that the claim of FCRE is less than the principal balance as of February 3, 2017, the Debtor shall continue to make the same regular monthly payment ($31,575.03) until the claim amount determined by the Court is paid in full or until the plan term expires on April 15, 2025, at which time the claim of FCRE shall be fully satisfied and FCRE shall file a cancellation of its Mortgage and related security documents.

FCRE shall retain its existing lien on the Property until the claim is paid in full according to the terms of this plan or otherwise. Credit shall be given to Debtor by FCRE or its assigns for any payments made by the Debtor and/or any other party to FCRE or its assigns on this indebtedness for which Debtor has pledged the Property. This credit shall be treated as a pre-payment of the A & B debt, without penalty. Credit shall be given to Debtor y FCRE or its assigns for any amounts determined by the Beaufort County Court of Common Pleas to be owing to Debtor by FCRE, Tideland Realty, Inc. and/or Mary F. Davenport.

FCRE may inspect the August on Southside property once per calendar year, at its own cost. FCRE must provide the Debtor with ten (10) days' written notice of a proposed inspection and make reasonable accommodations to schedule a mutually convenient time for such inspection. An inspection may not last for more than two (2) consecutive days and shall not interfere with the Debtor's business operations or unreasonably disturb tenants. FCRE may not bring security on to [sic] the Debtor's property for purposes of such inspection.

If the Debtor sells or refinances this property prior to maturity of the payment obligations under the terms of this plan or as may otherwise be agreed to in writing by the Debtor and the FCRE [sic] or assigns, FCRE shall release its lien on the collateral secured by this loan in consideration of the payment of all principal and accrued interest due under the terms of this plan as of the date of payoff. There shall be no penalty for early repayment of this debt. Debtor shall maintain insurance on the FCRE collateral consistent with the requirements of the existing loan documents. Debtor shall be responsible for the payment of pre-petition property taxes on the FCRE collateral in accordance with the Chapter 11 plan and will pay post-petition taxes promptly as they become due.

**<u>Events of Default are specifically limited to the following:</u>**

1. Failure to pay the monthly mortgage payment (including reserves for taxes, insurance and repairs, as and when due);

2. Cancellation of property insurance;

3. Delinquent tax notice; or

4. Material failure to provide required Financial Documents on or before May 1st of each year. [Financial Documents are defined as: prior year tax return, prior year balance sheet as of the last day of the year, prior year profit and loss statement, and rent roll as of January 1st of each year].

If FCRE determines that an Event of Default has occurred and before FCRE declares the debt to be in default, FCRE shall give the Debtor written notice. The written notice shall describe the default with reasonable specificity. The Debtor shall have twenty (20) days from receipt of written notice provided to Debtor and Debtor's attorneys by FCRE or its assigns in which to cure any named default. In the event Debtor fails to cure the default within that 20 day period, **FCRE's only remedy** shall **be** judicial foreclosure pursuant to South Carolina law.

. . .

(Dckt. 374, pp. 5-6) (emphasis in original).

As to the allowed general unsecured claims of non-insiders, which total $6,919.72, the Amended Plan proposes payment in full with interest at a 5.00% rate, within 120 days after the Effective Date of the Plan. (Dckt. 374, p. 9). The class of unsecured insider creditors, whose claims total $115,737.00, would also be paid in full with interest at a 3.00% rate, "from funds received from Debtor's rental income over sixty (60) months, beginning on the date which is ninety (90) days following the Effective Date of this Plan in quarterly installments of $6,238.92." (Dckt. 374, p. 9).

The Amended Plan further provides that "[c]onfirmation of this Plan shall act as an injunction against any collection efforts against L. Christopher Kettles, Guarantor of

48

the FCRE debt. So long as the Debtor is not in default of the terms of the Confirmed Plan, FCRE is prohibited from initiating or continuing any action to collect from L. Christopher Kettles on his guaranty obligation." (Dckt. 374, p. 8). In support of this provision, the Debtor represents that "L. Christopher Kettles has such an identity with the Debtor that a suit against him is in essence a suit against the Debtor or would deplete the assets of the estate." (Dckt. 374, p. 8).

    (vi) <u>The Death of Mr. Kettles and FCRE's Claims Against his Estate</u>

Unfortunately, Mr. Kettles passed away in Jacksonville, Florida, on June 7, 2018. (Dckt. 468-2, p. 1). His death was brought to the Court's attention on July 24, 2018, when FCRE filed a Motion for Relief of the Automatic Stay. (Dckt. 468). FCRE sought permission to file a motion in the South Carolina Case substituting Sharan Sheppard Kettles ("Mrs. Kettles"), the personal representative of Mr. Kettles' estate, as third-party defendant and counter-claimant. (Dckt. 468, pp. 2-3). The Court granted FCRE's requested stay relief. (Dckt. 490). Subsequently, FCRE filed an Amended Motion for Relief of the Automatic Stay (dckt. 493) seeking permission to amend its answer, affirmative defenses, counterclaims, and third-party claims in the South Carolina Case to reflect certain alleged events of default that occurred after the initial filing of FCRE's answer on September 6, 2016. Finding that FCRE's proposed additional stay relief would impose an unnecessary financial burden on the Debtor and on Mrs. Kettles to respond to FCRE's amended pleadings in the South Carolina Case, the Court denied without prejudice FCRE's Amended Motion for Relief of the Automatic Stay. (Dckt. 571).

On August 22, 2018, a Petition for Administration of the Estate of Kettles was filed in the Flagler County Circuit Court in Florida, File No. 2018-CP-000415. On September 10, 2018, FCRE filed a Statement of Claim in the amount of $6,159,950.07 in the probate proceedings based on Mr. Kettles' alleged breach of the Guaranty. (Transcript p. 28; dckt. 499-1). On September 25, 2018, Circuit Judge Patti A. Christensen entered an order admitting to probate the last will and testament of Mr. Kettles and appointing Mrs. Kettles as the Personal Representative of Mr. Kettles' Estate. (Transcript p. 37; dckt. 507, pp. 2-3).

(vii) The Debtor Files a Motion to Incur Debt

In an apparent effort to take FCRE out of the case, on August 10, 2018, the Debtor filed an Expedited Motion to Allow Debtor to Incur Post-Petition Secured Debt Pursuant to 11 U.S.C. § 364(c)(2) (the "Motion to Incur Debt") requesting authority to borrow $4,750,000.00, of which $3,700,000.00 would be paid to FCRE, and requesting that FCRE's claim be dismissed. (Dckt. 476, pp. 4-5). On August 21, 2018, FCRE filed a Motion for Rule 2004 Examination of the proposed lender. (Dckt. 480). The following day, August 22, 2018, the Debtor filed an objection (dckt. 481) to FCRE's Motion for Rule 2004 Examination. That same day, FCRE filed an objection (dckt. 483) to the Debtor's Motion to Incur Debt. These matters were scheduled for hearing on August 28, 2018.

Unsurprisingly, FCRE represented through counsel at the hearing that it would require a payoff greater than the $3,700,000.00 proposed by the Debtor. The Court found that without FCRE's consent, the Debtor would be unable to close on the proposed loan, rendering it infeasible. And since FCRE's purpose in questioning the proposed lender at a

Rule 2004 examination was related to the proposed loan, the Court found that such examination was unnecessary. Therefore, the Court denied without prejudice both the Debtor's Motion to Incur Debt and FCRE's Motion for Rule 2004 Examination of the proposed lender. (Dckt. 521).

(viii) <u>Voting</u>

On August 29, 2018, the Court entered an Order Approving the Debtor's Amended Disclosure Statement. (Dckt. 486). The Order allowed the Debtor to begin balloting of its Amended Plan, fixed the last day for filing written acceptances or rejection of the Amended Plan as September 26, 2018, and scheduled a confirmation hearing for October 1, 2018. (Dckt. 486, p. 1). The Order stated that "[i]n the event . . . the plan is not confirmed at said hearing, a hearing will thereupon be held to determine whether the case should be dismissed or converted to Chapter 7." (Dckt. 486, p. 1).

Acceptances were filed by Coltrane & Wilkins, LLC (dckt. 495); Mahany Law (dckt. 496); Yellow Van Services d/b/a Stanley Steamer (dckt. 498); the Estate of Mr. Kettles (dckt. 507); and Whitmore Plumbing. (Dckt. 511). Sherwin Williams returned a ballot that neither accepted nor rejected the Amended Plan. (Dckt. 528). And FCRE filed the only dissenting vote. (Dckt. 500).

During this voting period, on September 25, 2018, FCRE filed its Objection and Brief in Opposition to Confirmation of Debtor's Amended Chapter 11 Plan Proposed March 8, 2018 (the "Objection to Confirmation") (dckt. 499), which the Court will discuss in more detail below. FCRE filed a Supplemental Objection to Confirmation on September

27, 2018. (Dckt. 514).

(ix) FCRE's Motion for Post-Petition Attorney's Fees, Expenses, and Default Interest

Because FCRE's post-petition attorneys' fees, expenses, and default interest would impact the feasibility of the Debtor's Amended Plan, at the February 21, 2018 status conference the Court suggested that FCRE request at least an interim determination of under 11 U.S.C. § 506(b). (2/21/18 Transcript pp. 44-46). Accordingly, on September 13, 2018, FCRE filed its § 506(b) Motion (dckt. 491) seeking $1,207,042.14 in post-petition attorneys' fees, expenses, and default interest for the period February 3, 2017, through July 31, 2018. (Dckt. 491, p. 2). Attached as exhibits to FCRE's motion are invoices from various entities, including the three law firms that have performed post-petition legal services for FCRE, as well as a comprehensive analysis of these legal bills prepared by Ms. Davenport. (Dckt. 491-2). On December 28, 2018, FCRE amended its § 506(b) Motion (dckt. 566) increasing the amount of post-petition attorneys' fees, expenses, and default interest to $1,457,471.52 from the period February 3, 2017, through December 28, 2018. (Dckt. 566, pp. 2-3). The Debtor filed a brief in opposition (dckt. 567) to FCRE's § 506(b) Motion on January 7, 2019, which elicited a response from FCRE. (Dckt. 574). The Court took the matter under advisement at a hearing held on January 7, 2019.

G. The Confirmation Hearing

The Court held a confirmation hearing on the Debtor's Amended Plan (dckt. 374) on October 1, 2018. At the hearing, the Court heard testimony[33] on behalf of the Debtor

---

[33] Aside from two documents identified by Mr. McNair, the Debtor did not tender any other exhibits in support of confirmation. However, the Court has reviewed certain other

from Mrs. Kettles and Mr. McNair. The only witness who testified on behalf of FCRE was Ms. Davenport. Below, the Court will set forth its findings from the relevant testimony of each witness.

(i) <u>Sharan Kettles</u>

The Court first heard testimony from Mrs. Kettles, who currently manages the Property. (10/1/18 Transcript pp. 37-38). She has a degree in culinary arts from Pensacola State College and has previously worked as a paralegal. (10/1/18 Transcript pp. 56-58). She met Mr. Kettles in 2000 and began helping him manage properties in 2003. (10/1/18 Transcript p. 60). In 2008, the two married. (10/1/18 Transcript p. 60). At some point, Mrs. Kettles became the secretary and a director of the Debtor's general partner, ABGP, Inc., alongside Mr. Kettles, who served both as president and as a director of that entity.[34] (10/1/18 Transcript pp. 48, 53).

According to Mrs. Kettles, Mr. Kettles taught her how to manage properties, with duties including fixing bathtubs, leasing apartments, collecting rent, paying bills, sending invoices, reconciling accounts, maintaining rent rolls, and tracking lease expiration dates. (10/1/18 Transcript pp. 39, 67). She testified that in recent years, Mr. Kettles "was not that hands-on" because he wanted her to manage the Debtor's operations. (10/1/18 Transcript p. 39).

Following Mr. Kettles' death, Mrs. Kettles became the president of ABGP

_____

evidence admitted at prior hearings.

[34] Mr. and Mrs. Kettles were the only directors of ABGP, Inc. (10/1/18 Transcript pp. 88-89).

53

pursuant to a corporate resolution passed by the board of directors. (10/1/18 Transcript pp. 37-38, 53, 88; dckt. 483-1). Mrs. Kettles emphasized that her husband's passing had no effect on the day-to-day management of the Debtor's operations.[35] (10/1/18 Transcript pp. 38-39, 45, 68). Backed by the limited partners, she intends to continue managing the Debtor's business. (10/1/18 Transcript pp. 38-39, 46, 54-55).

According to Mrs. Kettles, on-site operations at the Property are managed by Carolina Mosqueira ("Ms. Mosqueira"), who has been a licensed property manager in charge since March of 2018. (10/1/18 Transcript pp. 39, 41, 43). Ms. Mosqueira works in her office at the Property from Monday through Friday and is responsible for handling evictions. (10/1/18 Transcript p. 41, 43). There are also two maintenance workers at the Property, as well as lawn service and a part-time employee who picks up the trash. (10/1/18 Transcript pp. 39, 42). Mrs. Kettles testified that she calls Ms. Mosqueira and the maintenance workers at least once per day to stay abreast of the situation at the Property. (10/1/18 Transcript pp. 39-40, 44). For her part, Mrs. Kettles visits the Property on a weekly basis. (10/1/18 Transcript p. 40).

On cross-examination, Mrs. Kettles acknowledged that although she used to live at the Property, she now resides in Fernandina Beach, Florida. (10/1/18 Transcript pp. 65-66). She also testified that she receives no compensation for her management of the

---

[35] This was contradicted somewhat by Ms. Kettles' admission that for a number of weeks after her husband's death, she did not visit the Property. (10/1/18 Transcript p. 84) ("[T]here was a period – I'll be very frank – that I didn't go there in late June. I didn't go there in July."). Her testimony is also in conflict with the argument put forth in the New York Case that Mr. Kettles was "critical to the success of the company[.]" (Dckt. 219, pp. 6-7).

Debtor, either from the Debtor or from The August Group, Inc. (the "August Group")[36] an entity controlled by Mr. Kettles that owns a 51% limited partnership interest in the Debtor.[37] (10/1/18 Transcript pp. 70-71, 74, 79). The only income she received in connection with the Debtor came from potential distributions to Mr. Kettles from the Debtor or from the August Group. (10/1/18 Transcript p. 80). Mrs. Kettles also testified that Ms. Mosqueira's background was in cosmetology and that she had no prior experience in multifamily property management. (10/1/18 Transcript p. 90).

(ii) Jerry McNair

Next, the Debtor called Mr. McNair as an expert witness on the issue of feasibility. (10/1/18 Transcript pp. 118-19). After working in the commercial shipping industry for approximately twenty years, Mr. McNair has practiced as a certified public accountant in Savannah, Georgia, for thirteen years. (10/1/18 Transcript pp. 114-17). He testified that his firm's clients include about sixty homeowners' associations and about two hundred individuals who own rental properties, and thus he is familiar with the real estate

---

[36] According to Mrs. Kettles, the August Group "oversees day-to-day operation of [the] property. August Group makes sure that they do all of the accounting. They do all of the corporate filings that need to be done. They do all the negotiations for insurance coverage to change policies or reduce policies or whatever, that type of thing. But the primary operation is overseeing the operation of the property to . . . make sure that the property is . . . managed correctly. (10/1/18 Transcript p. 78). And Mrs. Kettles is the person who performs those tasks for the August Group. (10/1/18 Transcript pp. 69, 78). Although the Debtor pays the August Group a management fee, Mrs. Kettles is not paid by the August Group. (10/1/18 Transcript p. 79). Under the loan documents, the August Group was authorized to manage the Property. (1/10/18 Ex. "C-15").

[37] However, Mrs. Kettles stated that she might have been paid from 2005 to 2007 "either directly through A & B or through August Personnel that A & B provided the funds for[.]" (10/1/18 Transcript pp. 72-73).

industry. (10/1/18 Transcript p. 129). Following voir dire by counsel for FCRE, the Court qualified Mr. McNair as an expert witness over FCRE's objection. (10/1/18 Transcript pp. 142-43). Through Mr. McNair's testimony, the Debtor introduced two exhibits: a four-page typed document and a single-page handwritten document, which together comprised the entirety of Mr. McNair's work product in this case.[38] (10/1/18 Transcript p. 127).

Mr. McNair began by discussing a table he prepared of the Debtor's cash receipts and cash disbursements for the period of September of 2017 through August of 2018. (10/1/18 Ex. "D-1"). This information was taken directly from the Debtor's monthly operating reports for that period. (10/1/18 Transcript pp. 123, 126, 132). Mr. McNair testified that he checked the accuracy of these numbers by comparing them to the Debtor's bank statements. (10/1/18 Transcript p. 132). For each of the twelve months, Mr. McNair calculated the amount of cash receipts less cash disbursements, then added that number to the Debtor's cash at the beginning of the month to determine the Debtor's cash at the end of the month. (10/1/18 Transcript pp. 121-125). Based on these calculations, Mr. McNair determined that the cash in the Debtor's operating account increased by $73,972.25 over the twelve-month period. (10/1/18 Transcript p. 144; 10/1/18 Ex. "D-1").

To determine the income available to service the debt to FCRE, Mr. McNair next adjusted the $73,972.25 figure by adding back expenses that he believed would not recur, along with other adjustments. (10/1/18 Transcript p. 144). These add-backs consisted of $218,346.00 in legal fees, $32,856.59 for repairs to Units 51 and 55 (which were damaged

---

[38] In his defense, Mr. McNair was brought into this case on the eve of the confirmation hearing. (Dckt. 512, filed on September 26, 2018). *See also* 10/1/18 Transcript pp. 119-20.

by Hurricane Matthew in 2016), $27,181.80 from the "reserve for replacement" account,[39] and $224,508.00 in payments on principal and interest. (10/1/18 Transcript p. 144, 10/1/18 Ex. "D-1"). Mr. McNair then subtracted the $184,908.00[40] that allegedly had been loaned to the Debtor by Mr. Kettles, resulting in net income of $391,956.64 to service the debt to FCRE. (10/1/18 Transcript pp. 144-145, 153). Using this $391,956.64 figure, Mr. McNair tested the feasibility of the Debtor's Amended Plan under a number of different scenarios using different loan balances and interest rates.[41] (10/1/18 Ex. D-1, p. 2 "Confirmation Plan Payment Analysis").

Mr. McNair next attempted to show that the $391,956.64 figure for net income was overly conservative. To that end, he assumed a 2.5% annual growth in rental rates over the next five years. Based on rising rental rates in Port Royal South Carolina, he described 2.5% as a "very conservative" assumption. (10/1/18 Transcript pp. 146-48, 150, 154, 158). Based on this assumption, McNair determined that rental growth over that five-year period would be $68,188.25. Mr. McNair did not adequately explain how he arrived at this figure.[42]

---

[39] Mr. McNair stated that "[t]he reserve for replacement account, which is, you know, in my mind, similar to a second bank account, increased. So that cash increased 27,000." (Transcript p. 144).

[40] The ballot filed by Mr. Kettles' Estate indicates that its claim is in the amount of $115,737.00. (Dckt. 507).

[41] It does not appear that Mr. McNair budgeted for repairs for replacements and reserves, which he added back to his $73,972.25 figure for total receipts less disbursements in order to calculate net income available to service the debt. (10/1/18 Ex. "D-1" p. 1). These expenses, however, were expressly provided for in the Amended Plan (dckt. 374, pp. 4-5) and in the First Amendment to the Amended Plan (dckt. 559, pp. 2-3), and are necessary as a matter of sensible financial management. Thus, Mr. McNair should have budgeted for them.

[42] The $68,188.25 appears to be an annual figure based on the fact that Mr. McNair added it to his $391,956.64 figure. (10/1/18 Ex. "D-1" p. 2). He also testified that the

(10/1/18 Transcript p. 154). He then added $68,188.25 to the $391.956.64 net income to find a total net income of $460,144.89. (10/1/18 Ex. "D-1" p. 2). As reflected on a handwritten exhibit, Mr. McNair then used this $460,144.89 figure (based on the assumption of 2.5 annual growth in rental rates) to calculate the feasibility of repayment under four additional scenarios. (10/1/18 Transcript pp. 138, 156). The Court has prepared the following table summarizing Mr. McNair's scenarios:

| Scenario | Net Income to Service Debt | Loan Balance | Interest Rate | Amortization/Years | Annual Debt Service | Feasible? |
|---|---|---|---|---|---|---|
| 1 | $391,956.64 | $3,900,000.00 | 4.04% | 30 | $224,508.00 | Yes |
| 2 | $391,956.64 | $3,670,216.52 | 5.25% | 27.5 | $252,468.00 | Yes |
| 3 | $391,956.64 | $3,670,216.52 | 6.25% | 27.5 | $279,780.00 | Yes |
| 4 | $391,956.64 | $4,670,216.50 | 5.25% | 27.5 | $321,252.00 | Yes |
| 5 | $391,956.64 | $4,670,216.50 | 6.25% | 27.5 | $356,252.00 | Yes |
| 6 | $460,144.89 | $5,250,000.00 | 5.25% | 27.5 | $361,137.00 | Yes |
| 7 | $460,144.89 | $5,250,000.00 | 6.25% | 27.5 | $400,196.00 | Yes |
| 8 | $460,144.89 | $5,780,000.00 | 5.25% | 27.5 | $397,595.00 | Yes |
| 9 | $460,144.89 | $5,780,000.00 | 6.25% | 27.5 | $440,597.00 | Yes |

Concluding that all nine scenarios were feasible,[43] Mr. McNair testified that "the numbers are . . . just strong[.]" (10/1/19 Transcript p. 159).

---

$68,188.25 is a graduated figure because rental growth in later years would "certainly" be greater than $68,188.25. (10/1/18 Transcript pp. 155, 178-79). Mr. McNair's twelve-month summary of the Debtor's cash receipts and cash disbursements, however, reflects rental income of $879,311.28. (10/1/18 Ex. "D-1" p. 1). Multiplying $879,311.28 by 0.025 (reflecting Mr. McNair's assumption of 2.5% growth) results in $21,982.78, not $68,188.25. In short, the Court has no idea where Mr. McNair derived the figure of $68,188.25.

[43] Mr. McNair conceded that the ninth scenario, with an annual debt service of $440,597.00 compared to net operating income of $460,144.89, is "getting pretty tight," and thus he would advise the Debtor to "exercise caution" and would describe that scenario as "not advisable." (10/1/18 Transcript p. 157).

On cross-examination, Mr. McNair acknowledged certain errors in his methodology. As to his calculation of net income available to service the debt, he testified that he should not have added back $218,346.00 in legal fees. The $218,346.00 figure was the amount of legal fees actually incurred during the twelve-month period, which involved fees associated with this bankruptcy case. (10/1/18 Transcript pp. 144-45). Mr. McNair simply assumed such legal expenses would not recur. (10/1/18 Transcript pp. 144, 171). Yet the Debtor would certainly have some legal fees each year. Moreover, the South Carolina Case is in its initial stages and presumably will represent a significant expense over the coming months and perhaps years. Therefore, the entire $218,346.00 should not have been added back. (10/1/18 Transcript p. 145, 171).

More importantly, Mr. McNair's only projection of any kind was based on his assumption of a 2.5% annual increase in rental rates over the next five years. (10/1/18 pp. 133-34). He had some difficulty explaining how he arrived at this 2.5% figure. (10/1/18 Transcript p. 134). And he made no attempt whatsoever to calculate future operating expenses at the Property. (10/1/18 Transcript pp. 136, 155-56). He never projected what the Debtor's insurance and tax payments would be in future years. (10/1/18 Transcript pp. 141, 155). Acknowledging that insurance premiums and property taxes would "creep up some," Mr. McNair said he regretted his failure to project expenses. (10/1/18 Transcript pp. 155-56).

(iii) <u>Mary Davenport</u>

Finally, the Court heard testimony from Ms. Davenport, the Executive Vice President of Freedom Mortgage Corporation and Executive Vice President of FCRE.

(10/1/18 Transcript p. 208). A licensed real estate broker in New York since 1987, she also has a securities license from the Securities and Exchange Commission and has served as a credit specialist and workout officer at the Federal Deposit Insurance Corporation. (10/1/18 Transcript pp. 208, 212). As Executive Vice President of FCRE, she has considerable experience performing due diligence on commercial loans, including loans for multifamily properties. (10/1/18 Transcript p. 209).

On direct examination, Ms. Davenport critiqued Mr. McNair's analysis. First, she stated that in calculating net income available to service the debt, Mr. McNair improperly added back the $27,181.80 reserve for replacements. (10/1/18 Transcript pp. 217-221). As Ms. Davenport explained, the reserve for replacements is required under the loan documents "in anticipation of having a sufficient pool of capital available for major capital items that need to be repaired such as a roof or plumbing systems or . . . some[thing] outside the everyday, ordinary maintenance of a property." (10/1/18 Transcript pp. 217-218). Based on the significant projects required at the Property over the next five years,[44] Ms. Davenport testified that no reasonable lender would agree to let the Debtor abandon the required reserves. (10/1/18 Transcript p. 221).

Similarly, Ms. Davenport testified that Mr. McNair should not have added back the principal and interest payments of $224,508.00 because it impacted his starting figure for amortizing the debt. (10/1/18 Transcript p. 222). As Ms. Davenport explained:

---

[44] Mrs. Kettles testified that all of the 96 buildings at the Property need to be repainted within the next five years, at a cost of between $10,000.00 and $15,000.00 per building. (10/1/18 Transcript pp. 199-200). Additionally, the parking lot will need to be resurfaced. (10/1/18 Transcript pp. 199-200).

The big problem here with this is that he's amortized the balance down to 3.6 million as of the September payment, which is approximately correct. Okay?

But you can't have amortization without a corresponding principal payment. Since this – we're looking at a trailing 12 months . . . they did pay the payment. If we don't include that, then the principal can't amortize. It would be an interest-only loan, and your balance would stay static. So by adding back the principal . . . we would have to add back that amortization and put $75,000 back onto 3.6 million.

(10/1/18 Transcript p. 224). In other words:

[H]e's double-counting . . . . He's amortizing down the balance and adding back the payment that amortized down the balance. Right? So you can't have both. You can either have the balance – at the beginning of the trailing 12-month period, you can have that balance, which was 3.6 million plus 75, and then add the payment back, or you can amortize that balance down and keep the payment in there.

(10/1/18 Transcript p. 291-92). *See also* (10/1/18 Transcript p. 301) ("FCRE's not paying its own amortization. The debtor has to pay that."). Using Ms. Davenport's methodology of deducting the $75,000.00 principal payments and the $27,181.00 reserve for replacements, she testified that the net income available to service the debt should actually be $289,755.64, which is considerably less than Mr. McNair's figure of $391,956.64. (10/1/18 Transcript p. 223).

Using her figure of $289,755.64, Ms. Davenport then endeavored to demonstrate that Mr. McNair's scenarios were not feasible based on their debt service coverage ratios. She explained that the debt service coverage ratio is "the ratio of the amount of available cash to service the debt divided by the debt service payment." (10/1/18 Transcript p. 226). According to her testimony, "[t]ypically, lenders . . . banks, in particular, will require a minimum of 1.2," while the "securitization market requires a minimum of

1.25." (10/1/18 Transcript p. 227). Based on the possibility of unexpected expenses, a lender will "always want to have a margin of at least . . . 20 to 25 percent more cash flow than [the principal and interest] payment requirement." (10/1/18 Transcript p. 227). At Ms. Davenport's figure of $289,755.64 net income available to service the debt, every one of Mr. McNair's scenarios would have a debt service coverage ratio of 0.80 or lower, and thus each scenario would result in a default by the Debtor. (10/1/18 Transcript pp. 245-47, 260).

Based on this analysis, Ms. Davenport opined that the Debtor's plan was unfeasible with respect to refinancing the Property to pay the remaining balance of the debt to FCRE after seven years. As she explained:

> [T]he fact of the matter is the value of your property is declining as well. So it's sort of a double hit . . . because as your cash flows go down, if you apply a cap rate to the value of that property . . . because you've got declining cash flows. You've got–even if your cap rate is steady at 8 percent or whatever cap rate you want to use, if you have less cash flow coming off of it, your value is going to continue to go down.
>
> So even if you make your payments through the period, if your balloon payment is dependent on a refinance, you have to look at what the cash flow would be in year 10 or 7, in this case, and say, well . . . with that cash flow, how much of a loan would that cash flow support . . . and will it be enough to pay the balloon off?
>
> . . .
>
> So in year 7, based upon the 25-year amortization schedule, the balloon balance for FCRE would be . . . about $3.2 million. Based on the cash flow that would be coming off of the property in year 7, it would only support a loan of a million seven based upon the same terms and conditions of the confirmation plan.
>
> . . .
>
> So the balloon payment is essentially assured default, based upon the cash flows that are coming off this property and the future prospects . . . of this property.

(10/1/18 Transcript pp. 276-77). *See also* 10/1/18 Transcript pp. 215-16. In other words, according to Ms. Davenport, the Debtor would have difficulty obtaining the necessary refinancing to make the balloon payment.

As to the applicable interest rate, Ms. Davenport explained that the prime rate increases when the Federal Reserve raises the discount rate. (10/1/18 Transcript pp. 240-43). Then, in describing the relationship between risk and interest rates, she stated that "the riskier the loan . . . the higher the interest rate should be on the loan because you're taking a greater risk that there will be a default and you won't get your money back." (10/1/18 Transcript p. 215). According to Ms. Davenport, the Debtor's Amended Plan is extremely risky because it would strip away many of FCRE's protections from the original loan documents:

> Without any type of ability to enforce anything, that loan would be . . . considered [by a purchaser] absolutely nonperforming because they have no teeth. They can't do anything. There's nothing that they can do.
>
> . . .
>
> [T]his is essentially a hard money loan. Right? If you are unsure about the borrower and unsure about the collateral and don't really have a structure and documents that you can actually do, it would be considered a hard money loan. And hard money loans, as you know, have excessively high rates almost reaching up into usury in the 20 percent area. I mean, some private money loans can go up to 50 percent, payday loans, et cetera.
>
> . . .
>
> If the loan documents were abrogated and just . . . removed from the bankruptcy, then that would equate to having no documents, from a risk perspective.
>
> . . .
>
> So if we just have a plan that says they're going to pay you this and, in 7 years,

hopefully, they're going to pay you the balloon and we have no documents . . . that is significantly more risky than just having a lost note affidavit in the file.

. . .

(10/1/18 Transcript pp. 234-37). Based on this risk, and pursuant to the formula set forth in *Till*, FCRE takes the position that the minimum interest rate under the Amended Plan should be prime plus 2.00%. (10/1/18 Transcript p. 279). Ms. Davenport also testified that a market rate for the loan proposed in the Debtor's Amended Plan would be even higher, as the Court will discuss in more detail below. (10/1/18 Transcript pp. 282-83).

(iv) <u>The Debtor Again Amends its Plan</u>

Over a month after the confirmation hearing, on November 5, 2018 the Debtor filed a document entitled "First Amendment to Debtor's Amended Chapter 11 Plan Proposed March 8, 2018." (Dckt. 559). This document, which purported to amend various provisions of the Amended Plan (dckt. 374), elicited an objection (dckt. 561) from FCRE on November 27, 2018. FCRE also filed two supplemental objections to confirmation. (Dckt. 538, dckt. 562, dckt. 565), as well as a brief on the issue of materiality. (Dckt. 540). The Debtor, for its part, filed a brief in support of confirmation. (Dckt. 541).

**IV. CONCLUSIONS OF LAW**

Before considering whether to confirm the Debtor's Amended Plan (dckt. 374), the Court must first determine the amount of FCRE's pre-petition claim (Claim 2-2), which requires the Court to either rule on the Debtor's Claim Objection (dckt. 208, dckt. 387) or estimate that claim. Second, the Court must address FCRE's § 506(b) Motion (dckt. 491, dckt. 566) for post-petition attorneys' fees, expenses, and default interest. Finally, the Court

will take up the issue of confirmation.

A. <u>The Debtor's Objection to FCRE's Claim</u>

       As set forth above, FCRE's claim, as amended, (Claim 2-2) consists of the following components: (1) the principal balance on the debt; (2) accrued interest from January 7, 2017, through February 2, 2017; (3) legal fees through February 2, 2017; (4) out of pocket expenses; (5) accrued default interest excess over the contract rate from September 7, 2016, through January 6, 2017; (6) return of monies paid under the Contempt Order; (7) return of attorneys' fees paid; (8) return of default interest returned to the Debtor; (9) return of money transferred from the DACA account to the Debtor; and (10) the loss on hedge during the holding period. The Debtor does not object to the principal and interest components of FCRE's claim ($3,801,548.15). In its Claim Objection (dckt. 208), the Debtor disputes the following components of FCRE's claim (the "Disputed Claim"):

    1. <u>Legal Fees through February 2, 2017, in the amount of $509,783.01</u>[45] – The Debtor maintains it was not in default under the terms of the loan documents and that it had made all payments required under the loan and would therefore not be responsible for FCRE's attorney's fees and costs. In addition, even if there is determined [sic] that there was a non-monetary default, it was not material and would not justify the Debtor being responsible for FCRE's attorney's fees. The Debtor also objects to the attorney's fees claimed by FCRE because FCRE unlawfully, in in [sic] disregard of South Carolina law, took over possession and control of the Debtor's property without court authority. FCRE's incurrence of attorney's fees was self-imposed due, not in response to default or actions of the Debtor, but it its [sic] own unnecessary actions. In addition, even if there was a material default under the terms of the Loan Documents, FCRE is only entitled to reasonable attorney's fees. The amount of attorney's fees FCRE is claiming is unreasonable. Therefore, the Debtor is not responsible for FCRE's legal fees and this portion of the claim should be disallowed.

---

    [45] This component of FCRE's claim was later amended to $472,283.01 to eliminate some double-counting. (Claim 2-2, Part 2, p. 3).

2. <u>Out of Pocket Expenses in the amount of $7,308.90</u> - The Debtor maintains it was not in default under the terms of the loan documents and further objects to these expenses based on the reasons set forth in paragraph 1 above. Therefore, the Debtor is not responsible for FCRE's out of pocket expenses.

3. <u>Accrued Default Interest Excess over Contract Rate from September 7, 2016 to January 6, 2017 in the amount of $81,114.14</u> - The Debtor maintains it was not in default under the terms of the loan documents and further objects to the imposition of default interest based on the reasons set forth in paragraph 1 above. Therefore, default interest is not chargeable under the loan documents.

4. <u>Return of Monies paid under Contempt Order in the amount of $56,774.92</u> – It is not clear what FCRE is claiming under this line item and how this amount would be chargeable to the Debtor, but Debtor denies such return would be property [sic] as FCRE caused the issues which resulted in the South Carolina action.

5. <u>Return of Attorney's Fees Paid Pursuant to the Contempt Order in the amount of $14,339.00</u> – The Contempt Order entered by the Court of Common Please of Beaufort County, South Carolina, requires FCRE to pay Debtor's attorney's fees and has not been overturned by the Court of Appeals. Thus, these fees are not chargeable to the Debtor.

6. <u>Return of Default Interest Returned to Borrower in the amount of $25,532.76</u> - The Debtor maintains it was not in default under the terms of the loan documents and further objects to the charging of default interest based on the reasons set forth in paragraph 1 above. Therefore, default interest is not chargeable under the loan documents and should be denied.

7. <u>Return of money transferred from DACA account to Borrower in the amount of $15,745.00</u> – It is not clear what FCRE is claiming in this line item and how this amount would be chargeable to the Debtor.

8. <u>Loss on Hedge during Holding Period in the amount of $221,755.90</u> – The Debtor disputes that the Loan Documents provide for the Debtor to be responsible for any loss by FCRE on its investment. The Debtor was not a party to FCRE's Swap or Derivative contracts and cannot be responsible for FCRE's losses resulting from such contracts and/or resulting from FCRE's own conduct as set forth in paragraph 1 above.

(Dckt. 208, pp. 2-4) (emphasis added).

Section 501(a) of the Bankruptcy Code states that "[a] creditor . . . may file a proof of claim." 11 U.S.C. § 501(a). "[T]he Bankruptcy Code does not define 'proof of claim,' and so [courts] look to the Federal Rules of Bankruptcy Procedure for the requirements for a proof of claim." *Walston v. PYOD, LLC (In re Walston)*, 606 F. App'x 543, 545 (11th Cir. 2015) (unpublished decision). Bankruptcy Rule 3001(a) defines "proof of claim" as "a written statement setting forth a creditor's claim," and adds that such statement "shall conform substantially to the appropriate Official Form." Fed. R. Bankr. P. 3001(a). Under Bankruptcy Rule 3001(b), a proof of claim "shall be executed by the creditor or the creditor's authorized agent except as provided in Rules 3004 and 3005." Fed. R. Bankr. P. 3001(b). Bankruptcy Rule 3001(c), furthermore, "specifies that when a claim is based on a writing," like the mortgage loan at issue here, "a creditor must attach the original or a duplicate of the underlying writing and other supporting documentation, such as 'invoices, itemized statements of running accounts, [and] contracts.'" *In re Thornburg*, — B.R. —, 2018 WL 7377881, at *1 (Bankr. M.D. Fla. 2018) (quoting *In re Taylor*, 363 B.R. 303, 307 (Bankr. M.D. Fla. 2007)). Under Bankruptcy Rule 3001(d), "[i]f a security interest in property of the debtor is claimed, the proof of claim shall be accompanied by evidence that the security interest has been perfected." Fed. R. Bankr. P. 3001(d). Bankruptcy courts "generally require that the claimant attach a copy of the promissory note and the mortgage, or, at least, an explanation as to why the note is not provided." *In re Minbatiwalla*, 424 B.R. 104, 112 (Bankr. S.D.N.Y. 2010).

In its Supplemental Claim Objection (dckt. 387), the Debtor only raises one

additional argument. The Debtor points out that FCRE's original proof of claim was executed by Mary Davenport in her capacity as Executive Vice President of *Freedom Mortgage Corp.* rather than of FCRE. (Claim 2-1, p. 3). Based on the absence of attached documentation showing "specific authority for Freedom Mortgage Corp. to act as attorney or authorized agent of FCRE," the Debtor contends that "FCRE's claim should be disallowed in its entirety." (Dckt. 387, p. 2). The Court disagrees. As FCRE correctly points out (dckt. 389, p. 3), Ms. Davenport has testified repeatedly in this litigation that FCRE is a wholly-owned subsidiary of Freedom Mortgage Corp. with no independent employees. *See, e.g.,* 2/24/17 Hearing 6:30 p.m.; 2/5/18 Transcript p. 17. Although Ms. Davenport is Executive Vice President of Freedom Mortgage Corp., pursuant to an action of consent she is *also* Executive Vice President of FCRE.[46] (1/10/18 Transcript p. 3; 10/1/18 Transcript p. 208). The Court therefore finds that she had authority to file the proof of claim on behalf of FCRE under Bankruptcy Rule 3001(b).

Further, the Court finds that FCRE's proof of claim (Claim 2-1, Claim 2-2) fully complies with all other requirements of Bankruptcy Rule 3001. Specifically, Ms. Davenport executed Official Form 410 and attached all of the required supporting documentation, including the Loan Agreement; the Promissory Note; the Mortgage; the Assignment of Leases and Rents, Security Agreement and Fixture Filing; the Assignment of Management Agreement and Subordination of Management Fees; a UCC-1 Financing Statement recorded with the Secretary of State of South Carolina; a UCC-1 Financing

---

[46] The document, entitled "Action by Consent of the Sole Member" and dated February 17, 2014, appears at dckt. 389-2, p. 1.

Statement recorded in Beaufort County, South Carolina; a UCC-1 Financing Statement recorded in Chatham County, Georgia; the legal invoices for all claimed legal fees; a calculation of FCRE's recoverable out of pocket expenses; an amortization schedule calculating the interest and default interest owed by the Debtor; the Answer, Counterclaim and Third-Party Complaint filed in the South Carolina Case; the South Carolina court's order granting the Debtor's motion for contempt; hedge contract confirmations from Wells Fargo Securities; and the escrow balances as of the petition date. (Claim 2, Ex. "1"-"14"). Thus, FCRE filed a valid proof of claim in compliance with Bankruptcy Rule 3001.

"Parties bear shifting burdens or proof in asserting and challenging a bankruptcy claim." *Thornburg*, — B.R. —, 2018 WL 7377881, at *1. Under § 502, "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). "A proof of claim executed and filed in accordance with [the Federal Rules of Bankruptcy Procedure] shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). *See also Thornburg*, — B.R. —, 2018 WL 7377881, at *1 (citing *In re Winn-Dixie Stores, Inc.*, 418 B.R. 475, 476 (Bankr. M.D. Fla. 2009)). "Once an objection is filed, the burden of proof shifts to the objecting party, usually a debtor or a trustee, to rebut the *prima facie* validity of the claim." *Thornburg*, — B.R. —, 2018 WL 7377881, at *1 (citing *In re Eddy*, 572 B.R. 774, 778-79 (Bankr. M.D. Fla. 2017)). As one court explained:

> [T]he objecting party [must] . . . produce evidence at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. This can be done by the objecting party producing specific and detailed

allegations that place the claim into dispute, by the presentation of legal arguments based upon the contents of the claim and its supporting documents . . . in which evidence is presented to bring the validity of the claim into question. If the objecting party meets these evidentiary requirements, then the burden of going forward with the evidence shifts back to the claimant to sustain its ultimate burden of persuasion to establish the validity and amount of the claim by a preponderance of the evidence.

*Thornburg*, — B.R. —, 2018 WL 7377881, at *2 (quoting *In re Armstrong*, 320 B.R. 97, 103

(Bankr. N.D. Tex. 2005)).

FCRE's proof of claim, which was executed and filed in accordance with

Bankruptcy Rule 3001, is entitled to *prima facie* validity. Did the Debtor carry its burden to

rebut the *prima facie* validity of the Disputed Claim? The Court finds that it did for a number

of reasons. First, the merits of the South Carolina Case have not been decided. Most, if not

all, of the disputed portions of FCRE's claim are based on the alleged non-monetary defaults,

which have not been established. The South Carolina court entered an injunction restoring

the Debtor to management of the Property (2/5/18 Ex. "C-115") and a contempt order against

FCRE for violating that injunction. (1/10/18 Ex. "C-35"). Pursuant to 11 U.S.C. § 502(b)(1),

a claim may be disallowed if "such claim is unenforceable against the debtor and property

of the debtor, under any agreement or applicable law for a reason other than because such

claim is contingent or unmatured . . . ." 11 U.S.C. § 502(b)(1). Accordingly, "[t]o determine

whether a claim is allowable by law, bankruptcy courts look to 'applicable nonbankruptcy

law.'" *In re Residential Capital, LLC*, 518 B.R. 720, 731 (Bankr. S.D.N.Y. 2014).

Applicable nonbankruptcy law includes state law. *Grogan v. Garner*, 498 U.S. 279, 283-84

(1991) ("The validity of a creditor's claim is determined by rules of state law."); *In re*

*MarMc Transp., Inc.*, 469 B.R. 84, 88 (Bankr. D. Wyo. 2012). Here, the relevant state law is supplied by the South Carolina Case, where the trial court found that FCRE's self-help was undertaken "without due process of law" and in interference with the Debtor's "contracts . . . secured by its real property[.]" (2/5/18 Ex. "C-115" p. 5). In its present posture, then, the South Carolina Case appears to have been caused by the conduct of FCRE, which that court remedied by returning the parties to the *status quo ante*. (2/5/18 Ex. "C-115" p. 3; 1/10/18 Ex. "C-35" p. 4).

Accordingly, with respect to the components of the Disputed Claim incurred in connection with the South Carolina Case, the Court finds that the South Carolina court's rulings shifted the burden of proof from the Debtor to FCRE. And, by failing to demonstrate that it will prevail in the South Carolina Case, FCRE has not carried its ultimate burden of persuasion to establish the validity and amount of the Disputed Claim by a preponderance of the evidence.

But that is not the end of the analysis. What FCRE *has* demonstrated is that its Disputed Claim for attorneys' fees, expenses, and other charges is unliquidated, which entails certain consequences. The Bankruptcy Code defines the term "claim" as follows:

(5) The term "claim" means–

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

71

11 U.S.C. § 101(5). "The express definition of claim, therefore, is that a claim is a liquidated or unliquidated right to payment . . . ." *In re John Q. Hammons*, No. 16-21142, 2017 WL 4638439, at *3 (Bankr. D. Kan. Oct. 13, 2017). Pertinent to this case, "[t]he accepted definition of a 'liquidated debt' is one that is readily ascertainable as to value." *Miller v. D & M Holdings US Inc. (In re Digital Networks North America, Inc.)*, Adv. Pro. No. 17-50900 (KG), 2018 WL 3869599, at *6 (Bankr. D. Del. Aug. 13, 2018) (quoting *In re Dow Corning Corp.*, 215 B.R. 346, 359 (Bankr. E.D. Mich. 1997)). *See also In re Robinson*, No. 12-15591-FJB, 2012 WL 5457336, at *2 (Bankr. D. Mass. Nov. 8, 2012) ("A debt is liquidated if it is subject to 'ready determination and precision in computation of the amount due.'"). An unliquidated debt, on the other hand, is not susceptible to ready determination. *In re Aparicio*, 589 B.R. 667, 676 (Bankr. E.D. Cal. 2018) ("[D]isputes as to the debtor's liability for a debt does not render a debt unliquidated unless the dispute precludes the ready determination of the debt."). Here, the value of FCRE's Disputed Claim is not readily ascertainable because the South Carolina Case, where the lawfulness of FCRE's declaration of default is at issue, remains pending. Thus, as to the disputed portion, FCRE holds an unliquidated claim.[47]

B. Estimation of FCRE's Disputed Claim

An unliquidated claim, such as FCRE's, is subject to estimation, which is "a procedural device that is to be used when adjudication and liquidation of a claim would take

---

[47] "Whether a claim is 'unliquidated' . . . does not depend on whether it sounds in contract or in tort but on whether it is capable of ready computation." *In re North American Health Care, Inc.*, 544 B.R. 684, 688 (Bankr. C.D. Cal. 2016).

an unreasonably long time to allow courts to quickly and flexibly estimate the amount of an

as yet to be liquidated claim." *In re Mud King Prod., Inc.*, 514 B.R. 496, 510 (Bankr. S.D.

Tex. 2014) (quoting *In re Stone & Webster, Inc.*, 279 B.R. 748, 810 (Bankr. D. Del. 2002)).

Estimation serves two purposes:

> First, it is designed to avoid the need to await the resolution of outside disputes
> or lawsuits to determine the amount owed by means of anticipating and
> estimating the likely outcomes of those disputes/lawsuits.
>
> . . .
>
> Second, it is designed to promote fair distribution to creditors through a realistic
> assessment of uncertain claims.

*In re Trendsetter HR, LLC*, No. 16-34457-sgj11, 2017 WL 4457435, at *10 (Bankr. N.D.

Tex. Aug. 15, 2017). *See also In re Chemtura Corp.*, 448 B.R. 635, 650 (Bankr. S.D.N.Y.

2011) (quoting *In re Adelphia Bus. Sol., Inc.*, 341 B.R. 415, 422 (Bankr. S.D.N.Y. 2003))

(Estimation "provides a means for a bankruptcy court to achieve reorganization . . . without

awaiting the results of legal proceedings that could take a very long time to determine.").

Section 502(c), which governs estimation, provides as follows:

> (c) There shall be estimated for purpose of allowance under this section–
>
> > (1) any contingent or unliquidated claim, the fixing or liquidation of
> > which, as the case may be, would unduly delay the administration of the
> > case; or
> >
> > (2) any right to payment arising from a right to an equitable remedy for
> > breach of performance.

11 U.S.C. § 502(c).

Although the Court raised the possibility of estimating FCRE's claim at a

status conference held on July 18, 2017 (7/18/17 Hearing 11:42-44 a.m.), neither party has filed a motion requesting estimation. Nevertheless, § 502(c) states that the bankruptcy court "shall" estimate an unliquidated claim in appropriate circumstances. 11 U.S.C. § 502(c). Accordingly, numerous bankruptcy courts have held that "[e]stimation pursuant to Bankruptcy Code section 502(c) is mandatory where adjudication of the claim would unduly delay the administration of the bankruptcy case." *In re Club Ventures Inv. LLC*, No. 11-10891 ALG, 2012 WL 6139082, at *4 (Bankr. S.D.N.Y. Dec. 11, 2012). *See also In re North American Health Care, Inc.*, 544 B.R. 684, 688 (Bankr. C.D. Cal. 2016) ("The statute's use of the words 'there shall be' makes it clear that estimation of contingent or unliquidated claims is mandated and required if the claims are such that their fixing or liquidation would 'unduly delay' the case's administration."); *In re Roman Catholic Archbishop of Portland in Or.*, 339 B.R. 215, 219 (Bankr. D. Or. 2015) ("When actual liquidation would unduly delay administration of the bankruptcy estate, estimation is mandatory."); *Denke v. PNC Bank, N.A. (In re Denke)*, 524 B.R. 644, 653 (Bankr. E.D. Va. 2015) (quoting *In re Nova Real Estate Inv. Trust*, 23 B.R. 62, 65 (Bankr. E.D. Va. 1982)) ("Section 502(c) is a mandatory, not a permissive provision. It 'creates in the Court an affirmative duty under proper circumstances to estimate any unliquidated claim.'").

To determine whether a delay would be undue, "a court considers all circumstances in the case and, in particular, how long the liquidation process would take compared with the uncertainty due to the contingency in question." *John Q. Hammons*, No. 16-21142, 2017 WL 4638439, at *4 (quoting *In re Teigen*, 228 B.R. 720, 723 (Bankr. D.S.D.

1998)). "The costs and benefits associated with both liquidation and estimation also should be considered. Although liquidation of a claim may take longer, the delay is only undue if it is unjustifiable." *Id.* (quoting *Teigen*, 228 B.R. at 723). In other words:

> [E]stimation does not become mandatory merely because liquidation may taken longer and thereby delay administration of the case. Liquidation of a claim, in fact, will almost always be more time consuming than estimation. Nonetheless, bankruptcy law's general rule is to liquidate, not to estimate. For estimation to be mandatory, then, the delay associated with liquidation must be "undue."

*Id.* (quoting *In re Dow Corning Corp.*, 211 B.R. 545, 563 (Bankr. E.D. Mich. 1997)). One court has defined "undue delay" as "excessive or unwarranted slowing of the administration of a debtor's case[.]" *Id.* at *4.

The Court finds such undue delay in this case. FCRE is the Debtor's principal creditor, and thus it is beyond dispute that the resolution of FCRE's claim "is a critical juncture for the administration" of the Debtor's case. *Id.* Further, FCRE bases its Disputed Claim on a series of assumptions: (1) that it will prevail in its appeal of the South Carolina court's orders; (2) that its declaration of various non-monetary defaults and self-help will be found lawful under the loan documents; (3) that it will be awarded fees and expenses in connection with the South Carolina case; (4) that it will be awarded default interest; and (5) that it will be repaid monies paid under the Contempt Order, attorneys' fees paid to the Debtor, default interest returned to the Debtor, and money transferred from the DACA account to the Debtor. Resolution of these matters by the courts of South Carolina will likely require considerable time, given that the South Carolina Case is in its early stages and that FCRE's appeal has been pending for 30 months. Accordingly, the Court finds that

liquidation of FCRE's Disputed Claim would unduly delay the administration of this Chapter 11 case, and thus estimation is mandatory. *See In re Lionel, L.L.C.*, No. 04-17324, 2007 WL 2261539, at *2 (Bankr. S.D.N.Y. Aug. 3, 2007) ("[W]hen the liquidation of a claim is premised on litigation pending in a non-bankruptcy court, and the final outcome of the matter is not forthcoming, the bankruptcy court should estimate the claim.").

The Court emphasizes that estimation of FCRE's unliquidated claim is for the limited purpose of confirmation and should not be construed to have any preclusive effect on the merits of FCRE's claim. *See In re Vodenos*, 553 B.R. 786, 805-06 (Bankr. C.D. Cal. 2016) (quoting *In re A.P.I., Inc.*, 331 B.R. 828, 846 (Bankr. D. Minn. 2005)) ("Some courts hold that the estimation of a claim under § 502(c)(1) has binding effect *per se* only for the administration of claims and assets in a bankruptcy case, and does not give rise to a fixed and liquidated claim cognizable in any other forum . . . . Others have envisioned an estimation under § 502(c)(1) as having preclusive effect, but have recognized the bankruptcy court's power to limit or deny that effect in deference to another forum, at the instance of party or parties, or not."); *In re Tsai*, 2:13-BK-27391-PC, 2014 WL 1154032, at *3 (Bankr. C.D. Cal. March 19, 2014) ("[T]he estimation of an unliquidated claim for the limited purpose of confirmation has no collateral estoppel effect with respect to the merits of the claim."); *In re Hungerford*, No. 00-31671-13, 2001 WL 36211305, at *12 n.22 (Bankr. D. Mont. March 22, 2001) ("I emphasize that this estimation is for the limited purpose of confirmation under § 502(c)."); *In re Clark*, 172 B.R. 701, 705 n.5 (Bankr. S.D. Ga. 1994) (Walker, J.) ("Where a claim is estimated, and the determination of its ultimate validity is postponed until after

76

confirmation, res judicata will not prevent further litigation regarding the claim. The order of confirmation works together with the order on the claim to reserve consideration of the claim to a later date, so the issue cannot be said to have been finally determined.").

"[N]either the [Bankruptcy] Code nor the Federal Rules of Bankruptcy Procedure provides any procedures or guidelines for estimation[.]" *Chemtura*, 448 B.R. at 648. Consequently, bankruptcy courts have wide discretion in estimating claims. *In re Benati*, No. 15-71018, 2018 WL 1801194, at *10 (Bankr. C.D. Ill. Apr. 13, 2018) ("[C]ourts generally have wide discretion in determining what method should be used to estimate contingent or unliquidated claims."); *In re POC Properties, LLC*, 580 B.R. 504, 509 (Bankr. E.D. Wis. 2017) ("Courts have discretion and flexibility in determining the best method to estimate a claim."); *North Am. Health Care*, 544 B.R. at 688 ("This Court has wide discretion and latitude in estimating claims.").[48] "Generally, the Court may estimate claims by 'whatever method is best suited to the particular contingencies at issue,' so long as the underlying purposes of the Code are not contravened." *In re Perry*, 425 B.R. 323, 342 (Bankr. S.D. Tex. 2010) (quoting *Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134, 135-36 (3d Cir. 1982)). "The Court is required [to] evaluate claims pursuant to the legal rules which may govern the ultimate value of the claim." *Id.* (citing *Matter of Brints Cotton Marketing, Inc.*, 737 F.2d 1338, 1340 (5th Cir. 1984)).

Procedurally, "[b]ankruptcy courts have employed a wide variety of methods

---

[48] A bankruptcy court's estimation of a claim is reviewed for abuse of discretion. *The Golden 1 Credit Union v. Hopper (In re Ahrens)*, BAP No. EC-16-1065-JuKuMA, 2016 WL 6427279 (B.A.P. 9th Cir. Oct. 27, 2016).

to estimate claims, including summary trial, a full-blown evidentiary hearing, and a review of pleadings and briefs followed by oral argument of counsel." *Chemtura*, 448 B.R. at 650. *See also In re Chavez*, 381 B.R. 582, 587 (Bankr. E.D.N.Y. 2008) (quoting *Bittner*, 691 F.2d at 135) ("The methods used by courts have run the gamut from summary trials to full-blown evidentiary hearings to a mere review of pleadings [and] briefs."). Here, the Court has not held an evidentiary hearing specifically on the issue of estimation. However, the Court has thoroughly reviewed the parties' pleadings and briefs, as well as the testimony offered by numerous witnesses and the dozens of exhibits admitted at various hearings during the two-year pendency of this Chapter 11 case. The Court finds that this material provides a sufficient basis to estimate FCRE's claim.

"There are also diverse analytical methods that bankruptcy courts have utilized to estimate claims under § 502(c).["][49] *Chemtura*, 448 B.R. at 650. "Some courts have proceeded on an 'all or nothing' basis, awarding the full value of the claim if the claimant proves its case by preponderance, and awarding a zero value if the claimant fails to prove its claim." *Id.* (citing *Bittner*, 691 F.2d at 134). Other courts, however, "adopt a method that estimates the probability a claim will succeed and apply the probability to the damages, reasoning that they should take into account the likelihood that 'each party's version might or might not be accepted by a trier of fact.'" *POC Properties*, 580 B.R. at 509 (quoting *In re Windsor Plumbing Supply Co.*, 170 B.R. 503, 521 (Bankr. E.D.N.Y. 1994). Under the

---

[49] *See In re Cantu*, No. 08-70260, 2009 WL 1374261, at *3 (Bankr. S.D. Tex. May 15, 2009) (citing David S. Salsburg and Jack F. Williams, *A Statistical Approach to Claims Estimation in Bankruptcy*, 32 Wake Forest L. Rev. 1119 (1997)).

circumstances presented in this case, the Court finds this latter "probabilistic" method appropriate.

Here, as noted, the principal and interest due as of the petition date is not in dispute. FCRE's Disputed Claim includes several components arising in connection with the South Carolina Case: legal fees through February 2, 2017; out of pocket expenses; accrued default interest over the contract rate for the period September 7, 2016, through January 6, 2017; return of money paid under the Contempt Order; return of attorneys' fees paid; return of default interest returned to the Debtor; and return of money transferred from the DACA account to the Debtor, all of which depend on FCRE's assumption that it will prevail in the South Carolina Case. What is the probability that FCRE will so prevail?

Although the Court heard testimony from witnesses and argument from counsel on the Debtor's Claim Objection at three different hearings, the Court did not rule on the Claim Objection prior to confirmation. And that is because the Court was not prepared to rule on the very complicated question of FCRE's assertion of non-monetary defaults that caused it to exercise its self-help remedies. The Court has heard only broad summaries of those non-monetary defaults, without a full evidentiary hearing on the merits of each one. As alluded to elsewhere in this Opinion, some of those claimed defaults appear to be mere pretext for foreclosing on the collateral so that FCRE can liquidate the Property.

Nevertheless, to prevail in the South Carolina Case, FCRE need only prove that *any one* of its grounds for declaring a default was proper. The alleged non-monetary defaults in the July 20, 2016 Notice of Event of Default were not strongly supported by the evidence:

failure to maintain the Property in good and safe condition, the commission of waste, allowing material impairment to the Property's value, failure to provide documentation of property managers' licenses, failure to provide financial reports, failure to provide adequate security, failure to remedy defects, change of place of business without notice, and permitting leases of less than twelve months.[50] (1/10/18 Ex. "C-16" pp. 1-2). Ms. Davenport's representations to her prospective buyers as to the crime in the area flatly contradicted the alleged default based on failure to provide adequate security. (1/10/18 Ex. "D-24"; Ex. "D-25").

The second Notice of Default of November 21, 2016, was based on an alleged check-cashing business in violation of the single purpose entity requirement in the Loan Agreement. (1/7/19 Ex. "FCRE-1"). The Court finds this a particularly weak ground for declaring a default.[51]

The third Notice of Default, dated December 13, 2016, dealt with allegations regarding mold at the Property. (1/7/19 Ex. "FCRE-2"). But Ms. Davenport had assured her potential buyers that mold was not a problem. As she stated, "the property is located in South Carolina, on the coast. There is salt water in the air, and Spanish Moss, literally, everywhere in this region." (1/10/18 Ex. "D-24"; Ex. "D-25"). Moreover, at a hearing on April 5, 2017,

---

[50] Among the representations and warranties made by the Debtor under the Loan Agreement was this provision: **3.1.20 Leases.** Borrower represents and warrants to Lender with respect to the Leases that: . . . (m) the duration of any residential Lease shall be (i) no less than twelve (12) and (ii) no greater than twenty-four (24) months." (1/10/18 Ex. "C-105" p. 25) (emphasis in original).

[51] Among the time entries submitted by FCRE's attorneys as part of its proof of claim was .5 hours of legal research on "federal money laundering statutes." (Claim 2-1, Part 10, p. 17).

the Court heard testimony from Ansley Cohen, FCRE's mold remediation expert. The Court found that expert's testimony less than compelling, as was the reference to the Beaufort Housing Authority's report regarding mold. It seems clear that FCRE was searching for any basis for default. But at least as of the petition date, which forms the basis of the claim in the South Carolina Case, the Court finds FCRE's allegations of non-monetary defaults to be unpersuasive.

But the Court must estimate the claim based on other evidence that has come to light since the filing of the bankruptcy case. First, FCRE asserts that had it known of certain matters in advance, it would never have extended the loan in the first place. These included supposed misleading financial projections,[52] the existence of mold at the Property, criminal activity at the Property,[53] an undisclosed pending personal injury lawsuit[54] against a related entity, the Debtor's failure to make a scheduled balloon payment to a prior lender (GECC),[55] and the convoluted history of the Debtor's corporate general partner that was administratively dissolved. The Court does not find that any of these pre-closing matters

---

[52] The documents reviewed by FCRE as part of its due diligence prior to the loan closing in April of 2015 appear extremely limited. (Davenport Aff., Dckt. 33-3, p. 3, ¶ 6).

[53] The only proof of criminal activity was a statistical report of complaints that offers no insight into the actual facts of the alleged criminal activity. *See* 2/5/18 Ex. "C-6"-"C-11".

[54] In asserting this default, FCRE relied on a provision of the Loan Agreement stating "3.1.4. Litigation. There is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against Borrower in any court or by or before any other Governmental Authority that, if adversely determined, would be reasonably likely to have a material adverse effect on the business, operations or condition (financial or otherwise) of Borrower or the Property." (1/10/18 Ex. "C-105" p. 22).

[55] There was no evidence in the record that GECC declared a default on this loan, which matured in 2010.

81

constituted fraud on the part of the Debtor. But FCRE argues that the discovery of one or more of these misrepresentations would permit it to declare a default.

Second, and more problematic for the Debtor, the evidence reflects a somewhat casual attitude by Mr. and Mrs. Kettles toward the Debtor's obligations under the loan documents. In particular, the Debtor's record-keeping, accounting practices, failure to segregate rents, and commingling of funds with other entities controlled by Mr. Kettles suggest the possibility that one or more defaults occurred that cannot be remedied. The fact that FCRE was purposefully searching for such violations of the loan documents would be no defense to real defaults if they, in fact, occurred.

In summary, adopting the probabilistic approach, the Court finds that there is a possibility that FCRE will be able to demonstrate a default by the Debtor that cannot be cured, which would permit FCRE to seek judicial foreclosure under South Carolina law. The Court estimates these prospects at 40%. Accordingly, with the exception of attorneys' fees and the alleged loss on the hedge contract, the Court will multiply by 40% the value of the Disputed Claim components sought by FCRE. With regard to its claim for pre-petition attorneys' fees of $472,283.01, the Court finds those to be overstated and estimates that a South Carolina court would award at most $250,000.00 for the pre-petition work, resulting in an estimate of that component in the amount of $100,000.00 based on the 40% probability of success.

FCRE's alleged loss on its hedge contract, however, requires a separate analysis. This aspect of FCRE's claim hinges on the notion that the Debtor is obligated as

a matter of consequential damages for FCRE's inability to securitize the subject loan and the corresponding loss it suffered under a hedge contract to which the Debtor was not a party. (1/12/18 Transcript p. 146) (Ms. Davenport acknowledging that the Debtor was not a party to the hedge transaction). When questioned at the January 2018 hearing about the source of this obligation in the Loan Agreement and related documents, Ms. Davenport pointed to two references. The first such reference was in the so-called term sheet (1/10/18 Ex. "C-99") dated February 17, 2015, which included the following language:

> **Secondary Market Transactions:** Lender shall have the right at any time to participate, syndicate or securitize all or any portion of its interest in the Loan (a **"Secondary Market Transaction"**).  In addition, Borrower shall agree to cooperate with Lender to facilitate any Secondary Market Transaction and the rating of the Loan.

(1/10/18 Ex. "C-99" p. A-3) (emphasis in original). *See also* (1/10/18 Transcript p. 8). The second reference to that obligation, according to Ms. Davenport, can be found in the following provision of the Loan Agreement:

**IX.  Sale and Securitization of Mortgage**

**Section 9.1 Sale of Mortgage and Securitization**

(a) Lender shall have the right (i) to sell or otherwise transfer the Loan or any portion thereof as a whole loan, or (ii) to securitize the Loan or any portion thereof in a single asset securitization or a pooled loan securitization. (The transaction referred to in clause (i) shall hereinafter be referred to as **"Secondary Market Transactions"** and the transaction referred to in clause (ii) shall hereinafter be referred to as a **"Securitization."** Any certificates, notes or other securities issued in connection with a Securitization are hereinafter referred to as **"Securities"**).

(b) If requested by Lender, Borrower shall assist Lender in satisfying the market standards to which Lender customarily adheres or which may be reasonably required in the marketplace or by the Rating Agencies in connection with any

Secondary Market Transactions, including, without limitation, to provide updated financial and other information with respect to the Property, the business operated at the Property, Borrower and the Manager.

(1/10/18 Ex. "C-105" p. 56) (emphasis in original). *See also* (1/10/18 Transcript pp. 8-9).

The Court finds little support in these provisions to impose on the Debtor an obligation to reimburse FCRE for its hedge losses, for two reasons. First, while the loan documents clearly contemplated securitization, they contain no express reference to FCRE's intention to hedge its losses. Nor is there even an oblique reference to FCRE's intention to do so. Second, the securitization failed because two potential buyers rejected the loan out of concerns over criminal activity at the property and certain alleged mold conditions. The Court finds no basis for holding the Debtor responsible for FCRE's hedge losses on these grounds. But, accounting for the possibility that the South Carolina court will disagree, the Court estimates the hedge loss at $5,000.00. Accordingly, the Court's estimates of the components of the Disputed Claim are as follows:

| Claim Component | FCRE's Claim | Court's Estimate of FCRE's Claim |
|---|---|---|
| Legal Fees | $472,283.01 | $100,000.00 |
| Out of Pocket Expenses | $7,308.90 | $2,900.00 |
| Default Interest over Contract Rate | $81,114.14 | $32,450.00 |
| Monies paid under Contempt Order | $56,774.92 | $22,700.00 |
| Attorneys' Fees Paid | $14,339.00 | $5,700.00 |
| Return of Default Interest | $25,532.76 | $10,200.00 |
| Money Transferred from DACA Account | $15,745.00 | $6,300.00 |

| Loss on Hedge | $221,755.90 | $5,000.00 |
| Total | $894,853.63 | $185,250.00 |

Based on the foregoing, the Court finds that the allowed amount of FCRE's claim is $3,986,798.15, which consists of principal and interest in the amount of $3,801,548.15 and the portions of the Disputed Claim in the estimated amount of $185,250.00. As will be seen, this claim estimation necessarily impacts negatively the feasibility of the Debtor's Amended Plan.

## C. FCRE's § 506(b) Motion

FCRE has filed a motion for post-petition fees, expenses, and default interest. The Court will address attorneys' fees and expenses first. Whereas 11 U.S.C. § 502(b) permits *pre-petition* attorneys' fees, expenses, and interest as part of a creditor's allowed claim, oversecured creditors may recover *post-petition* fees, expenses, and interest pursuant to 11 U.S.C. § 506(b), which provides as follows:

> (b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

11 U.S.C. § 506(b). In other words, an oversecured creditor "is allowed postpetition interest and reasonable attorneys' fees up to the value of the property less [the creditor's] prepetition claim." *In re SouthSide, LLC*, 520 B.R. 914, 920 (Bankr. N.D. Ga. 2014) (Murphy, J.). "In plain language, a claim for attorney fees and costs under § 506(b) must satisfy three prima facie elements: (1) the claimant must possess an allowed, over-secured claim; (2) the

claimant must have a contractual or statutory basis for its request for fees and costs; and (3) the requested fees and costs must be reasonable." *In re Trigeant Holdings, Ltd.*, No. 14–29027-EPK, 2015 WL 5441033, at *5 (Bankr. S.D. Fla. Apr. 1, 2015). The secured creditor bears the burden of proving these elements by a preponderance of the evidence. *In re Residential Capital, LLC*, 497 B.R. 403, 412 (Bankr. S.D.N.Y. 2013); *In re 201 Forest Street LLC*, 409 B.R. 543, 595-96 (Bankr. D. Mass. 2009).

The first element of § 506(b), whether the creditor is oversecured, "is a simple valuation question." *Trigeant*, 2015 WL 5441033, at *5. Here, the amount of FCRE's claim is $3,986,798.15, secured by the Property. As the Court found, the value of the Property is $5,250,000.00.[56] (Dckt. 365). Thus, FCRE has established that it has an oversecured claim.

Likewise, the second element, whether the fees are provided for under the loan documents is "a straightforward factual question." *Trigeant*, 2015 WL 5441033, at *5. In this case, the Loan Agreement provides as follows:

**Section 11.13 Expenses; Indemnity.**

(a) Borrower shall pay or, if Borrower fails to pay, reimburse Lender upon receipt of notice from Lender, for all reasonable costs and expenses (including reasonable attorneys' fees actually incurred and disbursements and the allocated costs of internal legal services and all actual disbursements of internal counsel) incurred by Lender in connection with (i) the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions of counsel (including without limitation any

---

[56] The Court has not heard any testimony about the value of FCRE's other collateral, such as its personal property and cash collateral. *See* dckt. 55, p. 4; dckt. 374-1, pp. 1-2. The September 2018 monthly operating report reflects $111,052.98 in the Debtor's operating account. (Dckt. 542, p. 25). The February 2019 monthly operating report reflects $192,382.44 in that same account. (Dckt. 585).

opinions requested by Lender as to any legal matters pertaining to this Agreement, the other Loan Documents or the Property); (ii) Borrower's ongoing performance of and compliance with Borrower's agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (iii) Lender's ongoing performance of and compliance with all agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date; (iv) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Borrower; (v) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing Lender all required legal opinions, and other similar expenses incurred, in creating and perfecting the Liens in favor of Lender pursuant to this Agreement and the other Loan Documents; (vi) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation or otherwise, in each case against, under or affecting Borrower, this Agreement, the other Loan Documents, the Property, or any other security given for the Loan; and (vii) **enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Property or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings**; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender.

(1/10/18 Ex. "C-105" p. 64) (emphasis added). Thus, the Loan Agreement contains the Debtor's contractual obligation to reimburse FCRE for legal fees and expenses incurred in the enforcement of its rights. There is no dispute as to the existence or to the general enforceability of the Loan Agreement. Accordingly, FCRE has satisfied this element under § 506(b).

The third and final element under § 506(b) is the reasonableness of FCRE's

attorneys' fees and expenses. "[J]ust because a creditor authorizes legal work does not mean that a debtor should pay for it[.]" *In re Bate Land & Timber, LLC*, 541 B.R. 601, 609 (Bankr. E.D.N.C. 2015). "Debtors . . . are not responsible for *unreasonable* fees incurred by a creditor in collecting the debt. Creditors can hire as many and as expensive lawyers as they choose but they then can shift no unreasonable fees onto the debtor[.]" *In re Unnerstall*, No. 6:17–bk–00336–KSJ, 2018 WL 1989936, at *2 (Bankr. M.D. Fla. Apr. 25, 2018). "[R]easonable fees are those *necessary* to the collection and protection of a creditor's claim and include fees for those actions which a similarly situated creditor might have taken. The fees must be cost justified by the economics of the situation and necessary to preserve the creditor's interest in light of the legal issues involved." *In re Sundale, Ltd.*, 483 B.R. 23, 29 (Bankr. S.D. Fla. 2012) (quoting *In re Dig. Prod. Corp.*, 215 B.R. 478, 482 (Bankr. S.D. Fla. 1997)). "[W]here services are not reasonably necessary or where action is taken because of an attorney's . . . overzealous advocacy, courts have the right and the duty, in the exercise of their discretion, to disallow fees and costs under § 506(b)." *Id.* at 30 (quoting *In re Wonder Corp. of America*, 72 B.R. 580, 591 (Bankr. D. Conn. 1987)).

Bankruptcy courts follow the federal lodestar approach in determining the reasonableness. *In re Reorganized Lake Diamond Assocs., LLC*, 367 B.R. 858, 875 (Bankr. M.D. Fla. 2007). *See also In re Coastal Realty Inv., Inc.*, No. 12–20564, 2014 WL 929612, at *13 (Bankr. S.D. Ga. March 10, 2014) (Dalis, J.) (citing *Grant v. George Schumann Tire & Battery Co.*, 908 F.2d 874, 877 (11th Cir. 1990)). "Under the lodestar approach, courts consider the number of hours of service reasonably devoted to the case multiplied by the

attorneys' reasonable rates, and reduced or enhanced according to the twelve-factor test enumerated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)."

*Reorganized Lake Diamond*, 367 B.R. at 875. The factors set forth in *Johnson* include the following:

> (i) time and labor expended; (ii) novelty and difficulty of the questions raised; (iii) skill required to properly perform the legal services rendered; (iv) attorney's opportunity cost in pursuing the matter; (v) customary fee for like work; (vi) whether the fee is fixed or contingent; (vii) time limitations imposed by the client or circumstances; (viii) amount in controversy and the results obtained; (ix) experience, reputation, and ability of the attorney; (x) undesirability of the case within the legal community in which the case arose; (xi) nature and length of the professional relationship between attorney and client; and (xii) attorney's fee awards in similar cases.

*Coastal Realty Inv., Inc.*, No. 12–20564, 2014 WL 929612, at *13 (citing *Johnson*, 488 F.2d at 717-19). In conducting this analysis, the bankruptcy court "is to weigh the hours claimed against [its] own knowledge, experience, and expertise, scrutinize a claim for fees for duplication of effort, and distinguish between legal services and clerical work." *In re Britt*, 551 B.R. 522, 523-24 (Bankr. N.D. Fla. 2016). "Within section 506(b)'s construct, bankruptcy courts have broad discretion to determine the allowance of attorney's fees . . . including . . . the power to review the reasonableness of such fees in the context of the case and the claimant's position in it." *In re Canal Asphalt, Inc.*, No. 15–23094 (RDD), 2017 WL 1956849, at *8 (Bankr. S.D.N.Y. May 10, 2017).

Here, FCRE seeks $1,005,678.31 in legal fees and attorneys' expenses incurred through December 28, 2018, by the firms Moore & Van Allen, PLLC; Meister Seeling & Fein, LLP; and James Bates Brannan Groover, LLP; as well as $73,786.96 in out of pocket

expenses incurred by FCRE. (Dckt. 566-1, p. 1). Specifically, the fees and hours billed by these three firms are as follows:

| Firm | Hours | Fees |
|---|---|---|
| Moore & Van Allen, PLLC | 296.50 | $94,246.65 |
| Meister Seeling & Fein, LLP | 1,021.90 | $630,005.50 |
| James Bates Brannan Groover, LLP | 895.10 | $241,518.50 |
| | | $965,770.65 |

(Dckt. 566-2, p. 1). FCRE's total legal billings of $1,005,678.31 are comprised of this $965,770.65 figure in addition to $39,907.66 in legal out of pocket expenses. (Dckt. 566-2, p. 1).

As an initial matter, the Court observes that Ms. Davenport did an excellent job of documenting the services performed by FCRE's counsel. Her meticulous analysis of the incurred attorneys' fees (dckt. 491-2, dckt. 566-2) should be a model for all fee applications before this Court. Based on this extensive documentation, the Court finds that the hours billed were hours actually spent performing the described services. The Court further finds that FCRE's experienced and capable counsel charged reasonable hourly rates for their services.

Having considered the relevant *Johnson* factors, the Court notes that FCRE filed some of its pleadings and briefs in this case from a defensive posture. For example, FCRE was required to respond to the Debtor's motion to stay the New York Case. (Dckt. 219). Additionally, the inadequacy of information disclosed in the Debtor's Disclosure

Statement (dckt. 265) warranted an objection from FCRE. FCRE also raised complex issues
pertaining to the Debtor's organizational history and eligibility to seek reorganization. The
Debtor filed a motion to incur debt that had no chance of success and put FCRE to further
expense. (Dckt. 476).

Nevertheless, the Court finds that a reduction in FCRE's attorneys' fees and
expenses is appropriate. FCRE repeatedly raised an unusually large number of issues in
various contested matters in this case. It alleged numerous violations by the Debtor of the
Court's First Interim Cash Collateral Order, and it filed a Motion to Appoint Trustee (dckt.
32) and a Motion to Convert. (Dckt. 161). FCRE requested authorization to perform
numerous examinations pursuant to Bankruptcy Rule 2004.[57] Much of the work seemed
repetitious and unnecessary.

The Court also notes that FCRE's claimed post-petition attorneys' fees and
expenses are considerably larger than the fees and expenses awarded to the McCallar Law
Firm, the Debtor's counsel in this case. The McCallar Law Firm has been awarded attorneys'
fees and expenses in the amounts of $72,595.57 (dckt. 207), $89,312.43 (dckt. 315), and
$159,239.45 (dckt. 455), for a total of $321,147.45 through March 9, 2018. (Dckt. 455, p.
2). Combined with counsel's statement at the confirmation hearing that his firm would seek

---

[57] FCRE moved to depose Mr. Kettles (dckt. 150, dckt. 159); Ms. Kettles (dckt. 151,
dckt. 153); J. Daniel Falligant (dckt. 178); Roderick T. Atkinson (dckt. 195); Grandbridge Real
Estate Capital (dckt. 242, dckt. 249); Purvesh Gosalia (dckt. 243, dckt. 247); Guggenheim
Commercial Real Estate Finance, LLC (dckt. 268); Coastal Federal Credit Union (dckt. 290);
John Christopher Williams and Mary Ellen Williams (dckt. 292); ML Butler and JT Armstrong
(dckt. 294); John G. Kennedy, III (dckt. 296); Byrl McCartney (dckt. 308); Mary Bass Lohr
(dckt. 310); Van Willis (dckt. 312); and Dougherty Mortgage, LLC. (Dckt. 480, denied at dckt.
521). Of these deponents, only Mr. and Mrs. Kettles testified before the Court.

an additional $175,000.00 (10/1/18 Transcript p. 107), the total sum through October 1, 2018, is $496,147.45. While the efforts of Debtor's counsel are not a measure of what FCRE is entitled to, it is at least a point of reference.

FCRE's substantial equity cushion at the outset of this case also informs the Court's analysis. As one court explained:

> [T]he reasonableness of counsel's activities in representing a secured creditor may depend on the extent to which the creditor's secured position is jeopardized. Where a creditor is oversecured, the size of a creditor's equity cushion is an underlying factor in the reasonableness determination. When there is only minimal risk, circumstances will generally require that counsel respond only to issues of material concern.

*Canal Asphalt*, 2017 WL 1956849, at *8 (quoting *In re Glazier Grp., Inc.*, No. 10-16099 (ALG), 2013 WL 1856305, at *3 (Bankr. S.D.N.Y. May 2, 2013). The Court finds that FCRE's actions in this bankruptcy case have been disproportionate to its risk and that the requested fees are not those that would be incurred by a typical creditor in its position. *See Canal Asphalt*, 2017 WL 1956849, at *8 ("[W]here it is clear that the claimant is requesting fees that a typical secured creditor in its position would not have incurred to protect or recover on its secured claim–for example, to acquire the collateral–such fees are not allowable under section 506(b)."). Throughout these proceedings, the Court advised counsel that it would closely scrutinize fee applications. In addition, the Court noted that in many respects this was a simple case. Valuation of the Property, for example, could have been stipulated to in light of the very recent appraisals that were available. Financial analysis of the Debtor's operations was also uncomplicated. The Court finds that FCRE could have accomplished the same result, denial of confirmation of the Debtor's Amended Plan, with

92

considerably less effort.

Based on the foregoing analysis under § 506(b), and on a detailed review of FCRE's legal invoices, the Court finds that FCRE is entitled to post-petition attorneys' fees in the amount of $700,000.00 and attorneys' expenses in the full amount of $39,907.66. FCRE is also entitled to claim all of the out-of-pocket expenses as "charges" under § 506(b) in the claimed amount of $73,786.96.

In addition to attorneys' fees and expenses, FCRE seeks default interest for the period March 6, 2017, through December 6, 2018, in the amount of $378,006.26. (Dckt. 566-1, p. 1). "Three categories of interest exist in bankruptcy cases: (1) interest accrued prior to the filing of the bankruptcy petition (prepetition interest); (2) interest accrued after the filing of a petition but prior to the effective date of a reorganization plan (pendency interest); and (3) interest to accrue under the terms of a reorganization plan (plan interest)." *In re Beltway One Dev. Grp., LLC*, 547 B.R. 819, 826 (B.A.P. 9th Cir. 2016). The category of interest at issue in this case is pendency interest.

"Generally, the Code does not provide for pendency interest to creditors, because the filing of the petition usually stops interest from accruing." *Id. See also In re 1111 Myrtle Avenue Grp., LLC*, — B.R. —, 2019 WL 642843, at *4 (Bankr. S.D.N.Y. Feb. 14, 2019) ("As a general rule, under equitable principles of insolvency law, interest ceases to accrue once a bankruptcy filing occurs."). Section 506(b), however, provides that an oversecured creditor may recover "interest on such claim" in addition to "any reasonable fees, costs, or charges provided for under the agreement or State statute under which such

93

claim arose." 11 U.S.C. § 506(b). "Thus, an oversecured creditor can recover pendency interest as part of its allowed claim, at least to the extent it is oversecured." *In re Beltway One Dev. Grp., LLC*, 547 B.R. at 826. In the Eleventh Circuit, unlike attorneys' fees, costs, and charges, interest is not subject to a reasonableness standard. *In re Brandywine Townhouses, Inc.*, 518 B.R. 671, 676 (Bankr. N.D. Ga. 2014) (citing *In re Welzel*, 275 F.3d 1308, 1314 (11th Cir. 2008)).

"While § 506(b) entitles an oversecured creditor to recover pendency interest on its claim, the statute does not specify the rate of interest to be applied." *Id.* Pursuant to § 506(b), a number of courts have allowed oversecured creditors to recover pendency interest at the default rate. *See 1111 Myrtle Avenue Grp., LLC*, — B.R. —, 2019 WL 642843, at *5 (collecting cases); *In re Del-A-Rae, Inc.*, 448 B.R. 303, 305 (Bankr. S.D. Ga. 2011) (Davis, J.); *Holmes v. Citigroup Inv. AgriFinance (In re Holmes)*, 330 B.R. 317, 320 (Bankr. M.D. Ga. 2005) (Hershner, J.). *See also* 4 *Collier on Bankruptcy* ¶ 506.04[2][b][i]-[ii] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. In this case, the Loan Agreement defines the term "default rate" as "a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent (5%) above the [4.04%] Interest Rate." (1/10/18 Ex. "C-105" p. 3). In its proof of claim, FCRE states that it seeks default interest at a rate of 9.04%. (Claim 2-2, Part 2, p. 5).

The default rate of 9.04% is triggered by an event of default. As discussed above, at this juncture there has been no determination in the South Carolina Case that the Debtor defaulted under the Loan Agreement. However, pursuant to the Loan Agreement, the

following are among the events of default:

**Section 10.1 Event of Default**

(a) Each of the following events shall constitute an event of default hereunder
(and **"Event of Default"**):

. . .

(vi) if Borrower or any Guarantor shall make an assignment for the benefit of
creditors;

(vii) if Borrower fails or admits its inability to pay debts generally as they
become due;

(viii) if a receiver, liquidator or trustee shall be appointed for Borrower, or any
Guarantor, or if Borrower or any Guarantor shall be adjudicated a bankruptcy
or insolvent, **or if any petition for bankruptcy, reorganization or
arrangement pursuant to federal bankruptcy law, or any similar federal or
state law, shall be filed by or against, consented to, or acquiesced in by,
Borrower or any Guarantor** or if any proceeding for the dissolution or
liquidation of Borrower or any Guarantor shall be instituted; provided, however,
if such appointment, adjudication, petition or proceeding was involuntary and
not consented to by Borrower or any such Guarantor, upon the same not being
discharged, stayed or dismissed within sixty (60) days or if an order for relief is
entered;

. . .

(1/10/18 Ex. "C-105" pp. 56-57) (emphasis added). The Loan Agreement further provides

as follows:

(b) Upon the occurrence of an Event of Default (other than an Event of Default
described in Section 10.1(a)(vi), (vii) or (viii) above) and at any time thereafter
Lender may, in addition to any other rights or remedies available to it pursuant
to this Agreement and the other Loan Documents or at law or in equity, take
such action, without notice or demand, that Lender deems advisable to protect
and enforce its rights against Borrower and in and to the Property, including,
without limitation, declaring the Debt to be immediately due and payable, and
Lender may enforce or avail itself of any or all rights or remedies provided in the
Loan Documents against Borrower and the Property, including, without

limitation, all rights or remedies available at law or in equity; **and upon any Event of Default described in Section 10.1(a)(vi), (vii) or (viii) above, the Debt and all other obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.**

(1/10/18 Ex. "C-105" pp. 56-57) (emphasis added). Under these provisions, even if FCRE wrongfully declared the pre-petition non-monetary defaults, the Debtor's filing of this Chapter 11 case constituted an event of default, thereby triggering the default interest rate. This provision is known as an *ipso facto* clause. *See In re Husain*, 364 B.R. 211, 217 n.7 (Bankr. E.D. Va. 2007) ("*Ipso facto* clauses are contractual provisions that declare a debtor in default if he or she becomes a debtor in a bankruptcy case."). The Court has been unable to find any Eleventh Circuit case law addressing whether a default based solely on an ipso facto clause suffices to trigger default interest for purposes of § 506(b).

*Ipso facto* clauses in executory contracts and unexpired leases are rendered invalid by 11 U.S.C. § 365(e)(1), which states:

(e)(1) Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on--

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) **the commencement of a case under this title**; or

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

96

11 U.S.C. § 365(e)(1) (emphasis added). Thus, the Court must first determine whether the

Loan Agreement between the Debtor and FCRE is an executory contract. If it is, then the

*ipso facto* clause is unenforceable, and the bankruptcy filing did not constitute a default.

        Neither party has asserted that the Loan Agreement is an executory contract,

much less an unexpired lease. "[L]oan agreements are generally not considered to be

executory contracts," which require some performance to remain due on both sides. *In re*

*Gen. Growth Prop.*, 451 B.R. 323, 329 (Bankr. S.D.N.Y. 2011). And several bankruptcy

courts have held that *ipso facto* clauses in loan agreements are enforceable. *See, e.g., In re*

*AMR Corp.*, 485 B.R. 279, 296-97 (Bankr. S.D.N.Y. 2013) ("As both U.S. Bank and the

Debtors admit that the Indentures here are not executory contracts or unexpired leases . . .

the Court concludes that Section 4.02(a)(i) is not an invalid ipso facto clause."); *Gen. Growth*

*Prop.*, 451 B.R. at 330 (citing "recent case law . . . upholding a right to post-petition default

interest triggered solely by a debtor's bankruptcy filing"); *In re St. Vincent's Catholic Med.*

*Ctrs. of N.Y.*, 440 B.R. 587, 602-03 (Bankr. S.D.N.Y. 2010) ("The Mortgage clearly

indicates that a default was within the contemplation of the parties at the time the Loan

Documents were made, because the Mortgage contains a long list of Events of Default and

remedies, and detailed calculations for a prepayment penalty and the Acceleration

Indemnification."); *In re 20 Bayard Views LLC*, No. 09-50723, 2010 WL 3867047 (Bankr.

E.D.N.Y. Aug. 11, 2010) (unpublished oral decision with transcript at dckt. 142) (finding

that the obligation reflected in loan agreement and mortgage was not an executory contract

and enforcing the default rate triggered by *ipso facto* clause).[58] Based on this authority, the
Court finds that the Loan Agreement here is not an executory contract, that its *ipso facto*
clause is not subject to § 365(e)(1), and that the Debtor's filing of this Chapter 11 case
constituted an event of default.[59]

Next, the Court must determine whether FCRE is entitled to recover post-
petition default interest and, if so, how much. "There appear to be two different approaches
to determining whether post-petition default interest is allowable as part of the secured claim
of an oversecured creditor. The first approach holds that default interest is allowable in
bankruptcy, so long as it would be enforceable under state law . . . The second approach
requires the bankruptcy court to review the equities of the case to determine whether the
default interest rate should be paid." *In re Cliftondale Oaks, LLC*, 357 B.R. 883, 885-86
(Bankr. N.D. Ga. 2006) (Drake, J.). Courts following the second approach "usually find that
if the increased rate does not impact the unsecured creditors and only impacts equity
interests, there are no equitable reasons to not enforce the contract rate." *In re Market Ctr.
East Retail Prop.*, 433 B.R. 335, 358 (Bankr. D.N.M. 2010).

Here, pursuant to the Court's First Interim Cash Collateral Order, the Debtor
has been making adequate protection payments to FCRE in the amount of the Debtor's
regular monthly payment. (Dckt. 52, p. 5). The Court, however, stated that "FCRE's

---

[58] *See also* Paul Rubin, *Not Every* Ispo Facto *Clause Is Unenforceable in Bankruptcy*,
American Bankruptcy Institute Journal, Vol. XXXII, No. 7, August 2013.

[59] FCRE's entitlement to default interest for the pendency period does not require a
finding that the Debtor was in default under the Loan Agreement before filing bankruptcy.
Rather, its entitlement to default interest was triggered by the bankruptcy filing itself.

acceptance of Monthly Payments consisting of principal and interest at the contract rate is without prejudice, and FCRE does not waive any of its rights under the Loan Documents, including its claim to interest at the Default Rate, as defined in the Loan Documents." (Dckt. 52, p. 5). Under both the Amended and the Final Cash Collateral Orders, this provision remains in effect. (Dckt. 114; dckt. 256, p. 2). All parties, therefore, were on notice that FCRE could seek post-petition default interest. Following the filing of FCRE's § 506(b) Motion (dckt. 491, dckt. 566), the Debtor has presented no evidence or argument in opposition to FCRE's request for default interest. The Debtor's response (dckt. 567) to the § 506(b) Motion made no mention of default interest. The Court finds that there are no equitable reasons not to enforce the default rate of 9.04% during the pendency period. The Court has reviewed the document prepared by FCRE attached to the supplemental § 506(b) Motion and admitted into evidence at the January 7, 2019 hearing. (Dckt. 566-1, p. 3) and finds that FCRE has properly calculated its entitlement to $378,006.26 in default interest. Accordingly, the Court finds that FCRE's total § 506(b) claim is as follows:

| *Reasonable* Attorneys' Fees | $700,000.00 |
|---|---|
| Attorneys' Out of Pocket Expenses | $39,907.66 |
| FCRE's Out of Pocket Expenses | $73,786.96 |
| Default Interest | $378,006.26 |
| Total | $1,191,700.88 |

D. Confirmation

Having determined that FCRE's pre-petition claim is $3,986,798.15 and that it is entitled to post-petition attorneys' fees, expenses, and interest of $1,191,700.88, for a

total claim of $5,178,499.03, which is fully secured, the Court can now decide whether to confirm the Debtor's Amended Plan. (Dckt. 374). In its Objection to Confirmation (dckt. 499, dckt. 514), FCRE enumerates the following reasons that the Amended Plan cannot be confirmed:

The Amended Plan violates the provisions of 11 U.S.C. § 1129(a)(3) because it places too much risk of reorganization on FCRE, and because the Amended Plan is proposed by a legally defunct, dissolved Debtor (whose general partner is also defunct and dissolved) and the Debtor does not have authority to file any plan that proposes a continuation of the Debtor's business;

The Amended Plan violates 11 U.S.C. § 1129(a)(5) in that it does not properly identify the proposed officers and directors of the reorganized Debtor, or identify the compensation of any insiders of the Debtor;

The Amended Plan violates the provisions of 11 U.S.C. § 1129(a)(11) (*i.e.* "feasibility") because the Debtor cannot fund the amounts due to FCRE from its cash operations, because the Amended Plan ignores any pre-petition and post-petition increase of the indebtedness owed to FCRE except to add it as a balloon payment on the end of the note with no interest accrual on any such amounts and for other reasons set forth below;

The Amended Plan violates the provisions of 11 U.S.C. § 1129(a)(10) as there may not be one class of impaired claims that have accepted the Plan (ignoring insiders);

The Amended Plan violates the provisions of 11 U.S.C. § 1129(a)(9) for reasons set forth below;

The Amended Plan strips FCRE of substantially all of its rights under the existing Loan Agreement and Mortgage rendering the Amended Plan not only "unfeasible" but also making the Amended Plan less than fair and equitable under 11 U.S.C. § 1129(b)(2);

The Amended Plan improperly and wrongfully proposes to release the guaranty of L. Christopher Kettles (and now his estate) from the unconditional and absolute liability for payment and performance on the FCRE loan to the Debtor;

The Amended Plan is not "fair and equitable" under the provisions of 11 U.S.C.

§ 1129(b)(2).

(Dckt. 499, pp. 1-2; dckt. 514, pp. 2-3) (emphasis in original).

(i) <u>General Confirmation Standards</u>

For a Chapter 11 plan to be confirmed, the proponent of the plan has the burden of establishing the requirements enumerated in 11 U.S.C. § 1129(a)(1)-(16) by a preponderance of the evidence. *In re J.C. Householder Land Tr. #1*, 501 B.R. 441, 447 (Bankr. M.D. Fla. 2013). One of these subsections, § 1129(a)(8), requires that each impaired class of creditors accept the plan. However, the Bankruptcy Code provides that where all requirements for confirmation except § 1129(a)(8) are met, the bankruptcy court "shall confirm" a Chapter 11 plan "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). Confirmation under § 1129(b) is "referred to as a 'cramdown' because the secured claims are reduced to the present value of the collateral, while the remainder of the debt becomes unsecured, forcing the secured creditor to accept less than the full value of its claim and thereby allowing the plan to be 'crammed down the throats of objecting creditors.'" *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 304 (3d Cir. 2010) (quoting *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1359 (7th Cir. 1990)). As will be discussed more fully below, the Debtor must satisfy the cramdown requirements of § 1129(b) with respect to FCRE's secured claim because it is an impaired class that has not accepted the Plan.

The Court has an independent duty to determine compliance with each of the

Bankruptcy Code's confirmation requirements, including, if necessary, the cramdown requirements of § 1129(b). *In re Lett*, 632 F.3d 1216, 1229 (11th Cir. 2011) ("Importantly, the Bankruptcy Code envisions a bankruptcy court exercising an independent duty to ensure that the strictures of § 1129(b) are met with regard to impaired classes of creditors in a Chapter 11 cram down."); *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1299 n.4 (11th Cir. 2001) ("A court must independently satisfy itself that these criteria [in § 1129] are met. Thus, it must consider facts relating to these criteria even in the absence of an objection.").

> (ii) <u>11 U.S.C. § 1129(a)(1)</u>

Section 1129(a)(1) requires that the Debtor's Amended Plan comply with all of the applicable provisions of the Bankruptcy Code. "The Code does not define the phrase 'applicable provisions,' however, it is aimed at compliance with 11 U.S.C. § 1122 and 1123." *In re Multiut Corp.*, 449 B.R. 323, 333 (Bankr. N.D. Ill. 2011). "The legislative history for this section states that '[p]aragraph (1) requires that the plan comply with the applicable provisions of Chapter 11, such as section 1122 and 1123, governing classification and contents of a plan.'" *Id.* (quoting H.R.REP. NO. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 6368; S.REP. No. 95-989, at 126 (1978)). *See also In re Akinpelu*, 530 B.R. 822, 824 (Bankr. N.D. Ga. 2015) (Diehl, J.) ("Under Section 1129(a)(1), the plan must comply with 'applicable provisions' of the Code including Sections 1122 and 1123.").

Some courts hold that release and exculpation clauses are subject to review under § 1129(a)(1). *In re TCI 2 Holdings, Inc.*, 428 B.R. 117, 132-33 (Bankr. D.N.J. 2010). Here, the Debtor's Amended Plan provides that "[c]onfirmation of this Plan shall act as an

injunction against any collection efforts against L. Christopher Kettles, Guarantor of the FCRE debt. So long as the Debtor is not in default of the terms of the Confirmed Plan, FCRE is prohibited from initiation or continuing any action to collect from L. Christopher Kettles on his guaranty obligation." (Dckt. 374, p. 8). FCRE challenges this provision on the basis that Mr. Kettles is deceased. (Dckt. 514, p. 24). The Court agrees with FCRE.

The starting point for analyzing third-party releases is 11 U.S.C. § 524(e), which states as follows:

> (e) Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.

11 U.S.C. § 524(e). Based on this provision, "[c]ircuit courts in the Fifth, Ninth, Tenth and the District of Columbia Circuits have held that the Bankruptcy Code only permits a bankruptcy court to grant releases against a debtor, and prohibits third-party releases absent consent." *In re Avanti Commc'ns. Grp. PLC*, 582 B.R. 603, 606 (Bankr. S.D.N.Y. 2018) (collecting cases). In contrast, "[c]ircuit courts in the Second, Fourth, Sixth, Seventh and Eleventh Circuits have held that third-party releases may be given consensually and, in limited circumstances, may be approved without consent." *Id.* In these circuits, a bankruptcy court's authority to approve third-party releases derives from 11 U.S.C. § 105(a), which provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

The Eleventh Circuit addressed the issue of third-party releases in *SE Property Holdings, LLC v. Seaside Eng'g & Surveying, Inc. (In re Seaside Eng'g & Surveying, Inc.)*,

780 F.3d 1070 (11th Cir. 2015). There, the Eleventh Circuit stated as follows:

. . .

In particular, we respectfully disagree with the position of the minority circuits with respect to § 524(e). As noted, that section, in relevant part, provides that the "discharge of a debt of the debtor does not affect the liability of another entity on . . . such debt." We agree with the Seventh Circuit in *Airadigm*: "The natural reading of this provision does not foreclose a third-party release from a creditor's claims." 519 F.3d 640, 656 (2008). Pursuant to § 524(e), the discharge of the debtor's debt does not itself affect the liability of a third party, but § 524(e) says nothing about the authority of the bankruptcy court to release a non-debtor from a creditor's claims. As the *Airadigm* court noted, if Congress had meant to limit the powers of bankruptcy courts, it would have done so clearly, as it did in other instances, or it would have done so by creating requirements for plan confirmation as in 11 U.S.C. § 1129(a) ("The court shall confirm a plan only if the following requirements are met . . . .").

Consistent with the majority view, we agree that § 105(a) codifies the established law that a bankruptcy court "applies the principles and rules of equity jurisprudence." *Airadigm*, 519 F.3d at 657 (quoting *Pepper v. Litton*, 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939)). We also agree, however, with the majority view that such bar orders ought not to be issued lightly, and should be reserved for those unusual cases in which such an order is necessary for the success of the reorganization, and only in situations in which such an order is fair and equitable under all the facts and circumstances. The inquiry is fact intensive in the extreme.

*Seaside Eng'g*, 780 F.3d at 1078-79. The Eleventh Circuit then adopted the seven-factor test

established by the Sixth Circuit in *In re Dow Corning Corp.*, 280 F.3d 648 (6th Cir. 2002):

[W]hen the following seven factors are present, the bankruptcy court may enjoin a non-consenting creditor's claims against a non-debtor: (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to

pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and; (7) The bankruptcy court made a record of specific factual findings that support its conclusions.

*Seaside Eng'g*, 780 F.3d at 1079 (quoting *Dow Corning*, 280 F.3d at 658). The Eleventh Circuit emphasized "that bankruptcy courts should have discretion to determine which of the *Dow Corning* factors will be relevant in each case" and that "[t]he factors should be considered a nonexclusive list of considerations, and should be applied flexibly, always keeping in mind that such bar orders should be used 'cautiously and infrequently,' . . . and only where essential, fair, and equitable." *Id.* (quoting *Behrmann v. National Heritage Foundation*, 663 F.3d 704, 712 (4th Cir. 2011)).

Having considered the *Dow Corning* factors, the Court finds that the release of Mr. Kettles (or, rather, his Estate) is not appropriate in these circumstances. Although Mr. Kettles was guarantor of the debt to FCRE, he passed away on June 7, 2018, and thus the Court finds that there is no longer any identity of interests between the Debtor and Mr. Kettles, and that the injunction is not essential to the Debtor's reorganization. Moreover, the impacted class, FCRE, opposes confirmation of the Amended Plan. Accordingly, the Court will not confirm a plan that includes this provision.[60]

Apart from the issues surrounding the third-party release, there has been no suggestion that the Debtor's Amended Plan violates sections 1122 or 1123 of the Bankruptcy Code, and the Court concludes based on its independent review that the Amended Plan

---

[60] If this was the only defect in the Amended Plan, it could simply be stricken. But there are others.

satisfies the requirements of 11 U.S.C. § 1129(a)(1).

    (iii) <u>11 U.S.C. § 1129(a)(2)</u>

        Section 1129(a)(2) requires the Court to find that "[t]he proponent of the plan [has] complie[d] with the applicable provisions" of the Bankruptcy Code. 11 U.S.C. § 1129(a)(2). "The legislative history of this section indicates that Congress was concerned 'that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure." *Multiut*, 449 B.R. at 339 (quoting H.R. REP. NO. 95-695, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 6368; S. REP. No. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5912). *See also TCI 2 Holdings*, 428 B.R. at 170 (Section 1129(a)(2) "requires that the plan proponent comply with the adequate disclosure requirements of § 1125."). "Additionally, § 1129(a)(2) mandates compliance with court orders issued in furtherance of the reorganization process." *Multiut*, 449 B.R. at 339.

        Here, the Court previously approved (dckt. 486) the Debtor's Amended Disclosure Statement. (Dckt. 373). Further, the Court has not been provided with any evidence that the Debtor failed to comply with the Court's Order Requiring Debtor-In-Possession to Mail Order Approving Amended Disclosure Statement (dckt. 487) regarding service of the approved Amended Disclosure Statement and solicitation of votes. Accordingly, the Court concludes that the Debtor has complied with the applicable provisions of the Bankruptcy Code as required by 11 U.S.C. § 1129(a)(2).

    (iv) <u>11 U.S.C. § 1129(a)(3)</u>

        Section 1129(a)(3) requires that the Amended Plan be "proposed in good faith

and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "The good faith requirement merely requires 'that there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Code.'" *In re 431 W. Ponce De Leon, LLC*, 515 B.R. 660, 673 (Bankr. N.D. Ga. 2014) (quoting *McCormick v. Banc One Leasing Corp. (In re McCormick)*, 49 F.3d 1524, 1526 (11th Cir. 1995)). "In assessing whether the plan was proposed in good faith, the assessment is focused on the plan itself, while also considering the totality of circumstances surrounding the Plan." *Id.* (citing *Piper Aircraft Corp.*, 244 F.3d at 1300). The good faith requirement is met when the plan is proposed with a "legitimate and honest purpose to reorganize and has a reasonable hope of success." *McCormick*, 49 F.3d at 1526.

Here, FCRE contends that the "Amended Plan violates the provisions of 11 U.S.C. § 1129(a)(3) because it places too much risk of reorganization on FCRE" and because it was "proposed by a legally defunct, dissolved Debtor." (Dckt. 499, p. 1). The risk to the creditor, however, is more appropriately analyzed under §§ 1129(a)(8) and 1129(a)(11), as counsel for FCRE acknowledged at the confirmation hearing. (10/1/18 Transcript p. 104). And the Court has previously ruled that the Debtor was a valid limited partnership under Georgia law and thus was eligible to seek reorganization under Chapter 11. (Dckt. 509). The Court has not been presented with any evidence that the Debtor filed its Amended Plan for some other reason than to further a legitimate effort to reorganize or to preserve the Debtor's business as a going concern. Accordingly, the Court concludes that the Amended Plan was filed in good faith, in satisfaction of the requirements of 11 U.S.C. § 1129(a)(3).

(v) 11 U.S.C. § 1129(a)(4)

Section 1129(a)(4) requires that all payments made, or to be made, by the Debtor "for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4). "'This subsection mandates full disclosure of all payments or promises of payment for services, costs, and expenses in connection with the case, and subjects the reasonableness of such payments to the scrutiny and approval of the court.'" *In re Trenton Ridge Inv'rs, LLC*, 461 B.R. 440, 473 (Bankr. S.D. Ohio 2011) (quoting *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988)). "It [is] not necessary for the Debtor[] to specifically provide for the Court's consideration and approval of professional fee applications in order for the Court to find compliance with § 1129(a)(4). *Id.*

Here, the Debtor's Amended Plan provides that the "McCallar Law Firm shall continue to be attorneys for the Debtor through the confirmation date and thereafter and shall be entitled to compensation from funds of the Debtor up to confirmation when and as approved by the Court." (Dckt. 374, p. 11). And FCRE has not suggested that the Amended Plan violates § 1129(a)(4). Accordingly, the Court concludes that the Debtor has satisfied the requirements of 11 U.S.C. § 1129(a)(4).

(vi) 11 U.S.C. § 1129(a)(5)

Section 1129(a)(5) requires that: (i) the plan proponent disclose the identity and affiliations of the proposed officers and directors of the reorganized debtor or any successor

108

to the original debtor; (ii) the appointment of such officers and directors be consistent with the interests of the creditors and equity security holders and with public policy; and (iii) the plan proponent disclose the identity and compensation of any insiders to be retained or employed by the reorganized debtor.

In its Objection to Confirmation (dckt. 499), FCRE argued that the Debtor's Amended Plan fails to "properly identify the proposed officers and directors of the reorganized Debtor, or identify the compensation of any insiders of the Debtor," in violation of § 1129(a)(5). At the confirmation hearing, the Court directed Debtor's counsel to further amend the Amended Plan in compliance with § 1129(a)(5). (10/1/18 Transcript pp. 104-05). On November 1, 2018, the Debtor accommodated the Court's request by filing its First Amendment to Debtor's Amended Chapter 11 Plan Proposed March 8, 2018. (Dckt. 559). The Amendment includes the following paragraph:

**<u>Officers and Officers Compensation</u>**

***Sharan Kettles is the sole officer and board member of ABGP, Inc., the general partner of the Debtor. The Estate of*** L. Christopher Kettles is the 100% owner of ABGP, Inc., which is the general partner of Debtor. The August Group, Inc., is the manager of the Debtor and shall be compensated based on 5% of collected revenues on a monthly basis.

(Dckt. 559, p. 8) (emphasis in original). Based on this amendment to the Amended Plan, the Court finds that the requirements of 11 U.S.C. § 1129(a)(5) have been satisfied.

(vii) <u>11 U.S.C. § 1129(a)(6)</u>

Section 1129(a)(6) requires that any regulatory commission having jurisdiction over the rates charged by the reorganized debtor has approved any rate changes provided for in the plan. "This subsection requires debtors subject to governmental regulation of their

prices or rates to obtain governmental approval of any rate changes in the plan." *In re Sentinel Mgmt. Grp.*, 398 B.R. 281, 316 (Bankr. N.D. Ill. 2008). Here, the Debtor does not charge any rates subject to regulatory approval, and thus § 1129(a)(6) is not applicable.

(viii) <u>11 U.S.C. § 1129(a)(7)</u>

Section 1129(a)(7), more commonly known as the "best-interest-of-creditors test," requires that "with respect to each impaired class, the class must unanimously accept the plan or each holder of a claim within the class must receive under the plan at least what such holder would receive under a Chapter 7 liquidation." *Trenton Ridge*, 461 B.R. at 473-74. *See also Ponce De Leon*, 515 B.R. at 692 (quoting *Mercury Capital Corp. v. Milford Connecticut Assoc., L.P.*, 354 B.R. 1, 8 (D. Conn. 2006)) (Section 1129(a)(7)(A)(ii) "only requires that 'a dissenting creditor [receive] at least as much value as the dissenting creditor would receive under a Chapter 7 liquidation.").

In this case, the only non-accepting impaired class is comprised solely of FCRE's secured claim. It is not in dispute that FCRE's claim is oversecured, and thus FCRE would likely receive a 100% distribution in a Chapter 7 liquidation of the Debtor.[61] However, the Amended Plan also provides that FCRE's claim will be paid in full, with interest, albeit over an extended period of time. "By definition," under these circumstances, "the Plan cannot fail the best interests test of § 1129(a)(7)." *See In re Couture Hotel Corp.*, 536 B.R. 712, 736 (Bankr. N.D. Tex. 2015) (noting that the best interests test "is not whether creditors

---

[61] The Debtor has prepared a liquidation analysis attached to the Amended Plan as Exhibit "A." (Dckt. 374-1). This analysis, which the Court finds credible, indicates that the Chapter 7 liquidation value of all the Debtor's assets would be $5,411,150.10. (Dckt. 374-1, p. 2).

110

will receive more 'up front' or more overall, but whether creditors will receive at least as much as they would in a chapter 7 liquidation"). Because FCRE would receive under the Amended Plan at least as much as it would receive in a Chapter 7 liquidation, the Court concludes that § 1129(a)(7) has been satisfied.

(ix) <u>11 U.S.C. § 1129(a)(8)</u>

Section 1129(a)(8) provides that "[w]ith respect to each class of claims or interests – (A) such class has accepted the plan; or (B) such class is not impaired under the plan." 11 U.S.C. § 1129(a)(8). In this case, only one impaired class, comprised of FCRE's secured claim, did not accept the Debtor's Amended Plan. However, 11 U.S.C. § 1129(b) provides that "if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). Thus, the Court may still confirm the Debtor's Amended Plan if it satisfies the cramdown provisions of 11 U.S.C. § 1129(b) with respect to FCRE's secured claim. *See In re 20 Bayard Views, LLC*, 445 B.R. 83, 99 (Bankr. E.D.N.Y. 2011).

Here, FCRE argues that the Amended Plan does not provide for the "fair and equitable" treatment of its secured claim. (Dckt. 499, p. 2). "[T]he phrase 'fair and equitable' is not a vague exhortation to bankruptcy judges that they do the right thing; rather, it implements the so-called absolute priority rule under which an objecting class must be paid

in full before any claim or interest junior to it gets anything at all." *Lett*, 632 F.3d at 1228-29

(quoting *In re Perez*, 30 F.3d 1209, 1212-13 (9th Cir. 1994)). Pursuant to 11 U.S.C. §

1129(b)(2), a plan is "fair and equitable" with respect to a class of secured claims if it

provides:

> (i)(I) that the holders of such claims retain the liens securing such claims,
> whether the property subject to such liens is retained by the debtor or transferred
> to another entity, to the extent of the allowed amount of such claims; and
>
> (II) that each holder of a claim of such class receive on account of such claim
> deferred cash payments totaling at least the allowed amount of such claim, of a
> value, as of the effective date of the plan, of at least the value of such holder's
> interest in the estate's interest in such property;
>
> . . .

11 U.S.C. § 1129(b)(2)(A)(i)(I)-(II).

There is no dispute that FCRE will retain its pre-petition lien under the

Amended Plan. *See* (Dckt. 374, p. 5) ("FCRE shall retain its existing lien on the Property

until its claim is paid in full according to the terms of this plan or otherwise."). FCRE,

however, argues that the Amended Plan fails to provide deferred cash payments equal to the

present value of FCRE's secured claim. (Dckt. 499, p. 20). A secured creditor receives the

present value of its claim if "the deferred payments, discounted to present value by applying

an appropriate interest rate . . . equal[s] the allowed amount of the secured creditor's claim."

*J.C. Householder Land Tr. #1*, 501 B.R. at 452. Thus, the Court must determine the

appropriate interest rate, and that determination requires an analysis of *Till*.

"For most courts, a cramdown interest rate methodology begins with review

of the Supreme Court's plurality decision in *Till v. SCS Credit Corp.*, 541 U.S. 465, 124

S.Ct. 1951, 158 L.Ed.2d 787 (2004)." *In re LMR, LLC*, 496 B.R. 410, 427 (Bankr. W.D. Tex. 2013). In *Till*, a Chapter 13 case, "the Supreme Court plurality adopted a 'formula approach' (sometimes called the 'prime-plus approach') to determine cramdown interest rates." *Id.* Under this formula approach, the court "start[s] with the national prime rate of interest and adjust[s] the prime rate upward for risk." *Id.*

In the "now infamous footnote 14," however, the Supreme Court plurality "seemed to suggest that although in Chapter 13 (consumer) cases there is no efficient market of cramdown lenders, the same may not be true in Chapter 11 (business) cases, and thus 'it may make sense to ask what rate an efficient market would produce' in determining a cramdown interest rate in Chapter 11 cases." *Id.* at 427-28 (quoting *Till*, 541 U.S. at 477 n.14). Some appellate courts have held "that a prerequisite to applying the *Till* formula approach in Chapter 11 is a finding that no 'efficient market' exists for the cramdown loan, based on footnote 14 in *Till*." *Id.* at 429. *See, e.g., Matter of MPM Silicones, L.L.C.*, 874 F.3d 787, 800-01 (2d Cir. 2017) ("[W]here, as here, an efficient market may exist that generates an interest rate that is apparently acceptable to sophisticated parties dealing at arms-length, we conclude, consistent with footnote 14, that such a rate is preferable to a formula improvised by a court"); *Bank of Montreal v. Official Comm. of Unsecured Creditors (In re American HomePatient, Inc.)*, 420 F.3d 559, 568 (6th Cir. 2005) (Footnote 14 "means that the market rate should be applied in Chapter 11 cases where there exists an efficient market. But where no efficient market exists for a Chapter 11 debtor, then the bankruptcy court should employ the formula approach endorsed by the *Till* plurality."). Other appellate courts,

113

however, have expressed skepticism of this efficient market approach. *See In re Texas Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 337 (5th Cir. 2013) ("Among the courts that adhere to Footnote 14, most have held that markets for exit financing are 'efficient' only if they offer a loan with a term, size, and collateral comparable to the forced loan contemplated under the cramdown plan").

In 2015, the Eleventh Circuit addressed the issue of the appropriate cramdown interest rate in *SE Property Holdings, LLC v. Seaside Eng'g & Surveying, Inc. (In re Seaside Eng'g & Surveying, Inc.)*, 780 F.3d 1070 (11th Cir. 2015). There, the Eleventh Circuit stated as follows:

> The Supreme Court adopted the formula approach for determining the interest rate payable to creditors in bankruptcy proceedings. *Till v. SCS Credit Corp.*, 541 U.S. 465, 478–79, 124 S.Ct. 1951, 1961, 158 L.Ed.2d 787 (2004). "Taking its cue from ordinary lending practices, the approach begins by looking to the national prime rate . . . . Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly." *Id.* Here, the bankruptcy court applied this formula, adding a 1% adjustment to the prime rate of 3.25%. The 1% adjustment is within the range suggested by the Supreme Court in *Till*, 124 S.Ct. at 1962, and therefore the bankruptcy court committed no clear error.

*Seaside Eng'g*, 780 F.3d at 1083. Based on this paragraph, this Court has previously used the *Till* "prime-plus" formula to calculate the interest rate in a Chapter 11 cramdown case. *See In re Mableton, LLC*, No. 15-40124-EJC, 2017 WL 2480579, at *13 (Bankr. S.D. Ga. June 7, 2017).

Here, the Debtor contends that *Till* is not controlling. Accordingly, the Amended Plan provides that the Debtor shall continue making its regular monthly payments

114

to FCRE at the contract rate[62] of interest (4.04%) for seven (7) years from April 15, 2018," with "the remaining balance of the debt . . . due and payable on April 15, 2025." (Dckt. 374, p. 5). Although it is true that the Eleventh Circuit in *Seaside Eng'g* did not expressly *require* the application of the *Till* formula, this Court agrees with the Fifth Circuit's observation that "many courts have followed the *Till* formula approach because they were persuaded by the *Till* plurality's reasoning, not because they considered it binding." *LMR,* 496 B.R. at 428 (citing *Texas Grand*, 710 F.3d at 331). Consequently, "the *Till* formula approach has now become the 'default rule' in Chapter 11 bankruptcies," followed by the "vast majority" of bankruptcy courts. *Id.* (citing *Texas Grand*, 710 F.3d at 336). Accordingly, the Court will apply the *Till* rate after first considering whether an efficient market rate exists.

At the confirmation hearing, the Debtor offered no evidence as to whether an efficient market exists for the cramdown rate proposed in the Amended Plan. The only evidence for the existence of such a market came from the testimony of Ms. Davenport on behalf of FCRE. Ms. Davenport explained that "the largest market with the most public information is the commercial mortgage-backed securities ["CMBS"] market." (10/1/18 Transcript pp. 282-83). As illustrated in Exhibit "FCRE 163," Ms. Davenport identified eight CMBS transactions in the previous six months of "newly originated multifamily loans by various lenders in the CMBS market." (10/1/18 Transcript p. 283). The weighted average

---

[62] At the October 1, 2018 confirmation hearing, Debtor's counsel argued that the contract rate of 4.04% is the appropriate cramdown interest rate because the Debtor has never defaulted on its payments to FCRE. (10/1/18 Transcript pp. 325-30). The Debtor failed to cite, and the Court has not found, any cases supporting this argument in favor of the contract rate. The Court therefore rejects this argument by the Debtor.

mortgage coupon on these loans was 4.9702%. (10/1/18 Transcript p. 286). Because these loans originated when prime was increased from 5.00% to 5.25%, new originations would "have 25 basis points more spread in them." (10/1/18 Transcript p. 286). Ms. Davenport then adjusted this rate based on the "bad credit qualities of a bankrupt debtor and a plan and old collateral and questionable rents and accounting information," resulting in at a market rate of 7.46%. (10/1/18 Transcript pp. 281-87; dckt. 514 pp. 16-17). Although Ms. Davenport must be commended for her efforts to calculate a market rate, the Court finds that FCRE's evidence was insufficient to establish the existence of an efficient market for the cramdown loan proposed in the Debtor's Amended Plan. Accordingly, the Court will apply the "prime-plus" formula established by the Supreme Court in *Till*.

To determine an appropriate cramdown interest rate using the "prime-plus" formula, the Court must look to the national prime rate and provide some upward adjustment to account for a debtor's increased likelihood of default. *Till*, 541 U.S. at 479. The Supreme Court stated that the burden of proof on any upward adjustment to the prime rate is "squarely on the creditors." *Id. See also In re Tapang*, 540 B.R. 701, 707 (Bankr. N.D. Cal. 2015); *In re Pamplico Highway Dev., LLC*, 468 B.R. 783, 792 (Bankr. D.S.C. 2012) ("The burden of establishing the proper risk adjustment is borne by the creditor.").

Courts generally apply a 1% to 3% upward adjustment depending on "the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Till*, 541 U.S. at 479. In addition, some courts evaluate the quality of the debtor's management, the commitment of the debtor's owners, and the health and future

prospects of the debtor's business. *LMR*, 496 B.R. at 430.

Here, the parties stipulated that at the time of the October 1, 2018 confirmation hearing, the national prime rate was 5.25%.[63] (10/1/18 Transcript pp. 16-17, 228-29, 243-44). Based on the evidence presented at the confirmation hearing, the Court finds that FCRE has carried its burden of establishing that a two-percent upward adjustment to prime is appropriate. Particularly concerning to the Court is the age of the Property (over 40 years). The Debtor's monthly operating reports do not reflect many substantial improvements to the Property beyond day-to-day maintenance. Indeed, Mrs. Kettles testified that the buildings will need to be painted, and the parking lot resurfaced, within the next five years. At the February 21, 2018 status conference on valuation, the Court estimated, based on the testimony of Mr. Batson, that deferred maintenance at the Property would require approximately $250,000.00 to cure. (2/21/18 Transcript p. 41). Although Mr. McNair testified that rental rates in Port Royal will probably continue in a healthy trend, the Debtor has limited cash reserves for any large projects.

The Court is also concerned about the Debtor's ownership and management. With regard to the owners' commitment to the proposed reorganization, Mrs. Kettles now has the responsibility of running the Debtor's operations. She has undertaken to continue managing the Property, largely out of loyalty to her late husband, from her home in Florida. For her services over the years, she has received only nominal consideration, and any return

---

[63] On December 20, 2018, the prime rate increased to 5.50%, where it currently stands. *See* Federal Reserve Statistical Release H-15, https://www.federalreserve.gov/releases/h15/. FCRE brought this rate increase to the Court's attention in its Third Supplemental Objection and Brief in Opposition to Confirmation of Debtor's Amended Chapter 11 Plan. (Dckt. 565).

on her investment of time and effort will occur, if at all, only years down the road. To make matters worse, she will soon be embroiled in a probate court fight with FCRE. But even if the Court did not doubt her commitment, the Court questions whether she has the requisite skills to handle all of the financial aspects of management. Before 2003, she had no experience managing properties and has been learning on the job since that time. Further, throughout this litigation, the Debtor has delayed obtaining the proper licensing for its property manager, Ms. Mosqueira. While there was some debate about whether South Carolina law or the loan documents required a licensed property manager, Mr. and Mrs. Kettles seemed unable to put such a person in place. These factors do not inspire complete confidence in the Debtor's management team.

Accordingly, the Court agrees with FCRE that the appropriate cramdown interest rate for its secured claim is prime (as of the confirmation hearing) plus two percent, or 7.25%. The Debtor's proposed cramdown rate of 4.04%, therefore, is insufficient to provide FCRE with the "present value" of its claim under the *Till* approach. Therefore, the Debtor's Amended Plan does not satisfy the cramdown requirements of § 1129(b)(2)(A)(i)(II) and cannot be confirmed over the objection of FCRE. And, as will be seen, the required cramdown rate also creates an impediment to feasibility.

(x) 11 U.S.C. § 1129(a)(9)

"Section 1129(a)(9) provides treatment for priority claims." *431 W. Ponce De Leon*, 515 B.R. at 676. In this case, the Debtor's Amended Plan provides the following treatment of priority claims:

**UNCLASSIFIED CLAIMS**

1. The § 507(a)(2) fees and expenses of McCallar Law Firm for representing Debtor in this case are to be paid when allowed by the Bankruptcy Court from cash on hand held by Debtor or as may be remaining on retainer or as may be paid by a third party.

2. All other § 507(a)(2) administrative expenses, including the U.S. Trustee's quarterly fees, shall be paid current no later than the effective date of the Plan, except as otherwise agreed upon by the administrative expense claimant. Upon confirmation, the Debtor will continue to pay quarterly U.S. Trustee fees until the case is closed, converted, or dismissed. 28 U.S.C. § 1930(a)(6).

3. All remaining § 507 unclassified claims, to include § 507(a)(8), will receive on account of such claim regular payments of a total value, as of the effective date of the plan, equal to the allowed amount of such claim, over a period ending not later than five (5) years from the effective date of the plan, to include interest at a rate of 4% or the prevailing interest rate as established and utilized by the governmental entity involved . . . .

(Dckt. 374, p. 3) (emphasis in original). There are only two priority claims in this case. First is the § 507(a)(8) priority tax claim filed by the Internal Revenue Service, which has been amended a number of times and currently stands at $4,132.94. (Claim 3-8). FCRE does not object to the treatment of this claim in the Amended Plan, and the Court finds that the Amended Plan satisfies the requirements of § 1129(a)(9)(C).

The second priority claim in this case is the administrative claim of the McCallar Law Firm (dckt. 374-2, p. 2), and FCRE objects to the treatment of this claim in the Amended Plan. When the Amended Plan was filed, that claim was estimated at $125,000.00. (Dckt. 374, p. 3). At the confirmation hearing, however, Debtor's counsel represented that unpaid administrative fees totaled $175,000.00. (10/1/18 Transcript p. 107). That amount likely continues to increase.

Section 1129(a)(9)(A) requires that the holder of an administrative claim be paid "cash equal to the allowed amount of such claim" on the effective date of the plan, unless the claimant agrees to different treatment." 11 U.S.C. § 1129(a)(9)(A). "The Code clearly requires the full payment of all allowed administrative expenses." *TCI 2 Holdings*, 428 B.R. at 173. "Put differently, '[t]he Code's confirmation scheme elevates allowed administrative claims to a dominant priority such that unless the holders agree to a different treatment, a plan cannot be confirmed without full payment of those claims even if there are no estate assets to pay them.'" *In re Molycorp, Inc.*, 562 B.R. 67, 77-78 (Bankr. D. Del. 2017) (quoting *In re Scott Cable Communications, Inc.*, 227 B.R. 596, 600 (Bankr. D. Conn. 1998)).

Here, the Amended Plan states that the administrative claims will be "[p]aid in [f]ull at Confirmation by L. Christopher Kettles." (Dckt. 374, p. 3). FCRE objects on the basis that "all of Kettles' assets are now part of Kettles['] Estate, which remain subject to estate administration at this time" and that "until such time as FCRE's claim is adjudicated, assets of the Kettles Estate may not be disbursed."[64] (Dckt. 514, pp. 8-9). The Court agrees with FCRE and finds that the Debtor has not adequately explained how the administrative claims will be paid.[65] Accordingly, the Amended Plan, in its current form,[66] does not satisfy

---

[64] FCRE also suggests that any administrative claims sought "should be rejected" because the Debtor was ineligible to file this Chapter 11 case due to the administrative dissolution of its corporate general partner. (Dckt. 514, p. 24). The Court, however, has already rejected FCRE's argument on this issue. (Dckt. 509, dckt. 510).

[65] FCRE states that "[b]ased on the Debtor's submitted Monthly Operating Reports, there is insufficient excess cash on hand from the Property operations to provide payment for these administrative expenses[.]" (Dckt. 514, p. 9). As of the writing of this Opinion, however, the most recently monthly operating report reflects cash on hand of over $190,000.00. (Dckt.

11 U.S.C. § 1129(a)(9). This defect, however, could be easily corrected by further amending the Amended Plan to explicitly provide that the allowed administrative claim will be paid in full on the plan's effective date or to disclose that the McCallar Law Firm has agreed to a different treatment of its claim.[67]

    (xi) <u>11 U.S.C. § 1129(a)(10)</u>

        Under § 1129(a)(10), "[i]f a class of claims is impaired under the plan," then it must be the case that "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). "The purpose of § 1129(a)(10) is to provide some indicia of support for a plan of reorganization by affected creditors and prevent confirmation where such support is lacking." *In re All Land Invs., LLC*, 468 B.R. 676, 689 (Bankr. D. Del. 2012) (quoting *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 243-44 (3d Cir. 2004)).

        Here, FCRE contends that the Amended Plan violates § 1129(a)(10) because "there may not be one class of impaired claims that have accepted the Plan (ignoring insiders)."[68] (Dckt. 514, pp. 2, 9). The Court disagrees. The Amended Plan includes three classes: the secured claim of FCRE, the general unsecured claims of non-insiders, and the

---

585, p. 25).

    [66] The Debtor's post-confirmation hearing amendment (dckt. 559) to the Amended Plan makes no provision for these administrative fees.

    [67] *See In re Mableton, LLC*, No. 15-40124-EJC, 2017 WL 2480579, at *15 (Bankr. S.D. Ga. June 7, 2017).

    [68] At the confirmation hearing, counsel for FCRE conceded that FCRE may "have no basis to object" under § 1129(a)(10). (10/1/18 Transcript p. 102).

general unsecured claims of insiders. (Dckt. 374, p. 3). FCRE, of course, has rejected the plan. (Dckt. 500). Mr. Kettles' Estate, which comprises the class of general unsecured claims of insiders, has accepted the plan. (Dckt. 507). Because Mr. Kettles' Estate is clearly an insider, its acceptance does not satisfiy the requirements of § 1129(a)(10).

That leaves the class of general unsecured claims of non-insiders, which consists of Coltrane & Wilkins, LLC ($3,377.17); Mahany Law ($2,870.00); Sherwin Williams ($976.35); Stanley Steamer ($109.00), and Whitmore Plumbing ($347.48). (Dckt. 374-2, p. 3). For the Amended Plan to comply with § 1129(a)(10), this class must have accepted the Amended Plan. From this class, ballots accepting the Amended Plan were filed by all claimholders except Sherwin Williams, which returned a blank ballot. (Dckt. 495, dckt. 496, dckt. 498, dckt. 511, dckt. 528).

There has been no suggestion that any of these claimholders are statutory insiders under 11 U.S.C. § 101(31) or non-statutory insiders, and the Court finds that none of them are. *See U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Management LLC v. Village at Lakeridge, LLC*, 138 S.Ct. 960, 963-64 (2018) ("[C]ourts have devised tests for identifying . . . 'non-statutory' insiders. The decisions are not entirely uniform, but many focus . . . on whether a person's 'transaction of business with the debtor is not at arm's length.'"). The Court further finds that the four acceptances from this class, which together hold claims in the amount $6,703.65 out of the total $7,680.00 held by the entire class, satisfy the requirements of § 1126(c), which states that a class accepts a plan so long as creditors "that hold at least two-thirds in amount and more than one-half in number of the

allowed claims of such class[.]" 11 U.S.C. § 1126(c). The Court therefore finds that the Amended Plan satisfies § 1129(a)(10).

(xii) <u>11 U.S.C. § 1129(a)(11)</u>

Under § 1129(a)(11), the Court is required to determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). Although the Bankruptcy Code does not use the terms "feasible" or "feasibility," the requirements set forth in § 1129(a)(11) are commonly known as the "feasibility test." *In re Two Streets, Inc.*, — B.R. —, 2019 WL 989410, at *7 (Bankr. S.D. Miss. Feb. 26, 2019).

The feasibility standard does not require the debtor to guarantee success. *In re Brandywine Townhouses, Inc.*, 524 B.R. 889, 892 (Bankr. N.D. Ga. 2014) (Ellis-Monro, J.) (quoting *In re Diplomat Constr., Inc.*, No. 09-68613-MGD, 2009 WL 6498180, at *2 (Bankr. N.D. Ga. Nov. 20, 2009)). Rather, the court must consider "whether the plan offers a reasonable probability of success." *Two Streets*, — B.R. —, 2019 WL 989410, at *7. Feasibility does, however, require "more than a promise, hope, or unsubstantiated prospect of success." *Brandywine*, 524 B.R. at 892 (quoting *Diplomat*, 2009 WL 6498180, at *2). This requirement "prevent[s] confirmation of visionary schemes which promise creditors and equity holders more under a proposed plan than the debtor can possibly attain after confirmation. A determination of feasibility must be 'firmly rooted in predictions based on objective fact.'" *Id.* (quoting *Diplomat*, 2009 WL 6498180, at *2). "When assessing whether

a plan of reorganization is feasible, bankruptcy courts consider factors such as the adequacy of the debtor's capital structure, the earning power of the business, economic conditions, the ability of management, the probability of the continuation of the same management, and any other related matter." *Two Streets*, — B.R. —, 2019 WL 989410, at *7. "[A] court can weigh (or indeed ignore) various factors [at] its discretion." *Id.* (quoting *In re Geijsel*, 480 B.R. 238, 257 (Bankr. N.D. Tex. 2012)).

After careful consideration of all of the testimony and other evidence presented, the Court finds that the Debtor has failed to meet its burden of showing that the Amended Plan has a reasonable probability of success. The Court has already pointed out the limited experience of the Debtor's management team, as well as the Debtor's limited cash reserves for major projects. Additionally, the Court is not persuaded by Mr. McNair's feasibility analysis, which was simplistic and was not forward-looking. To satisfy the requirements of § 1129(a)(11), "the debtor must present proof through reasonable projections that there will be sufficient cash flow to fund the plan. Such projections cannot be speculative, conjectural, or unrealistic." *Couture Hotel*, 536 B.R. at 736-37. Here, Mr. McNair's sole projection as to income was based on his reasonable assumption of 2.5% annual rental growth, although he failed to explain how he arrived at his figure of $68,188.25 rental growth over that five-year period. More importantly, he made no attempt to project expenses. "[W]here the financial realities do not support the proposed plan's projections or where proposed assumptions are unreasonable, confirmation of the plan should be denied." *In re 231 Fourth Avenue Lyceum, LLC*, 506 B.R. 196, 203-04 (Bankr. E.D.N.Y. 2014). The

124

Court cannot evaluate whether the financial realities in this case support nonexistent projections. Mr. McNair's analysis also fails to include the payments under the Amended Plan to unsecured insiders at $2,079.64 per month for the first five years. (Dckt. 374-3, p. 1).

At a minimum, to demonstrate feasibility, the Debtor needed to show amortization of FCRE's allowed claim, in addition to the § 506(b) enhancement, at a cramdown rate of 7.25%. The Court made it clear prior to the confirmation hearing that it would employ a *Till* analysis. Yet none of Mr. McNair's scenarios used a 7.25% cramdown rate. Thus, Mr. McNair provided no basis from which to evaluate the feasibility of the Amended Plan at the rate that the Court finds appropriate. His seventh scenario, with a loan balance of $5,250,000.00 amortized over 27.5 years at a 6.25% interest rate, was the closest to the Court's figures of $5,178,499.03 and 7.25%. This scenario resulted in an annual debt service of $400,196.00, or $33,349.67 per month. The Debtor currently pays $18,709.24 per month for principal and interest at 4.04%. (Dckt. 559, p. 2).

Equally important is the Debtor's failure to demonstrate the feasibility of the refinance in seven years. Ms. Davenport also testified that the Debtor's cash flow would be insufficient to make the balloon payment after seven years. (10/1/18 Transcript pp. 276-77). She projected a loan balance of $3.2 million in year seven. *Id.* Although the Court does not accept all of Ms. Davenport's calculations and assumptions, the Debtor offered no evidence whatsoever as to the feasibility of this balloon payment. "If a final payment, in the form of a 'balloon' payment, is proposed to come from new financing to be acquired by the Debtor

in the form of some new lending vehicle, then proof of feasibility is necessary. Whether that balloon payment can likely be made, and new financing acquired, requires credible evidence proving that obtaining that future financing is a reasonable likelihood." *In re Linda Vista Cinemas, L.L.C.*, 442 B.R. 724, 738 (Bankr. D. Ariz. 2010). Aside from the financial performance of the Debtor in year seven, a prospective lender would be interested in the Debtor's management team and other factors, and the Court is not confident that the Debtor would score highly on these metrics. For all of these reasons, the Court finds that the Amended Plan is not feasible under § 1129(a)(11).

    (xiii) <u>11 U.S.C. § 1129(a)(12)</u>

        Section 1129(a)(12) requires that "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan." 11 U.S.C. § 1129(a)(12). Here, the Debtor's Amended Plan provides that administrative expenses arising under 11 U.S.C. § 507(a)(2), "including the U.S. Trustee's quarterly fees, shall be paid current no later than the effective date of the Plan, except as otherwise agreed upon by the administrative expense claimant. Upon confirmation, the Debtor will continue to pay quarterly U.S. Trustee fees until the case is closed, converted, or dismissed." (Dckt. 374, p. 3). Thus, the Amended Plan complies with § 1129(a)(12).

    (xiv) <u>11 U.S.C. §§ 1129(a)(13) to (a)(16)</u>

        The remaining provisions of § 1129(a) do not apply in this case. Subsection (a)(13) concerns certain retiree benefits, subsection (a)(14) concerns domestic support

obligations, subsection (a)(15) applies only to individual debtors, and subsection (a)(16) applies only to nonprofit entities.

For the reasons set forth above, the Court finds that the Debtor's Amended Plan (dckt. 374) fails to satisfy the cramdown requirements of § 1129(b)(2)(A)(i)(II), does not adequately provide for administrative priority claims under § 1129(a)(9), and is not feasible as required by § 1129(a)(11). Therefore, by separate order, the Court will deny confirmation of the Amended Plan. In accordance with FCRE's request,[69] a hearing will be scheduled to determine whether the Court should dismiss the case, convert the case to Chapter 7, appoint a Chapter 11 Trustee, or permit the Debtor or other parties in interest[70] to propose a new plan of reorganization.

Dated at Savannah, Georgia, this 29th day of March, 2019.

Edward J. Coleman, III, Judge
United States Bankruptcy Court
Southern District of Georgia

---

[69] (Dckt. 514, p. 26) ("Accordingly, FCRE requests that the Court deny confirmation and then conduct a hearing to determine whether it is in the best interests of the creditors and equity holders to convert this case to a Chapter 7 case and appoint a Trustee to oversee the sale of the Property, or whether to dismiss the case in its entirety from any further proceedings governed by the bankruptcy code.").

[70] The exclusivity period in this case expired on October 3, 2018. (Dckt. 471).